**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

  -vs-

**RICHARD LEON WILBERN**

17-CR-06016-CJS-JWF
17-CR-06017-CJS-JWF

**NOTICE OF MOTION:**
**IDENTIFICATION EVIDENCE**

| | |
|---|---|
| **MOTION BY**: | Sonya A. Zoghlin, Assistant Federal Public Defender, Attorney for Richard Leon Wilbern. |
| **DATE, TIME & PLACE**: | September 6, 2018 at 9:30 a.m. before the Honorable Jonathan W. Feldman, U.S. Courthouse, Rochester, New York. |
| **SUPPORTING PAPERS**: | Affirmation of Sonya A. Zoghlin, affirmed on July 31, 2018 and all the prior pleadings and proceedings had herein. |
| **RELIEF REQUESTED**: | An Order granting the relief requested herein. |

Dated:  July 31, 2018
     Rochester, New York

                s/Sonya A. Zoghlin
               Sonya A. Zoghlin
               Assistant Federal Defender
               28 East Main Street, Ste. 400
               Rochester, New York 14614
               sonya_zoghlin@fd.org
               Attorney for Richard Leon Wilbern

TO: Douglas Gregory, AUSA

**TABLE OF CONTENTS**

**Page**

I. Procedural History ................................................................................................. 2

II. Motion For Discovery ............................................................................................ 6

III. Motion For Disclosure of *Brady/Giglio* Material .................................................. 11

IV. Motion to Supress Identification Evidence……………………………................... 12

V. Motion Seeking Leave to Make Further Motions ................................................. 14

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 17-CR-06017-CJS-JWF |
| -vs- | **AFFIRMATION** |
| **RICHARD LEON WILBERN** | |

Sonya A. Zoghlin, Assistant Federal Public Defender for the Western District of New York, affirms as follows:

I am an attorney licensed to practice law in the State of New York and the United States District Court for the Western District of New York, and I represent Richard Leon Wilbern.

I am familiar with this case by reasons of the defense's investigation of this matter, conversations with my client and others, and the defense review of the discovery material provided to date by the government.

This affirmation is submitted in support of various forms of relief requested herein, and is based upon the facts as I know them, the Federal Rules of Criminal Procedure, the Federal Rules of Evidence, the United States Constitution, and other pertinent statutes and law.

I hereby incorporate all legal and factual assertions set forth in documents previously filed on Mr. Wilbern's behalf, as well as oral arguments presented before this Court in connection with this case including, but not limited to, those contained in Document 39 (Defendant's Motion for Disclosure Pursuant to Fed.R.Evid. 404(B), 608&609 and Fed.R.Crim.P. Rule 16; Disclosure of *Brady/Giglio* Material and Witness Statements; and Compliance with Fed.R.Crim.P. Rule 12); and at oral argument on March 2, 2018.

I.      **PROCEDURAL HISTORY: Indictment 17-CR-6017**

On September 27, 2016, Richard Wilbern was arrested in connection with the robbery of the Xerox Federal Credit Union in Webster, New York on August 12, 2003, during which an individual was shot and killed. The criminal complaint charged Mr. Wilbern with a Credit Union Robbery, Resulting in Death, in violation of 18 U.S.C. §§2113(a) and (e), and Possession and Discharge of a Firearm in Furtherance of a Crime of Violence, Resulting in Death, in violation of 18 U.S.C. §§924(c)(1)(A)(iii) and (j)(1). On December 15, 2016, the Government announced that it would not seek the death penalty against Mr. Wilbern. On January 24, 2017, Mr. Wilbern was charged by indictment with the same crimes.

Fed.R.Crim.P. Rule 12(b)(4) Notice

On April 28, 2017, the Government filed an initial Rule 12(b)(4) notice. *See* Document 25. Subsequently, the Court ordered the Government to file an updated FED.R.CRIM.P. Rule 12(b)(4) notice; the notice was filed on December 29, 2017. *See* Document 35. The two notices are largely the same.

With respect to the issue of identification, the government advised counsel that it does not expect any witness who was physically present during the offense to be called upon to make an in-court identification of Mr. Wilbern as the perpetrator of the crime. The government provided notice, however, that Mr. Wilbern "has been identified by several individuals as the person depicted on the bank security surveillance video which was widely circulated in media in the aftermath of the Xerox robbery/murder in (*sic*) August 12, 2003, and again in March 2016." *See* Document 35. The government further advised the defense that these individuals had also been asked to make identifications from still photos taken from the surveillance video. The government noted its expectation that these witnesses would be called upon to make an in-court identification at trial of Mr. Wilbern as the person depicted in the videotape. Finally, the

government claimed these witnesses, none of whom were named, had a "long standing familiarity" with Mr. Wilbern. *Id.*

3/2/18 Oral Argument

On March 2, 2018, the Court heard oral argument on Mr. Wilbern's motion to disclose specific information, including potentially exculpatory material required to be disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Kyles v. Whitley*, 514 U.S. 419 (1995).  In the context of identification evidence, the government agreed to provide specific material regarding witnesses who were shown pictures (including surveillance photographs from the date and time of the incident) for the purpose of identifying the perpetrator. Regarding those witnesses who were shown photographs and *did not identify* Richard Wilbern as the perpetrator, the government agreed to provide the defense with the following information:  the name of the witness; the date on which the identification procedure occurred; the circumstances under which it occurred (including the time, place, and specific pictures used with each witness); and the corresponding law enforcement reports.

Regarding witnesses who *identified* Richard Wilbern as the person depicted in the photograph, the government agreed to provide the same information, but declined (over defense objection) to provide the name or other identifying details regarding the witness(es).  The government agreed to provide redacted copies of the relevant police reports.

On March 6, 2018, the Court issued an order, with the consent of both parties, directing the government to provide all *Brady* material in its possession to the defense no later than March 9, 2018, and on an on-going basis as it becomes aware of additional information. *See* Document 44.  In letters dated March 8th, March 15th, and July 19th 2018, AUSA Douglas Gregory provided defense counsel with the names of approximately 21 people who were shown the bank

3

surveillance photographs and did not recognize the person depicted. (Mr. Gregory later clarified that one of these individuals had been listed in error.)

The surveillance photographs shown to the witnesses, copies of which have been provided to defense counsel (and displayed extensively in the press), depict a person wearing a disguise, including sunglasses, a wig, and possibly some sort of bulky vest under his jacket. The quality of the still photographs is poor, despite the apparent "digital enhancement" applied by law enforcement.

The government apparently had a change of heart about their agreement, as expressed during oral argument on March 2, 2018, to provide reports (redacted or otherwise) regarding the procedures during which three of four witnesses are alleged to have identified the person depicted in the bank photographs as Mr. Wilbern. In a letter dated March 8, 2018, Mr. Gregory responded to a defense request for "copies of all documents relating to witnesses you will ask to make an in-court identification of Wilbern at trial who have also previously been shown surveillance images of the perpetrator," as follows: "Any recorded interviews of these witnesses are Jenck's materials and will not be disclosed at this time."

On April 30, 2018, AUSA Gregory provided defense counsel with information regarding four witnesses (identified as witnesses A through D) who were shown multiple photographs from the bank surveillance video during interviews with law enforcement agents. *See* Letter from Douglas Gregory to Anne Burger, dated April 30, 2018, attached as **Exhibit A.** Each of these four people is alleged to have identified the person depicted in the still photographs as Richard Wilbern; the government expects each will make an in-court identification of Mr. Wilbern at trial. Specifically, regarding witnesses B, C, & D, the government provided only the dates on which each identification procedure occurred and the specific pictures displayed to each witness.

According to this information, police agents displayed photos to Witness B on one date in December 2016; to Witness C on three separate dates in September, October and November 2016; and to Witness D on one date in October 2017. The government failed to provide any additional information about these witnesses or the identification procedures in which they participated.

Regarding Witness A [hereinafter "CLB"], the government provided two dates on which identification procedures occurred, September 27, 2016 and November 15, 2016, and attached an FBI report, handwritten notes, and a list of 20 questions entitled "Questions for [Witness A]." The report appears to be based solely on the first interview date, September 27th. The government failed to provide any additional information about the second identification procedure. Notably, though CLB claimed to have had a close, personal relationship with Mr. Wilbern from 1997-1998, she acknowledged not having seen him in at least 15 years.

The material provided confirms that it was law enforcement agents, not CLB, who introduced Richard Wilbern's name into the conversation. Of the 20 questions included in the typed list entitled "Questions for [CLB]," 17 of them were specifically about Wilbern (beginning with Question #2, "how long have you known Richard Wilbern") and including "has he ever expressed anger towards anyone," "has he ever been violent in your presence," "have you ever seen him with an FBI jacket," "what kind of briefcase did he have," "what kind of guns did he have," "what did he say about Xerox?" In an apparent attempt to purge the taint of having introduced his name into the interview before asking CLB to view the photographs, an agent reported the following interaction: "When asked if she thought she was associating the picture with WILBERN now because agents were asking her questions about him, she stated no."

5

**II.   MOTION FOR DISCOVERY**

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure requires the disclosure by the government, upon the defendant's request, of books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody or control and (i) the item is material to preparing the defense. *See* Fed.R.Crim.P. Rule 16(a)(1)(E)(i). The information sought by Mr. Wilbern regarding the multiple identification procedures in this case is, indeed, material to preparing his defense.

To date, the government has provided the defense with banker's boxes full of printed documents and multiple terabytes of data (provided on hard drives, dvds and compact discs). To the best of my knowledge, none of this material provides any information that can be identified as relating to the police arranged identifications referred to in AUSA Gregory's letter dated April 30, 2018.

In defendant's Discovery Motion (document #39), Mr. Wilbern noted that certain requests for information were still outstanding. These requests included the following:

> Information including documents, scripts and photographs relating to the questioning of witnesses and display of surveillance photographs in an effort to obtain identifications of Richard Wilbern as the perpetrator. *See* Document 39 at p. 6.

In support of this request, the defense noted several bases on which to challenge the suggestiveness of these out-of-court identification procedures, as well as the reliability of the in-court identifications anticipated by the government, including the following:

- The poor quality of the surveillance video and still images obtained from the video -- as reiterated by the government in its response to defendant's discovery motion, a proposed expert had previously attempted to compare known facial images of another suspect with the facial images of the person depicted on the bank surveillance tape; he was unable to reach a conclusion based on the "quality of the video tape" and the "lack of visible detail" in the still images taken from the videotape. *See* Document 40, p. 5.

- The fact that no witness, despite the government's assertion that each of them has "a clear and independent basis" upon which to identify Mr. Wilbern (*see* Exhibit A to Government's December 29, 2017, Rule 12(b)(4) notice), had previously come forward to offer this information to law enforcement despite the widespread publicity;

- Two of the actual eye-witnesses to the crime noted that the surveillance images of the perpetrator distorted his actual appearance. (One eye-witness observed that the images made the perpetrator overall look physically chubby when he wasn't; another told law enforcement that the surveillance images made the perpetrator's cheeks appear chubbier than what they had observed during the incident).

The government failed to address any of these concerns. As discussed above, the only information ultimately provided to the defense were the seven dates on which four witnesses are alleged to have made identifications, and a police report describing only one of those dates for only one of those witnesses. The government offered no explanation for the disclosure of details regarding one identification procedure with one witness while withholding the same information about the other three witnesses and six identification procedures. The government should be directed to provide the discovery information as initially requested by the defense or, in the alternative, the information it agreed to provide during oral argument on March 2, 2018 regarding these discovery requests.

Information about pretrial identifications of a defendant made by government witnesses falls within the scope of Rule 16. *See U.S. v. Mitchell*, 540 F.2d 1163, 1166 (3d Cir. 1976), *citing Simmons v. United States*, 390 U.S. 377, 388-89 (1968); *U.S. v. Cranson*, 453 F.2d 123, 125-126, n. 6 (4th Cir. 1971), *cert denied*, 406 U.S. 909 (1972)("pre-trial discovery of the circumstances of any pre-trial identification procedures, whether photographic or otherwise, may likely be available on motion"). Moreover, the material sought herein, i.e., the circumstances surrounding the pre-trial identification procedures, must be disclosed to afford Mr. Wilbern the right to the effective assistance of counsel; to due process; to confront the witnesses against him; to a fair trial; and to prepare and present a defense to the crimes charged. *See* U.S. Const. amend. V, VI.

The subject of identification, and the effect of unduly suggestive identification procedures, has been the subject of extensive research and publications. The Second Circuit has expressed broad acceptance of social science based arguments regarding identification. *See Young v. Conway*, 698 F.3d 69, 87 (2d Cir. 2012). This research has established several general principles, including the following:

- Multiple identification procedures decrease the accuracy of identifications and increase rates of false identifications; *Id* at 78.

- Even subtle disguises can impair the accuracy of an identification; *Id.* at 79.

- People are significantly more prone to identification errors when trying to identify someone of a different race, especially where a Caucasian individual is attempting to identify someone who is African American; *Id.*

- A pre-trial identification may taint an in-court identification based on the "mugshot commitment effect," i.e., having identified that person as the perpetrator, the witness becomes attached to her prior identification and is more likely to identify the same person again in a subsequent ID procedure. *Id.* at 82-83, *citing* Charles A. Goodsell et al., Effects of Mugshot Commitment on Lineup Performance in Young and Older Adults, 23 Applied Cognitive Psychol. 788, 789 (2009).

- "Study after study demonstrates that eyewitness recollections are highly susceptible to distortion by post-event information or social cues; that jurors routinely overestimate the accuracy of eyewitness identifications; that jurors place the greatest weight on eyewitness confidence in assessing identifications even though confidence is a poor gauge of accuracy; and that suggestiveness can stem from sources beyond police orchestrated procedures. *Perry v. New Hampshire*, 565 U.S. 228, 263-264 (2012)(Sotomayor, dissenting)(citations omitted).

- Whatever the cause the effect is that jurors frequently cannot accurately discriminate between correct and mistaken eyewitnesses and rely on the testimony of mistaken eyewitnesses. *Young v. Conway*, 698 F.3d 69 at 88.

- "An otherwise fair pretrial identification procedure may be rendered impermissibly suggestive through subsequent actions or remarks by government agents." <u>United States v. Thai</u>, 29 F.3d 785, 810 (2d Cir. 1994).

Another well-document phenomenon throughout social science is what's referred to as "confirmation bias." *See* Affidavit of Charles A. Goodsell, attached as Exhibit B, at ¶¶7-9. Essentially, confirmation bias in the context of identification procedures can lead people to perceive matches, and thus make identifications, where they don't exist based on an *expectation* of a particular result. The information disclosed by the government regarding the first identification procedure performed with Witness A (CLB) is a prime example. The FBI report reveals that it was law enforcement agents, not CLB, who first introduced Richard Wilbern's name into the conversation. Indeed, they apparently asked her 17 questions about Mr. Wilbern, including questions about whether he was violent or owned a gun, before showing her the surveillance photos and asking her if she recognized the person depicted. What's more, this clearly suggestive procedure was entirely unnecessary; the agents need only have asked the witness first whether she recognized the individual depicted before essentially suggesting that it was Richard Wilbern. The agent's attempt to purge the taint of this suggestion by asking the witness herself to evaluate whether she was affected by it is, as Dr. Goodsell explains, is completely unreliable. *See* Exhibit B at ¶10-11.

This concern is particularly relevant under the circumstances of this case. Before the March 2016 press conference, no one, including the Government's new-found identifying witnesses, had alerted the police to their view that a person they apparently knew, Richard Wilbern, resembled the suspect. They failed to make any connection between Mr. Wilbern and the perpetrator whose image, captured on surveillance video, was displayed repeatedly in print and television media. Despite this intensive media coverage, a sizable cash reward offered for information leading to an arrest, and ongoing attention to the continued search for the perpetrator, none of these people told any law enforcement agency that they knew the person

9

depicted in these images. *See, e.g.,* Greg Livadas & Jeffrey Blackwell, *Killing shuts down Xerox*, Democrat and Chron., Aug. 13, 2003 at A1; Daryl Bell, *A $20,000 reward set for Xerox gunman*, Democrat and Chron., Aug.21, 2003, at B1; Daryl Bell, *Xerox shooting at critical juncture*, Democrat and Chron., Aug. 22, 2003, B3; Lara Becker Liu & Alan Morrell, *Xerox reward hits $60,000*, Democrat and Chron., Dec. 5, 2003, at B1; Maeleeke J. Lavan, *Sign seeks leads in Xerox killing*, Democrat and Chron., Mar. 25, 2004, at B4; Gary Craig & Will Cleveland, *Help sought with deadly Xerox heist*, Democrat and Chron., Mar. 22, 2016, at A1.

Though hundreds of community members offered "tips" about the possible identity of the perpetrator, no one mentioned that they recognized the perpetrator as Richard Wilbern. From 2003 through 2016, flyers, billboards, television and print media repeatedly displayed the still surveillance images in Monroe County and beyond. *See, e.g*., Daryl Bell, *New photo yields clues*, Democrat and Chron., Aug. 19, 2003, at B1; Maeleeke Lavan, *Year later, Webster slaying still painful*, Democrat and Chron., Aug. 12, 2004, at A1; Kaitlyn Lionti, *New Billboards Highlight WNY Connection to Notorious Rochester Murder & Robbery*, Spectrum Local News, (Mar. 21, 2016, 8:50 PM) spectrumlocalnews.com/nys/Rochester/news/2016/03/21/buffalo-connection-to-robbery (The FBI displayed a "digitally enhanced surveillance video" of the perpetrator on digital billboards in Rochester, Buffalo and Niagara Falls). The images were also circulated on law enforcement related national television on at least two occasions. Yet, the individuals who now claim to recognize these images as pictures of Richard Wilbern, and whom the government intends to call as witnesses to repeat this identification at trial, never came forward.

As discussed in Dr. Goodsell's affidavit, the information disclosed thus far raises more questions than answers. To properly evaluate whether the identification procedures in this case were unduly suggestive, much more information is needed than has been provided thus far. *See*

Exhibit B at ¶12. Any comprehensive assessment of whether the identification procedures were unduly suggestive and whether, in turn, an in-court identification has been tainted by this suggestion, requires the government to disclose additional information, including then nature of the witness' prior relationship with Mr. Wilbern (rather than the government's unrebuttable assertion that they are well known to each other) and the specific circumstances under which they were interviewed and asked to identify the photographs of the offense.

For these reasons, the Court should direct the government to disclose this information regarding each witness who is alleged to have identified the perpetrator as Richard Wilbern, and the circumstances of each identification procedure.

### III.   MOTION FOR DISCLOSURE OF *BRADY/GIGLIO* MATERIAL

In the alternative, if the Court finds that this information is not discoverable the Court should direct the government to provide it because it is potentially exculpatory. The government proposes to call four witnesses to testify that they know Richard Wilbern very well and they recognize the person depicted in the surveillance photograph to be him. And yet, they never made this connection until FBI agents determined that he was their suspect and introduced that notion to each witness before asking them to make an identification. If the identification procedures with Witnesses B, C, & D were remotely similar to that described for Witness A, this information, which undermines any in-court identification, is potentially exculpatory. Where a witness's reliability may be determinative of guilt or innocence, material impeaching that witness's credibility constitutes *Brady* material. *Giglio v. United States*, 405 U.S. 150, 154 (1972), *Fuentes v. Griffin*, 829 F.3d 233 (2d Cir. 2016).

The Court is empowered to order disclosure of *Brady* material at any time as a matter of "sound case management." *United States v. Nogbou*, 2007 WL 4165683 at *3-*4 (S.D.N.Y.

2007), *United States v. Giffen*, 379 F.Supp.2d 337, 347 (S.D.N.Y. 2004), *see also United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001) (in the context of *Brady*, refusing to address the "scope of a trial judge's discretion to order pretrial disclosures as a matter of sound case management.") Early disclosure of *Brady* material reduces the risk of delay based on the need to follow up on important evidence or, following a conviction, the need for a new trial in light of what would otherwise have been an avoidable *Brady* violation. In this case, early disclosure is necessary to avoid prejudice to the defense and the potential waste of judicial time and resources.

## IV.     MOTION TO SUPPRESS IDENTIFICATION EVIDENCE

As discussed above, the government has disclosed that Mr. Wilbern was the subject of multiple, police-arranged identification procedures involving four witnesses over seven different dates. Mr. Wilbern moves to suppress any evidence of these identification procedures as well as any in-court identification by the same witnesses on the grounds that the identification procedures were unduly suggestive and, as a result, any in-court identification not independently reliable.

As the Supreme Court has consistently affirmed, a defendant has the right not to be subjected to an identification procedure that creates a "very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)); *see also Stovall v. Denno*, 388 U.S. 293, 301-02 (1967). Moreover, due process requires pre-trial screening, and the suppression of any pretrial identification procedure that is unduly suggestive unless its reliability can be established through independent evidence. *Manson v. Brathwaite*, 432 U.S. at 114 ("reliability is the linchpin in determining the admissibility of identification testimony").

In determining the admissibility of a pre-trial identification, the court must undertake a "one-step or two-step inquiry." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990). First, the court must consider whether the identification procedure was unnecessarily suggestive. If the Court determines it was not, the reliability of the identification is a question solely for the jury to determine. *See Jarrett v. Headley*, 802 F2d 34, 42 (2d Cir. 1986). If, however, the Court determines that the procedure was unnecessarily suggestive, it must make a pre-trial determination as to whether the identification is nevertheless admissible because it is "independently reliable rather than the product of the earlier suggestive procedures." *United States v. Maldonado-Rivera* 922 F.2d at 973. *See also United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.), *cert. denied*, 434 U.S. 872 (1977) (citing *Manson v. Brathwaite*, 432 U.S. at 109-17); *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir.), *cert. denied*, 513 U.S. 862 (1994).

In the alternative, the Court should hold a hearing to determine the facts underlying each identification procedure. For all the reasons discussed above, there is ample basis for this Court to order a pre-trial hearing in this case, well in advance of trial, to determine both the suggestiveness of the pre-trial identification procedures and the reliability of the proposed in-court identifications. *See Jackson v. Denno*, 378 U.S. at 368; *see also Neil v. Biggers*, 409 U.S. 188 (1972); *Simmons v. United States*, 390 U.S. at 388-89; *Stovall v. Denno*, 388 U.S. 293 (1967); *U.S. v. Cranston*, 453 F.2d at 125-126 (4th Cir. 1971) ("Where a timely and sufficient motion is made to suppress identification testimony on the ground that it has been tainted by pretrial photographic identification procedures or other improper identification procedures, an evidentiary hearing outside the jury's presence is required.")

13

**V.    MOTION SEEKING LEAVE TO FILE ADDITIONAL MOTIONS**

The defense respectfully moves this Court for an Order allowing it to make further and additional motions that may be necessitated by due process of law, by the Court's ruling on the relief sought herein, by additional discovery or *Brady* material provided by the Government or investigation by the defense, and/or by any information provided by the Government in response to the demands contained herein.

The specific requests contained in this motion are not meant to limit or preclude future requests by the defense for other, further relief from this Court as appropriate.

Dated: July 31, 2018
       Rochester, New York

                        Respectfully submitted,

                        s/Sonya A. Zoghlin
                        Sonya A. Zoghlin
                        Assistant Federal Public Defender
                        28 E. Main Street, Suite 400
                        Rochester, New York 14614
                        585-263-6201
                        Sonya_Zoghlin@fd.org
                        Attorney for Richard Leon Wilbern

TO:   Douglas Gregory, AUSA