IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.                                                          17-CR-6017CJS

RICHARD LEON WILBERN,

                        Defendant.
_____

        The United States of America, through its attorneys, James P. Kennedy, Jr., United

States Attorney for the Western District of New York, and Douglas E. Gregory, Assistant

United States Attorney, of counsel, hereby files its response to the pre-trial motions of

defendant Richard Wilbern. While the defendant's substantive motions were filed

individually by subject matter, the Government responds in a single pleading, referencing the

defendant's submissions on the Case Management/Electronic Case Files (CM/ECF) system

by Docket Entry number.

**TABLE OF CONTENTS**

Government's Response in Opposition to Defendant's Motion
for a *Daubert* Hearing Seeking the Preclusion of Low Copy Number
Number DNA Testing Linking the Defendant to the Crime Scene ........................... 2

Additional Rule 16 and Brady Requests – OCME reports (ECF 80) ........................... 40

Government's Response in Opposition to Defendant's Motion
to Suppress Tangible Evidence (ECF 80) .................................................................... 44

Government's Response in Opposition to Defendant's Motion
to Suppress Statements Made to the FBI and the Collection of a
DNA Sample Voluntarily Provided (ECF 80) ............................................................ 51

Government's Opposition to the Suppression of Identification
Evidence by Persons Familiar with the Defendant who Identified
Him through Security Camera Photographs (ECF 82) ............................................... 63

Government's Opposition to Defendant's Request for an Order
Regarding Potential Conflicts (ECF 76) ...................................................................76

Government's Opposition to Defendant's Motion to Dismiss
Count 2 Charging Firearms Possession (ECF 77) ....................................................80

Government's Opposition to Defendant's Motion for an
Intra-district Transfer of the Case for Trial (ECF 78, 79) ..........................................86

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION
FOR A *DAUBERT* HEARING SEEKING THE PRECLUSION OF LOW COPY
NUMBER DNA TESTING LINKING THE DEFENDANT TO THE CRIME SCENE**

**ECF Docket Entry 81; 17-CR-6017CJS**

The defendant has moved, pursuant to Federal Rules of Evidence 702, to preclude expert testimony relating to low copy number ("LCN") DNA test results offered by the Office of the Chief Medical Examiner ("OCME"), and has requested a hearing under *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993).[1]  Plainly stated, there is no valid basis upon which to preclude testimony of the reliable scientific conclusions at trial, and no *Daubert* hearing is required to resolve the issue.  The claims advanced by the defendant here are literally the same outdated and recycled arguments which have been routinely rejected by both state and federal courts for many years.  At their best, the defendant simply disagrees with the application of LCN techniques in this case, namely the interpretations and final conclusions of OCME.  However, as the Court well knows, those contentions go to the weight, not the admissibility, of the expert testimony.  The proper avenue for any challenge

---

[1]      "Low Copy Number" testing is also referred to as "Increased Cycle" DNA testing, Low Template (LT) DNA, or "Touch DNA." *See generally http://www.nyc.gov/html/ ocme/html/hss/hss_home.shtml.*

to OCME's LCN interpretations and conclusions is not through a *Daubert* inquiry, but rather by confronting the evidence through vigorous cross-examination of the government's experts at trial and/or presentation of defense experts who provide an alternative scientific view. Accordingly, the defendant's motion to preclude the expert testimony, and for a *Daubert* hearing, should be summarily denied on the written submissions before the Court.

## I.    Relevant Facts and Background Information on LCN DNA Testing at OCME

### a.    Defendant's Possession of the Umbrella

On August 12, 2003, at approximately 9:45 a.m., Richard Wilbern entered the Xerox Federal Credit Union ("XFCU") wearing a dark blue nylon jacket with the letters "FBI" written in yellow on the back of the jacket and on the sleeves.   He wore dark sunglasses and a poorly fitting afro-style wig.   Wilbern was also carrying a large briefcase and a green and gray-colored umbrella.   He proceeded to a cubicle occupied by a female employee.   Once inside the cubicle, Wilbern sat in a chair, placing the umbrella in front of him upon the desk of the employee and maintaining the briefcase near his feet.   Wilbern explained to the employee, in sum and substance, that he was there to conduct a security assessment.   After additional questioning by the employee, Wilbern removed two firearms from the briefcase. One firearm was described as a handgun and the other as a sawed-off rifle.   Wilbern also removed a paper bag from the briefcase and ultimately instructed the female employee to fill the bag with money from behind the teller counter.   The employee stood up from her desk and walked towards the teller station with the bag in her hands.

As the employee walked to the counter, Wilbern exited the cubicle, walking across the lobby to a second cubicle occupied by an XFCU employee and a customer. He ordered both individuals to lie on the floor. Upon exiting that cubicle, Wilbern confronted customer Raymond Batzel, who was then walking away from the teller station. Notwithstanding having a gun pointed directly at him, Batzel apparently refused Wilbern's order to get down on the floor. He was immediately shot in the neck at point blank range. The bullet severed Batzel's spine and caused massive internal damage, resulting in his death. As this occurred, a second customer was entering the credit union and upon witnessing the shooting of Batzel, attempted to turn and escape. Wilbern pointed his gun and shot the customer in the back as he fled. The customer was able to escape the credit union and ultimately survived.

After shooting both customers, Wilbern quickly returned to the teller station and demanded to know where the female employee was. He then ran back to the original cubicle retrieving his briefcase. He returned to the teller counter and demanded cash. The original female employee and a second male teller provided Wilbern with cash from the drawer, which he then placed in the black briefcase. After filling the briefcase, Wilbern fled the credit union. Unfortunately for him, he left the umbrella behind. In the aftermath of the event, law enforcement discovered the umbrella that Wilbern had carried into the bank. The umbrella was placed into evidence for subsequent forensic testing.

At trial, the government intends to introduce evidence that human DNA sufficient for DNA testing was obtained at two specific locations on the umbrella. From each of those two locations, two separate swabs were taken by a criminalist at the Monroe County Public Safety Laboratory (hereafter "MC Lab"). The first location was described as the umbrella's "external wrap-around closure and button" (swabs labeled as 8.1 and 8.2). The second

location was described the umbrella's "lower latch mechanism" found on the interior metal shaft of the umbrella (swabs labeled as 8.3 and 8.4). In subsequent testing, the MC Lab was able to detect human DNA on Swabs 8.1 and 8.3, but given the testing capabilities available to them at the time, no DNA profiles were able to be generated. The second set of swabs taken from these locations (swabs 8.2 and 8.4) were allowed to dry and then packaged and stored at the MC Lab pursuant to their preservation protocols, which included maintenance in the Polymerase Chain Reaction ("PCR") freezer.

In 2011, knowing that significant advances had been made in the field of DNA profiling, the MC Lab sent Swabs 8.2 and 8.4 to New York City's Office of the Chief Medical Examiner ("OCME"). Upon examining the swabs, OCME confirmed the presence of human DNA on both swabs. Then OCME was able to quantify the amount of DNA located at the locations - swab 8.2 contained 88.2 picograms and swab 8.4 contained 15.03 picograms. Given the amount, and pursuant to the established protocols of the OCME, LCN DNA testing was utilized. Based upon the testing, the OCME determined that, as to Swab 8.2, there was a mixture of DNA from at least two people. However, based upon the fact they were able to develop a full 15 loci DNA profile, they were able to determine the "Major Contributor" to that DNA sample. As to Swab 8.4, they determined this to be a "single source" sample – that is, the DNA of one person. They concluded that the DNA profile of Swab 8.4 was fully consistent with the profile developed for Swab 8.2. In other words, it was consistent with being the same person. Reports relative to their conclusions were generated and both DNA profiles were maintained in the records of OCME, awaiting an opportunity to compare the results to a suspect DNA sample.

In 2016, law enforcement obtained a DNA sample from Richard Leon Wilbern, a former Xerox employee. OCME was asked to compare the 2011 DNA profiles with the DNA profile of Richard Wilbern. As to Swab 8.2, OCME concluded that the DNA profile of the "Major Contributor" matched the DNA profile of Wilbern. According to OCME, the probability of finding that profile again in the general population is approximately 1 in 6.8 trillion people. As to Swab 8.4, which OCME had previously determined to be a "single source contributor," OCME concluded that the profile was consistent with the DNA profile found at Swab 8.2, and consistent with the known DNA profile of Wilbern. Even though a lower number of loci had been determined at the Swab 8.4 location (10 versus 15), OCME was able to conclude that the probability of finding that match again in the general population was 1 in 138 million people.

b.    The Basics of DNA and LCN DNA Testing Methods[2]

In order to understand LCN DNA analysis, sometimes referred to as "increased cycle" or "high sensitivity", and the nature of its general scientific acceptance, it may be helpful to understand the basics of the science underlying DNA and DNA testing. Deoxyribonucleic acid, commonly referred to as "DNA", is the inherited genetic material found in human cells, which contains markers that differ from person to person. *Association for Molecular Pathology v. Myriad Genetics, Inc.,* 133 S. Ct. 2107, 2111 (2013). DNA within a cell is tightly packaged

---

[2]    As a supplement to the Government's Response, the government attaches a report prepared by Dr. Craig O'Connor, Assistant Director of the Chief Medical Examiner's Department of Forensic Biology, which provides, among other topics, a general description of LCN "increased cycle" testing, as well as the basic principles and procedures for validating scientific methods. He has testified as an expert on numerous occasions relative to LCN DNA in both state and federal court, including in the Second Circuit case of *United States v. Morgan* in the Southern District of New York, which approved the admissibility of LCN testing. His report is attached as Government Exhibit 1.

in structures called "chromosomes." *Id.* While DNA spends much of its time in chromosome form, during cell division, the DNA uncoils so that it can be copied. When unraveled, DNA's structure most represents a twisted ladder, or "double helix." *Id.* The sidebars of the ladder are made up of sugars and phosphate. The rungs of this ladder are made up of the following four bases, called "nucleotides": adenine (A), thymine (T), guanine (G), and cytosine (C). *Id.* Adenine always bonds with thymine (A,T), while guanine always bonds with cytosine (G,C). Those units form what is known as base pairs. *United States v. Jakobetz*, 955 F.2d 786, 791 (2d Cir 1992). The sequence in which these bases bond together at a particular location on the DNA ladder (called a locus, plural loci) determines the biological instructions contained in one's genetic code. While approximately 99% of human DNA *material* is identical, there are inherited regions of our DNA that vary significantly from person to person, called polymorphisms. In fact, no two people - with the exception of identical twins - have the same base pair DNA *sequence*. *Id.*

Forensic DNA profiling targets certain locations of our DNA strand that contain the highest potential for polymorphisms from person to person. During the 1990s, the human identity testing community settled on a set of 13 locations, termed "core loci", that remain widely used for DNA profiling. Butler, John M., *J. Forensic Sci.*, March 2006, Vol. 51, No. 2 (2005). Core loci occur in between genes in which a high degree of variability is present among humans. For example, these core loci would not be responsible for more common physical traits such as hair color, eye color or genetic diseases. *Id.* Moreover, the 13 core loci were selected because they also contain large numbers of repetitive base pair sequences. Ming Chin, et al., *Forensic DNA Evidence: Science and the Law* §7.4. This set of 13 genetic

markers historically formed the core of the FBI Laboratory's Combined DNA Index System (CODIS). Because of their accepted use in the United States National DNA database (NDNAD) as well as other criminal justice databases around the world, these short tandem repeat (STR) loci dominate the genetic information that has been collected on humans to date. The locations of the 13 CODIS "core loci" are described as CSF1PO, FGA, TH01, TPOX, vWA, D3S1358, D5S818, D7S820, D8S1179, D13S317, D16S539, D18S51, and D21S11 (7). *Id.* Notably, in 2011, OCME also tested at two additional locations, including D2S1338 and D19S433, as well as the gender marker AMEL.

The most common type of DNA analysis performed among forensic scientists globally is the Polymerase Chain Reaction ("PCR") of Short Tandem Repeat ("STR") methodology of testing, sometimes referred to as PCR/STR testing. PCR is very sensitive and STR typing results have been demonstrated from as little DNA as that contained in a single human cell. Butler, John M., *Advanced Topics in Forensic DNA Typing: Methodology* (2012) citing Findlay et al., *Nature* (1997). PCR/STR testing has been generally accepted as reliable in the relevant scientific community for almost three decades, and is routinely utilized by the OCME.[3] *People v. Megnath*, 898 N.Y.S.2d 408 (N.Y.Sup Ct. Queens Cnty 2010) (collecting cases); *People v. Wesley*, 83 N.Y.2d 417 (1994). Simply understood, PCR is a scientific process in which DNA fragments are duplicated many times, thereby allowing very small samples to be tested. Sometimes called "molecular Xeroxing" the PCR process essentially mimics the

---

[3] In 2003, OCME began utilizing a kit manufactured by Applied Biosystems, called the AmpFlister® ldentifiler® Kit. The AmpFlister® ldentifiler® Kit amplifies all 13 of the previously required loci for the Combined DNA Index System (CODIS), as well as two additional loci, D2S1338 and D19S433. It also tests for the Amelogenin gender-determining marker. *See* Report of Craig O'Connor, ¶ 20.

body's own cell replication process. This process is used to replicate the characteristics found at the core loci many times over. *People v. Garcia*, 963 N.Y.S.2d 517, 519-20 n. 3; Richard Saferstein, *"Criminalistics: An Introduction to Forensic Science"* 416-420 (6th ed. 2004).

There are five basic steps in the PCR method of STR analysis: (1) extraction, (2) quantitation, (3) PCR amplification, (4) electrophoresis, and (5) analysis of the resulting DNA alleles. Extraction is simply the recovery of DNA from biological samples such as blood, bone, hair, saliva, semen, and skin cells. Quantitation is the measurement of the amount of DNA extracted from the relevant samples. If a sufficient amount of DNA is detected, amplification and analysis can be attempted. Amplification is a process which produces larger amounts of DNA from small starting amounts of DNA by repeated cycles of copying. Amplified fragments are then sent through a scientific device called a capillary electrophoresis machine, and the data generated by the machines are analyzed on a computer software program that provides a printout, called an electropherogram. A trained forensic analyst will evaluate the electropherogram to make a final determination of the DNA profile.

In making a determination of one's DNA profile, forensic analysts analyze the short tandem repeats, or STRs, to determine the sequence in which the base nucleotides bond together at a particular locus. STRs are accordion-like stretches of DNA that contain repeating units of between two and seven nucleotides in length. They are tandemly repeated from approximately a half dozen to several dozen times at a particular locus. John M. Butler, *BioTechniques 43:Sii-Sv* (October 2007). The number of repeats at a particular locus constitutes the DNA type, called an "allele", present at that location. *Maryland v. King*, 133 S. Ct. 1958, 1967 (2013). Because each person receives half of his DNA from one

biological parent and half of his DNA from the other biological parent, each person has two DNA alleles at each locus. For example, if 8 repeats of a sequence of bases were present in the STR locus, the DNA allele could be marked "8." However, the DNA type at one locus may be called "8, 11," which reflects the presence of eight STRs from the mother, and eleven STRs from the father at the same locus, or *vice versa*. A locus with two different numbers is "heterozygous." However, if only one number appears at a particular locus, it means the person inherited the same number of repeats from each parent, and the locus is called "homozygous." The numbers derived at a particular locus is often times referred to as an "allele call."

Developing the complete DNA "profile" requires a forensic scientist to review the entire series of "allele calls" at each of the thirteen (or, in the case of OCME, fifteen) different loci. Once a DNA profile is obtained, a forensic scientist can then compare that profile against other DNA profiles—including the profiles created from evidentiary samples collected from crime scenes, or to DNA samples obtained from a potential suspect—to determine whether a DNA match exists. While individuals may share the same alleles at one particular location, the chance that two people have the same alleles throughout each of the core loci becomes a matter of simple statistical probability. National Institute for Justice, *"DNA for the Defense Bar"* (June 2012). One such expression of the sequence frequency is called "random match probability" (RMP). RMP determines the probability of randomly selecting an individual who carries the same alleles at each of the tested loci. *Id.* at 70; *See Report of Craig O'Connor*, ¶ 23-25.

**c.      OCME is a Highly Regulated Institution Subject to Stringent Protocols and Review**

The New York City Office of the Chief Medical Examiner (OCME) was established in 1918.   Its primary mission is to identify the cause and manner of death in specified cases such as those involving accident, violence, suicide, and other categories enumerated in the New York City Charter at § 557(f)(1).   OCME established the first toxicology laboratory in 1918 and the first serology laboratory in 1938.   In addition, the New York City Charter recognizes and empowers OCME's role in the forefront of state-of-the-art forensic analysis. *Id.* at 557(f)(3).   OCME began performing DNA testing in criminal cases in 1991 through its Department of Forensic Biology.   OCME's DNA analysis includes the examination of homicide, sexual assault, and other crime evidence for DNA extraction and typing; that analysis may tend to either include or exclude a suspect, or prove to be inconclusive. *See* NYC Office of the Chief Medical Examiner, *http://www1.nyc.gov/site/ocme/about-ocme.page* (last visited September 15, 2018).

With respect to DNA evidence, OCME's objective is to identify items of evidence for the presence of biological materials (such as blood, semen, saliva, and skin cells) using reliable, state-of-the-art technology in an attempt to see whom it may belong.   To do so, OCME uses and follows up-to-date protocols that have been validated, published, peer reviewed, and accepted within the scientific community.   *Report of Craig O'Connor*, ¶ 4. Along with its responsibility for all DNA testing involving New York City criminal cases, OCME provides its DNA testing services to law enforcement agencies and criminal

laboratories nationwide on a for-fee basis. *See generally* *http://www.nyc.gov/html/ocme/html/home/home.shtml*.

The methods and procedures by which OCME conducts DNA analysis are governed by federal and state regulations. The Federal Bureau of Investigation ("FBI") Quality Assurance Standards[4] require public forensic laboratories that are authorized to upload DNA profiles to the FBI-operated Combined DNA Index System ("CODIS"), like OCME, to be accredited. State accreditation is granted by the NYS Commission on Forensic Science (CFS) upon a binding recommendation from its DNA Subcommittee (the "DNA Subcommittee"). New York State legislation also designated the ANSI-ASQ National Accreditation Board ("ANAB") as the accrediting body for all forensic laboratories in the state.

Accreditation requires a full assessment by a team of qualified DNA scientist assessors every five years, annual surveillance visits by ANAB staff auditors, an inspection report, and an annual accreditation review report. In addition, biannual external audits are conducted by the National Forensic Science and Technology Center ("NFSTC"). NFSTC lead members are DNA auditors trained by the Federal Bureau of Investigation ("FBI"). The assessors use International Standards (ISO 17025) and Federal Standards (FBI DNA Quality Assurance Standards) to evaluate facilities, equipment, training, validations for new equipment and techniques, and casework reports, and to determine whether the laboratory is following

---

[4]    The FBI Quality Assurance Standards are attached as Government Exhibit 2.

standard operating procedures. In alternate years, OCME performs an internal audit and reports the results to the FBI and ANAB.

OCME's Forensic Biology Department is housed in a state-of-the-art DNA laboratory in a building constructed in part for that purpose, which opened just eleven years ago, in 2007. The laboratory incorporated features specifically to accommodate OCME's various DNA testing capabilities. The building was designed to physically separate the more sensitive low template (or low copy number) and mitochondrial ("MT") DNA techniques from the more routine, high-template techniques. Additionally, samples with a known source, such as those from suspects or victims, are stored and tested separately from evidence samples with an unknown source.

### d. LCN versus HCN Testing

While forensic analysts once needed a bloodstain in the size of a quarter, they can now perform reliable DNA testing on a sample that is the size of a pinhead. John Buckelton, et al., *Forensic DNA Evidence Interpretation, 6-8* (2005). The scientific technique underlying LCN DNA testing, also known as "increased cycle", now allows forensic analysts to successfully use smaller amounts of DNA evidence to be tested and accurately analyzed. *Megnath*, 898 N.Y.S.2d at 411. For example, LCN testing allows for a DNA profile to be obtained from physical evidence extracted from skin cells left on an object when an individual merely touches the object or some physical item, sometimes referred to as "Touch DNA." Thomas Craig, *By a Scintilla of Evidence: The Issues Involved in the Admissibility of Low Copy*, 23 B.U. J.Sci.

& Technology Law, 2016, citing Justice Ming Chin, et al., *Forensic DNA Evidence: Science and the Law, §7.4,* attached as Exhibit 3.

In 2011, the year in which the relevant samples in this case were tested, the OCME's decision on the type of DNA analysis that would be performed was dependent upon the amount of DNA that was detected in the sample. For example, when a more significant quantity of DNA is extracted, then HCN DNA analysis is used. Samples such as semen, blood and saliva would generally yield enough DNA for HCN analysis. When a low amount of DNA is extracted (typically from evidence consisting of only skin cells or fingerprints left on an object), the LCN DNA testing method as performed by the OCME can often be used to successfully obtain a DNA profile. *Megnath*, 898 N.Y.S.2d at 413. Generally speaking, LCN DNA testing was utilized when the sample to be tested contained less than 100 picograms of human DNA. Adele A. Mitchell, et al., *Validation of a DNA Mixture Statistics Tool Incorporating Allelic Drop-Out and Drop-In,* Forensic Sci Int'l: Genetics (2012), attached as Exhibit 4.

Regardless of whether a sample contained more or less than 100 picograms, the same basic PCR/STR testing, which has been universally approved for decades, is utilized. In other words, both HCN and LCN follow the very same steps, that is, (1) extraction, (2) quantitation, (3) PCR amplification, (4) electrophoresis, and (5) analysis. The LCN DNA uses the same PCR/STR technique, with some modifications to account for the increased sensitivity, to identify a person's DNA profile. *Megnath,* 898 N.Y.S.2d at 411. The primary difference between HCN DNA analysis and LCN DNA analysis is at step 3, the number of times the DNA is amplified during the PCR process and the validated

interpretation protocols. Given the smaller amount of DNA material, LCN DNA analysis will increase the number of replicating cycles 31 times, versus the standard 28 times utilized with HCN. *Id.* Hence the term "increased cycle."

## II. Applicable Law

Federal Rule of Evidence 702 permits the admission of expert testimony where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), held that the trial judge is responsible for "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. "In determining the admissibility of expert testimony, it is the proponent's burden under *Daubert* to establish admissibility, rather than the opponent's burden to establish inadmissibility." *United States v. Jones,* 2018 WL 2684101 (S.D.N.Y. June 6, 2018) *citing United States v Morgan*, 53 F. Supp. 3d 732, 740 (S.D.N.Y. 2014), aff'd, 675 Fed. Appx. 53 (2d Cir. 2017) (summary order), *cert. den*. 138 S. Ct. 176, (Oct. 02, 2017).

To assist with the task of determining the reliability of expert testimony, *Daubert* provides the trial judge with five non-exclusive, illustrative factors to apply to the expert's reasoning or methodology: (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) the technique's "known or potential rate of error;" (4) "the existence and maintenance of

standards controlling the technique's operation;" and (5) whether the technique is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593–94. These factors are not exclusive and do not constitute a "definitive checklist or test." *Id*. at 593. Rather, the "trial judge [has] considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); see also *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 266 (2d Cir. 2002) ("Although Rule 702 sets forth specific criteria for the district court's consideration, the *Daubert* inquiry is fluid and will necessarily vary from case to case.").

As the Second Circuit has recognized, the inquiry under *Daubert* is limited, noting that "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Amorgianos*, 303 F.3d at 267. Rather, "[t]he judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Id.* Simply stated, the *Daubert* analysis is intended to give the district court the discretion "needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Id*.

Finally, while the gatekeeping function requires a district court to ascertain the reliability of an expert witness's methodology, it does not require that a formal hearing be conducted in order to do so. *Kumho Tire*, 526 U.S. at 152 (district courts possess "latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability"); *United States v. Williams*, 506 F.3d

151, 161 (2d Cir. 2007) (separate hearing not required to determine reliability of methodology); *United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000) (nowhere does the Supreme Court mandate the form that the inquiry into reliability must take); *see also United States v. Crisp*, 324 F.3d 261, 268 (4th Cir. 2003) ("Under *Daubert*, a trial judge need not expend scarce judicial resources reexamining a familiar form of expertise every time opinion evidence is offered.").

## III.    Discussion

As with any scientific technique that faces scrutiny, there will undoubtedly be individuals with opposing points of view.    However, assessing conflicting testimony regarding multiple scientifically valid interpretations is precisely the type of disagreement that the flexible thrust of *Daubert* entrusts to a jury.    *Morgan*, 53 F. Supp. 3d at 742 citing *In re Fosamax Prods. Liab. Litig.,* 645 F. Supp. 2d 164, 172-74 (S.D.N.Y.2009) (quoting *Kumho Tire Co.,* 526 U.S. at 153).    The LCN DNA evidence the government intends to present at trial can hardly be considered the type of "junk science" which *Daubert* prohibits.    In fact, the OCME has done everything required of them, which included properly validating their testing methodology, results and conclusions and thereafter seeking approval from their regulatory body, the DNA Subcommittee of the New York State Commission on Forensic Science. With the exception of a single New York state court judge, every other state and federal court considering OCME's LCN methodology has determined the evidence to be firmly rooted in science, not simply "a subjective belief or unsupported speculation", and therefore admissible at trial.    Given the extensive litigation to date, which includes a comprehensive *Daubert* hearing conducted in the Southern District of New York, as well as a recent *Frye* hearing in

the state of New Jersey, both firmly addressing the precise LCN issues raised in this case, any further evidentiary hearings are unnecessary and wholly redundant.

    **a.**    **LCN DNA Testing Has Been Generally Accepted in Scientific Community**

The defendant's principal argument, that LCN DNA testing is not *generally* accepted in the scientific community, is patently false. Since the late 1990's there have numerous scientific efforts with low-level DNA testing, and "single cell" analysis for clinical applications were being performed as early as 1995. Butler, at 313 *citing* Findlay et. al. 1995. By 2011, a number of laboratories were fully engaged in LCN DNA testing, none of which would ever be accused as being a collection of "junk scientists." The international list includes the Forensic Science Service (Birmingham, UK), LGC Forensics (Middlesex, UK), Orchid Cellmark (Abingdon, UK), the Netherlands Forensic Institute (NFI, The Hague, The Netherlands), Institute for Environmental Science & Research (ESR, Auckland, New Zealand), the Swedish National Laboratory of Forensic Science (Linköping, Sweden), the German Bundeskriminalamt (BKA, Wiesbaden, Germany), the International Commission on Missing Persons DNA Laboratory (ICMP, Sarajevo, Bosnia and Herzegovina), the Armed Forces DNA Identification Laboratory (Rockville, Maryland), the University of North Texas Center for Human Identification (Ft. Worth, Texas), and the New York City Office of Chief Medical Examiner (NYC OCME) Forensic Biology Laboratory. The applications of Low Copy DNA testing range from missing persons investigations to forensic casework. *Id*. at 312-313.

In addition to the OCME, validation studies on LCN techniques had been published by scientists of the Forensic Science Service, the Netherlands Forensic Institute, LGC Forensics, Orchid Cellmark and the Institute for Environmental Science & Research.   Butler, at 313.

**b.      The OCME's LCN DNA Methodology and Procedures were Properly Validated and Approved for Use by the DNA Subcommittee of the New York Commission on Forensic Science**

In *United States v. Morgan*, 53 F. Supp. 3d 732, District Judge Victor Marrero of the Southern District of New York conducted an extraordinarily detailed *Daubert* hearing which explored the history of OCME, OCME's accreditation, the adequacy of OCME's LCN DNA validation studies and the subsequent approval for LCN DNA testing by the DNA Subcommittee of the New York Commission on Forensic Science.[5]   The Court was called upon to address a number of arguments raised by Morgan in opposition to the admissibility of LCN DNA results, many of which have been repeated here. In addition to receiving numerous legal memoranda, reports, validation studies, written opinions and letters, the Court also took live testimony from the government's expert witness, OCME criminalist Dr. Craig O'Connor, the very same criminalist responsible for the LCN DNA comparisons in the instant case.   The defense called a well-known and highly respected DNA expert, Dr. Allan Jamieson, in opposition.[6]

---

[5]      While the decision by District Judge Victor Marrero is certainly not binding on this Court, <u>any</u> court would be hard pressed to conduct a more thorough evidentiary hearing on the issues.   In fact, the arguments currently advanced by the defendant Wilbern are not particularly original ideas - they were clearly lifted from the *Morgan* defense submissions.    That is not a criticism. The Government's Response similarly lacks creativity, given the fact that the LCN debate has been extensively litigated.

[6]      Dr. Craig O'Connor's testimony, dated January 29, 2014, is attached as Exhibit 5.   Dr. Allan

As Judge Marrero found, OCME began developing the capacity to conduct LCN DNA tests in 2003 and 2004. *Morgan*, 53 F. Supp. 3d at 737. In order to ensure that the LCN DNA testing was accurate and reliable, OCME was required to design and conduct appropriate validation studies. *Id.* OCME performed its validation studies based upon the protocols created by the Scientific Working Group on DNA Analysis Methods, commonly known as "SWGDAM". *Morgan*, 53 F. Supp. 3d at 737.[7] The results of the validation studies were published in a peer-reviewed journal. Theresa Caragine et al., *Validation of Testing and Interpretation Protocols for Low Template DNA Samples Using AmpFlister® Identifiler®*, 50 Croat. Med. J. 250 (2009), attached as Exhibit 7. As that article explains, "[t]hrough extensive testing of low template single-source and mixed samples, [OCME has] developed quality control, testing, and interpretation protocols. These protocols were designed to address the concerns regarding the increased sensitivity of this system and the accompanying stochastic effects. Although not every situation can be anticipated, employing these conservative interpretation protocols and evaluating the sample as a whole including the pooled injection ensures that allelic assignments, when they can be made, are correct." *Id.*

In his decision, Judge Marrero specifically endorsed the "[a]dequacy of OCME's validation studies." *Id.* at 741. He noted that pursuant to the protocol set forth by SWGDAM, OCME's validation studies used a variety of different types of samples, including

---

Jamieson's testimony, dated January 31, 2014, is attached as Exhibit 6.

[7] The Scientific Working Group on DNA Analysis Methods, commonly known as SWGDAM, serves as a forum to discuss, share, and evaluate forensic biology methods, protocols, training, and research to enhance forensic biology services as well as provide recommendations to the FBI Director on quality assurance standards for forensic DNA analysis. *See https://www.swgdam.org/* (last visited September 15, 2018). Their Validation Guidelines are attached as Exhibit 8 (2004 version) and Exhibit 9 (2012 version).

samples of different sizes and mixtures with different ratios of DNA. *Id.* at 737. OCME tested single-source DNA samples, for example, of 150pg, 100pg, 50pg, 25pg, 12.5pg, and 6.25pg. *Id.* at 738. OCME also tested 100pg, 50pg, and 25pg samples containing mixtures of multiple people's DNA (called a "mixture"), each with different ratios of genetic material between the contributors. *Id.* In total, OCME examined over eight hundred DNA samples as part of its validation studies. *Id.* Judge Marrero thoroughly reviewed the concerns raised by the defense, including the fact that when evaluating low amounts of DNA certain stochastic events, such as allele drop-in, allele drop-out, and stutter, can occur. Judge Marrero determined, "based on the results of these validation studies, OCME created its interpretation guidelines, intended to allow for consistent interpretation of LCN testing results by accounting for increased stochastic effects as the quantity of DNA decreases." *Id.* The Court added: "[m]ost persuasively, the scientific community—a number of independent experts intimately familiar with the criteria for scientific validity—has repeatedly endorsed the sufficiency of OCME's validation studies and protocols. *Id.* at 742.

In concluding his remarks on the adequacy of the validation, Judge Marrero stated,

> Moreover, there is no evidence before the Court that OCME's interpretation protocols were reached in error or a manner inconsistent with the validation data. Dr. Allan Jamieson, Morgan's expert witness, suggests that some validation data allows for alternative interpretations that were not included in OCME's final protocols….However, under *Daubert*, the possibility that a different conclusion could be drawn from validation data does not undercut the reliability of the conclusion that was drawn, as long as the expert has "good grounds" for the chosen interpretation….Here, the "good grounds" standard is clearly met by the Government… (citations omitted)

*Id.* at 741-42.

As the Court noted, the completion of the validation studies was, of course, not the end of the road for the OCME. The OCME was then required to present their conclusions to the New York State Commission on Forensic Science (CFS) through the DNA Subcommittee, as required by NYS Executive Law § 995-b(13)(a). *Id.* at 739; *See* Report of Craig O'Connor, ¶ 33. The DNA Subcommittee is charged with assessing all DNA methodologies proposed to be used for forensic analysis. *Id.* Over the course of several meetings in 2004 and 2005, OCME provided the Subcommittee with meaningful presentations demonstrating their internal validation. Following discussions, additional questions, and further studies, on September 9, 2005, the DNA Subcommittee unanimously approved OCME's use of increased cycle LCN DNA testing in case work. On December 6, 2005, based upon that binding recommendation, the CFS approved the use of LCN DNA testing with casework using the validated LCN procedures. *See* Letter dated October 6, 2005 from John Ballantyne, Chair, NYS DNA Subcommittee to Chauncey Parker, Chair, NYS Commission on Forensic Science, attached as Exhibit 10; Letter dated December 15, 2005 from John Hicks, Director, Office of Forensic Services, to Mechthild Prinz, Director, New York City Office the Chief Medical Examiner, attached as Exhibit 11.

In holding that the expert testimony regarding OCME's LCN DNA testing was reliable and admissible evidence under the test set forth in *Daubert*, Judge Marrero concluded by stating the "overwhelming weight of the evidence – OCME's approval by multiple expert committees, OCME's multiple publications, and O'Connor's testimony – demonstrates that OCME's testing methodology is firmly rooted in science." *Morgan,* 53 F. Supp. 3d at 744.

### c. Expert Testimony Regarding LCN DNA Testing Has Routinely Been Admitted in State and Federal Courts

State and federal courts have almost unanimously approved the admissibility of LCN DNA testing and conclusions at trial. The litigation on this matter is extensive and compelling. While the defendant cherry-picks the most favorable, and frankly gratuitous, language from the *Morgan* Court of Appeals decision, and cites the one (and only) New York case that supports their position[8], Wilbern completely failed to advise this Court, as perhaps he should have, that New York State trial courts have routinely admitted LCN DNA evidence for years. For example, more than eight years ago, in New York State Supreme Court, Queens County Judge Robert Hanophy conducted a *Frye* hearing to determine whether the LCN scientific method was generally accepted in the relevant scientific community. Judge Hanophy took testimony from "five reputable [and credible] forensic scientists." Following that hearing, the Court held that "the LCN DNA testing method as it is performed by the OCME and is interpreted by OCME protocols, will consistently yield reliable results." *Megnath*, 898 N.Y.S.2d at 411. The Judge opined:

> LCN DNA profiling as conducted by the OCME is not a novel scientific technique. DNA testing in the forensic community has been generally accepted as reliable for many years ... The same analysis that is utilized in HCN DNA testing and which has been admitted nationally in our Courts for years, is basically the same type of DNA testing that is used when LCN DNA testing is performed by the OCME.

*Id.*

---

[8] The only state court decision to rule in their favor, finding LCN to be inadmissible after a Frye hearing, is *People v. Collins*, 49 Misc.3d 595 (Sup. Ct Kings Co. 2015). That case is addressed and distinguished in further detail below

With regard to the defense concerns that there is a greater likelihood of stochastic effects due to the more sensitive nature of LCN testing, the Court emphasized that,

> [s]ince forensic scientists have long been familiar with the scientific issues or phenomena that arise in both HCN [high copy number DNA testing] and LCN DNA testing, forensic scientists, including the OCME, have created interpretation protocols to account for these phenomena when they occur in both HCN and LCN testing. While [they may] occur more frequently in LCN DNA typing, the OCME has implemented interpretation protocols to compensate for these occurrences. The interpretation protocols that were developed by OCME to compensate for the scientific phenomena were formulated by the OCME based on their extensive validation studies regarding LCN DNA testing.

*Id.* at 410.

In the years following the *Megnath* decision, numerous courts have accepted the scientific underpinning of LCN DNA testing and have admitted expert testimony in criminal matters. In fact, requests for *Frye* hearings are now routinely denied on their face. *See e.g., People v Garcia*, 39 Misc.3d 482 (Sup.Ct. 2013) (merely citing some experts who do not endorse LCN DNA testing is not sufficient to obtain a *Frye* hearing, noting that OCME's LCN DNA testing procedures have been admitted in New York state trial courts over 125 times); *People v. Gonzalez*, 155 Ad3d 505 (1st Dep't 2017)(finding LCN testing generally accepted in the scientific community and rejecting a defense request for a Frye hearing); *People v. Tribble*, No. 2523/2007 (N.Y. Sup. Ct. Bronx Cnty. 2010) (LCN analysis "is not novel for the purposes of a *Frye* inquiry" and can be admitted at trial without the need for a pre-trial hearing); *People v. Gordon*, No. 2686/2011 (N.Y. Sup. Ct. N.Y. Cnty. 2014) (LCN-DNA testing is generally accepted as reliable; it requires no *Frye* hearing before it is admitted); *People v. Atkins*, No. 475/2008 (N.Y. Sup. Ct. N.Y. Cnty. 2010) ("…there are no new or novel techniques involved in the LCN testing procedures, but that the same scientific process is involved in simply

analyzing smaller amounts of DNA material. The defendant's motion for a *Frye* hearing is denied"); *People v. Gordon*, No. 606-14 (N.Y. Sup. Ct. Bronx Cnty. 2016) (denying defendant's motion for a *Frye* hearing and noting LCN DNA testing has been admitted in numerous cases); *People v. Williams*, No. 3445/2008 (N.Y. Sup. Ct. Bronx Cnty. 2014) (use of LCN amplification method has been in existence now for over 15 years and has achieved both national and international recognition); *People v. Gibson*, No. 85N/12 (N.Y. Sup. Ct. Nassau Cnty. May 14, 2013) (denial of *Frye* hearing noting LCN DNA testing is not novel and widely accepted in the scientific community); *People v. Enriquez*, No. 5335/08 (N.Y. Sup. Ct. N.Y. Cnty. July 9, 2012) (same); *People v. Gonzalez*, No. 954/2013 (N.Y. Sup. Ct. N.Y. Cnty. July 23, 2013) (same); *People v. Lopez*, 23 N.Y.S.3d 820, 827 (N.Y. Sup. Ct. 2015) (a court is permitted to rely on conclusions reached in other *Frye* hearings by judges who addressed the same issue presented for resolution); *People v. Thawney*, No.8183/2015 (N.Y. Sup. Ct. Oct. 17, 2017) (same).

Earlier this year, in *People v. Foster-Bey*, 2018 WL 736052 (February 7, 2018), the Appellate Division, Second Department, upheld the defendant's conviction of assault in the first degree and criminal possession of a weapon, based in part on the People's use of LCN DNA testing offered by OCME. The Appellate Court held that the trial court was well within its discretion in denying a pre-trial *Frye* hearing on the issue of LCN DNA testing, stating:

> A court need not hold a *Frye* hearing where it can rely upon previous rulings in other court proceedings as an aid in determining the admissibility of the proffered testimony" (*People v. LeGrand*, 8 N.Y.3d 449, 458, 835 N.Y.S.2d 523, 867 N.E.2d 374). When the Supreme Court made its ruling in this case, a court of coordinate jurisdiction, upon conducting an extensive *Frye* hearing, had determined that LCN DNA testing was not a novel scientific technique,

and that, when properly performed, it is generally accepted as reliable in the forensic scientific community (*see People v. Megnath*, 27 Misc.3d 405, 413, 898 N.Y.S.2d 408 [Sup. Ct., Queens County]; see also *People v. Gonzalez*, 155 A.D.3d 507, 65 N.Y.S.3d 142; *People v. Garcia*, 39 Misc.3d 482, 963 N.Y.S.2d 517 [Sup. Ct., Bronx County]). The Supreme Court providently exercised its discretion in relying upon that determination, as well as the determinations of other courts of coordinate jurisdiction accepting that LCN DNA testing and the FST are not novel and are generally accepted by the relevant scientific community.

And even more recently, case law continues to provide overwhelming support for the government's position that LCN testing is scientifically reliable. In August 2018, subsequent to the filing of the defendant's motions in this case, a decision was issued in *People v. Rochat*, No. 13-07-01002-I (N.J. Sup. Ct. Bergen Co. 2017). The New Jersey court joined the long list of those who have considered (and rejected) many of the arguments currently being advanced by defendant Wilbern. In that case, Daniel Rochat was arrested for the brutal murder of Barbara Vernieri in September 2012. Investigators were able to obtain a number of biological samples from the crime scene which were submitted to OCME for DNA testing, including two items that utilized LCN DNA testing techniques. Prior to trial, the People indicated that they would offer the LCN evidence tested by the OCME. In denying a motion for a *Frye* hearing on the motion papers, the Hon. Susan J. Steele determined that based upon the relevant authority presented, LCN DNA was generally accepted in the scientific community and all arguments relating to the conclusions and interpretations were issues for a jury to resolve. The defendant filed a motion for leave to appeal Judge Steele's decision, which was denied.

In 2017, the defendant was convicted of murder and sentenced to life in prison. Rochat timely filed an appeal of his conviction and sentence. While the appeal was pending,

attorneys for the defendant asked the Appellate Division for a reconsideration of the motion for a new trial based upon Judge Steele's summary denial of a *Frye* hearing. For reasons that were not entirely clear, the Appellate Division remanded the issue for another judge to develop the record. At a subsequent hearing, the Court took testimony from Dr. Craig O'Connor and Dr. Howard Baum for the prosecution. The Court also heard from other well-respected scientists who were on the other side of the LCN issue, including defense witnesses Dr. Angela Van Daal, Dr. Eli Shapiro and Dr. Heather Coyle.[9] In addition to the expert testimony, the Court considered prior judicial opinions, publications and letters from the NYS Subcommittee of the Commission on Forensic Science. *See* Decision of the Hon. Margaret M. Foti, *People v. Rochat*, dated August 23, 2018, attached as Exhibit 12, at 44.

In her ruling, Judge Foti was clearly "mindful of the concerns of the defense regarding contamination, and stochastic effects," but countered that the "concerns have been addressed by the OCME in their procedures and testing methods, validated by OCME, and the testing methods have been approved by the DNA Subcommittee." *Id*. The Court recognized that "these concerns were thoroughly vetted by the defense at trial on direct and cross-examination and go to the question of *weight* of the evidence rather than to the question of *admissibility*. *Id*. (emphasis supplied in original text). The Court aptly noted that "the LCN DNA technique has been utilized in post-conviction innocence project cases to exonerate defendants. It cannot be credibly argued (as Dr. Coyle seems to maintain) that LCN DNA results are reliable to rule suspects out, but not to implicate suspects." *Id*.

---

[9] The transcripts are extremely lengthy but can be made available to the Court and counsel under separate cover, if needed.

Ultimately, the Court rejected the defense claims, holding that "[a]fter evaluating the testimony over six days of hearings, taking into consideration the scholarly writings both advancing and criticizing the LCN technique, and reviewing the significant number of New York and federal cases addressing the issue, the Court finds that the requirements of N.J.R.E. 702 and the *Frye* test are satisfied." *Id.*

The *Rochat* court, like *Morgan* and so many others, recognized that the science behind LCN DNA testing is no longer novel, if it ever was. One thing is for certain: LCN DNA testing cannot possibly be considered "junk science." OCME's expert testimony relative to LCN DNA testing has been accepted as reliable for nearly a decade. It has been thoroughly vetted by world-class scientists and reputable organizations. Nevertheless, even in the face of an overwhelming evidence to the contrary, the defense bar continues to tout the only case ever decided in its favor: *People v. Collins*, 49 Misc. 3d 595 (N.Y. Sup. Ct. 2015). In *Collins*, Judge Mark Dwyer held that LCN testing failed to meet *Frye* standards. However, this ruling has been criticized as an "outlier" and, at least to the government's knowledge, has never once been followed. In fact, several judges have expressly rejected the decision. *See, e.g. People v. Horne*, No. 1647/15 (N.Y. Sup. Ct. Bronx Cnty. January 2017) (this Court respectfully declines to endorse or follow the decision in *Collins*; this Court accepts the rulings of all the other courts finding LCN-based evidence admissible in New York State courts); *People v. Perez-Colon*, No. 219/2013 (N.Y. Sup. Ct. Richmond Cnty. May 5, 2015 (choosing to follow *Megnath* and rejecting *Collins*); *People v. James*, No. 81/2013 (N.Y. Sup. Ct. Richmond Cnty. 2015) (noting numerous courts that have rejected the *Collins* decision); *Phillips v. State*, 2015 Md. App LEXIS 154 (Court of Special Appeals, October 27, 2015) (a

Maryland appellate court ruled that low copy DNA results were admissible and that questions of reliability are within province of jury, recognizing but apparently rejecting the holding in *Collins*).[10]

### d. Administrative Challenges to LCN were Rejected in 2014 and 2017

The Court should also be made aware that administrative challenges to LCN testing, premised (in part) upon similar arguments made here, have also been rejected as meritless. In March 2014, in light of several issues raised in *Morgan* regarding the LCN testing of mixed samples of DNA, the CFS asked the DNA Subcommittee to review OCME's LCN testing procedures. *See* Letter dated June 2, 2014 to Michael Green, Executive Deputy Commissioner, New York State Division of Criminal Justice Services, from Eric Buel, Acting Chair, NYS DNA Subcommittee, attached as Exhibit 14. Two specific questions were addressed to the DNA Subcommittee: (1) whether there is a quantity of DNA below which LCN testing cannot be done; and, (2) whether OCMEs standard operating procedures for LCN testing had changed since the DNA subcommittee's approval of OCME LCN testing in 2005, and if so, whether those changes required additional validation. *Id.*; *See also, Morgan,* 53 F. Supp. 3d at 746.

At the September 2014 DNA Subcommittee meeting, Subcommittee Members discussed the issue in detail and ultimately reported to the CFS that there were no substantive changes to the OCME's LCN DNA testing procedures, and that any non-substantive changes

---

10      For the Court's convenience, the collection of court decisions cited in this Section have been attached as Exhibit 13.

to OCME's LCN DNA testing procedures have no effect on LCN DNA testing and raise no scientific issues, in essence re-approving the original 2005 approval of OCME's LCN DNA testing. *See* Letter dated September 16, 2014 to Michael Green, Chair, Commission on Forensic Science, New York State Division of Criminal Justice Services, from Jack Ballantyne, Chair, NYS DNA Subcommittee, attached as Exhibit 15. *See also Minutes of September 5, 2014 DNA Subcommittee Meeting*, New York State Criminal Justice Services, *http://www.criminaljustice.ny.gov/pio/openmeetings*.

On September 1, 2017, the Legal Aid Society and the Federal Defenders of New York filed a joint complaint to the New York State Inspector General (NYSIG) regarding alleged misconduct by the OCME. *See* Letter to Catherine Leahy-Scott, Office of the Inspector General, dated September 1, 2017, attached as Exhibit 16. While the majority of their complaints centered upon the OCMEs use of the Forensic Statistical Tool (FST), an issue not present here, they once again challenged OCME's ability to test DNA using the increased 31 PCR cycles methodology. On or about September 5, 2017, NYSIG referred the matter to the CFS. In a letter dated December 4, 2017, Dwight Adams, Chair of the NYS DNA Subcommittee, indicated the following in a letter to Michael Green, Chair of the CFS:

> In addition to raising issues with FST, allegations were made regarding the OCME's Low Copy (LCN) methodology. Based upon the validations performed by the OCME, the DNA Subcommittee believes that OCME could, using their LCN methodology, potentially identify a major contributor to a DNA mixture regardless of the number of minor contributors. The OCME validated its use of 31 PCR cycles in its LCN methodology. The DNA Subcommittee concludes it was appropriate for the OCME to use 31 PCR cycles in accordance with the OCME's validated casework protocols. In sum, the DNA Subcommittee finds no merit in the allegations regarding the OCME's scientific processes contained in the September 1, 2017 letter sent to the IG.

*See*, Letter to Michael C. Green, New York State Commission on Forensic Science, dated December 4, 2017, attached as Exhibit 17.

The NYS DNA Subcommittee was not the only group to weigh in on this issue. The OCME's external accrediting body, the American National Standards Institute (ANSI) and American Society for Quality (ASQ), through the National Accreditation Board (ANAB), likewise determined the allegations advanced by the Legal Aid Society and the Federal Defenders of New York were unfounded. *See* Letter to Timothy Kupferschmid, OCME Chief of Laboratories, dated January 16, 2018, attached as Exhibit 18.

### e. Specific Points Raised by the Defendant in Support of His Request for a *Daubert* Hearing are Similarly Unavailing

#### 1. Tina Delgado and AUSA John Stuart Bruce

The defendant argues that the FBI is skeptical of LCN testing and that the Department of Justice has found LCN DNA testing unreliable. In support of the proposition, they cite to a 2011 affidavit authored by FBI Technical leader Tina Delgado and utilized by AUSA John Stuart Bruce in the Eastern District of North Carolina. The so-called "Delgado" affidavit, and the use of the affidavit by AUSA Bruce, is little more than an exhausted, boilerplate argument. In fact, this issue has had no impact on the overall litigation of the scientific reliability of LCN and was pointedly rejected in the *Morgan* case.

By way of background, in late 2011 and early 2012, AUSA Bruce filed a responsive brief in connection with the case of *United States v. MacDonald*, 641 F.3d 596 (4th Cir. 2011),

*brief cite* at 2011 WL 12194950 (E.D.N.C. December 13, 2011). The brief was filed in opposition to a request by MacDonald for additional DNA testing pursuant to § 3600 of the "Innocence Protection Act ("IPA"). MacDonald requested LCN DNA testing be performed on physical evidence used in connection with his 1979 conviction for murder. In his submissions, AUSA Bruce adopted the statements of Delgado, and made *legal* arguments about LCN DNA testing based solely upon the underlying opinion of that FBI scientific expert, in the context of the § 3600 application.

In *Morgan*, the defense advanced the very same argument as the one being made here, that is, that the Department of Justice "believes" LCN to be unreliable. That, of course, is not the position of the Department of Justice, or else the DOJ and the FBI would not utilize the services of OCME, as they have in this and many other cases. In any event, Judge Marrero easily disposed with the argument <u>in the context</u> of a *Daubert* application:

> Morgan also highlights that the FBI does not accept LCN samples into its CODIS database…<u>and that in at least one other federal jurisdiction the United States Attorney and the FBI argued that LCN results were too unreliable for admission for the purpose at issue in one case.</u> However, under *Daubert*, an admissible scientific technique need not be beyond substantive legitimate debate. *See Amorgianos*, 303 F.3d at 266.

> It is appropriate, and indeed important, to consider the more controversial aspects of OCME's LCN methodology – but the proper forum for the debate is before the jury, and it is for the jury to decide which of two conflicting experts' testimony to credit, and how much weight to give the evidence it accepts.

*Morgan*, 53 F. Supp. 3d at 742-43. (emphasis supplied).

Notably, at the 2014 *Morgan* trial, the defense actually attempted to call AUSA Bruce as a witness to introduce his 2012 filing in order to bolster their claim before the jury that it

was the position of the entire Department of Justice that LCN DNA was unreliable.[11]  In

opposing *Morgan*'s application, the government rightly argued that the out of court statement

was not only hearsay, but should be excluded on relevancy grounds:

> As an initial matter, the position of the Department of Justice on the subject of the reliability of LCN testing – even if there were such a position – is of no relevance to the jury's determination of whether LCN testing is in fact, reliable. Although it is a clever debater's trick to argue that the lawyers for one's adversary once advocated a different position than they are advancing now, the litigating position of the Attorney General on an issue of scientific opinion, then or now, does not have a tendency to make the actual fact at issue – the scientific reliability of LCN testing – 'more or less probable than it would without the evidence.'

Government's Response*, United States v Morgan*, 2014 WL 9879013 (October 27, 2014),

attached as Exhibit 20.


District Judge Gregory H. Woods, in denying *Morgan*'s application agreed there was

no <u>scientific</u> basis for the AUSA Bruce testimony:

> Given that the defendant is, I believe, going to have the opportunity to question one or more witnesses from the FBI regarding their policy with respect to LCN DNA evidence, I do not think that it is worthwhile to take the jury through what I believe will become an expansive detour of the facts and context of the *MacDonald* case.   This is especially so because I believe that the purpose of the defendant is requesting that is not to contradict the government's evidence regarding the guilt of Mr. Morgan and the reliability of LCN technology, but to implicitly criticize its decision to prosecute him here. I believe that exploring *MacDonald* and the government's position there would be extremely confusing to the jury, misleading, unfairly prejudicial and a waste of our time.

Judge Woods continued, stating:

> The defendant cannot use purported statements of a party opponent as a ruse for introducing incompetent lay testimony on a scientific subject.   Of course, I don't think that's the purpose.   I think the real reason to introduce Mr. Bruce's testimony is not to introduce scientific evidence about which he does not

---

[11]    Submission in *United States v Morgan*, 2014 WL 9879004 (October 23, 2014), attached as Exhibit 19.

appear to be qualified to speak, but to have another federal prosecutor implicitly attack the decisions of the prosecutors in this case.

*See* Transcript of the Proceedings, Hon. Gregory H. Woods, *United States v. Morgan*, 12-CR-223 (Oct. 31, 2014), attached hereto as Exhibit 21.

### 2. The OCME Utilized Test Kits that Were Validated for LCN DNA Testing

The defendant claims, with absolutely no proof or authority in support, that OCME's use of the Applied Biosystems AmpFISTR Identifiler® PCR Amplification Kit with 31 cycles was not properly validated. In fact, it was properly validated. As Dr. Craig O'Connor testified to in *Morgan*, the Applied Biosystems Identifiler kit was validated for use in both HCN (28 cycle) and LCN (31 cycle) testing, consistent with the manufacturer's recommendations. *See* Morgan, 53 F. Supp. 3d at 55-60. Not only was the increased 31-cycle amplification part of OCME's LCN validation study, this particular methodology was specifically approved by the agency's accrediting bodies. *See* Exhibits 7, 10, 11. These generic arguments were similarly considered and rejected in both *Morgan* and *Rochat*.

### 3. Wilbern's Dispute as to Whether OCME Properly Determined a Match Between the DNA left on the Umbrella and His DNA is a Matter for a Jury to Determine

This argument deserves little attention in the context of a *Daubert* application. Essentially, the defendant disagrees with the conclusions the OCME analysts made with regard to the evidence in this case and claims that the OCME's conclusions are "rife with confirmation bias." Defendant's Motion to Preclude, ECF Docket Entry 81, at 16. More particularly, he disputes the individual "allele calls" made at selected loci relating to Swab

8.4, the "umbrella latch mechanism." Because this argument simply attacks the <u>conclusions</u> of the OCME, it is a non-issue with respect to a motion to preclude under *Daubert*.

Under well-established law, a court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Morgan*, 53 F. Supp. 3d at 740 citing *Amorgianos*, 303 F.3d at 266. Therefore, the possibility that a different conclusion could be drawn from validation data does not undercut the reliability of the conclusion that was drawn, as long as the expert has "good grounds" for the chosen interpretation." *Amorgianos*, 303 F.3d at 267. For the reasons set forth above, the "good grounds" standard has been clearly met by the government. *Morgan*, 53 F. Supp. 3d at 741-42 (expert witness described in great detail OCME's LCN testing protocols and the thought process behind each judgment call). Any conflicting testimony regarding the "allele calls" at various loci are matters that should be left to the sound discretion of the jury. *Id.* at 730 (it is for the jury to decide which of two conflicting experts' testimony to credit, and how much weight to give the evidence it accepts).

### 4. The Amount of DNA Tested in this Case is Above Validation Studies

This argument relies on a mistaken facts. The defendant argues that the DNA from the umbrella latch, referred to as Swab 8.4, "contains less DNA than the lowest amount tested in OCME's validation study and it is a <u>mixed sample</u> of at least two people." *See* Defendant's Motion to Preclude, ECF Docket Entry 81, at 17. First of all, the DNA sample from the umbrella latch is not a mixed sample; OCME concluded that the sample was a "single-source

sample."[12]   Secondly, the amount of DNA located on Swab 8.4 was determined to be roughly

15.05 picograms.   As stated above, in the course of their validation studies, OCME

accurately tested "single-source" DNA samples at the 150pg, 100pg, 50pg, 25pg, 12.5pg, and

all the way down to 6.25pg levels.   *Morgan*, 53 F. Supp. 3d at 738.   The validation studies,

when taken as a whole, which includes the accurate testing of single source samples down to

6.25 pg, demonstrated that OCME can reliably interpret single source samples at 15.03 pg.


### 5.    The Inspector General Report is Irrelevant to a *Daubert* Determination

Here, the defendant makes the wildly unfounded claim that the <u>science</u> of the OCME's

LCN DNA methodology is "unreliable" because of two unrelated <u>personnel</u> <u>issues</u> at the

OCME lab.    This is little more than spurious rhetoric intended to cast a negative shadow on

the OCME.   It certainly has nothing to do with the <u>scientific</u> issues under consideration on

a motion for a *Daubert* hearing.

In any event, in the case of Ms. Caragine, she was apparently found to have violated

laboratory protocol regarding "the resolution of scientific disputes by rewriting a final report

and reassigning cases when she disagreed with the findings rather than bringing them to the

DNA technical leader for arbitration."   *See* Defendant's Exhibit I, ECF Docket Entry 81-4.

This internal policy issue was hardly an indictment against the overall "science" of LCN

DNA testing.   In fact, there is nothing in the Inspector General's Report which even remotely

raised concerns, on any level, about the *scientific validity* of LCN DNA testing.   Moreover,

---

[12]    As outlined above, it was actually Swab 8.2, the "umbrella wrap around", that was determined to be a mixture of at least two people.

just so this Court can be doubly assured, Ms. Caragine had absolutely no involvement in the instant case: she performed no testing, no review and prepared no reports in the case against the defendant Richard Wilbern. She wasn't even employed by the OCME in 2016 when the OCME evaluated the Wilbern DNA sample and compared it with the umbrella results. The issue involving Ms. Caragine involved an internal procedural issue, not a scientific validity issue. On this score, even the *Collins* Court got it right, stating in a footnote relative to her testimony at the *Frye* hearing: "This Court does not consider (Dr. Caragine's personnel infractions) to be remotely relevant to her assessments of high sensitivity analysis." *Collins*, 49 Misc. 3d at 607, footnote 5.

Likewise, the allegations relating to employee Serrita Mitchell, who apparently was found to have performed poorly for many years without corrective action, should give the Court no pause for concern. While all of the accusations against Ms. Mitchell may have been true, the fact of the matter is that Ms. Mitchell was not a LCN DNA criminalist, never worked on LCN DNA cases and had absolutely no involvement in the Richard Wilbern file. Nothing in the Inspector General's report would indicate otherwise. Again, her malfeasance is of no relevance to the scientific issues presented here, other than to smear OCME generally. *See also Report of Craig O'Connor*, at ¶ 37.

In sum, the personnel issues raised by the defendant have little to do with the scientific validity of the OCME's expert testimony relative to LCN DNA testing. As such, the court should not even consider it.

### 6. The OCME Has Not "Abandoned" LCN Testing

The defendant claims that OCME has "abandoned" the LCN technique, suggesting perhaps that OCME believes their own LCN testing methods to be unreliable. Again, this is simply not true and is dangerously misleading to the Court. As the attached Report from Dr. O'Connor's states, the new FBI CODIS standards which became effective January 2017 required the expansion of the CODIS requirements from the previously required 13 loci to 20 loci. Accordingly, OCME could no longer use the Applied Biosystems AmpFISTR Identifiler® PCR Amplification Kit, which only tested at 13 of the core loci. After careful investigation, OCME chose a different DNA testing kit called Promega PowerPlex® Fusion kit. The Promega PowerPlex Fusion kit has been proven to test at 24 loci, including the 20 CODIS core loci, and has been validated to achieve reliable results on DNA samples as small as 37.5 picograms, without the need for increased PCR cycles. In other words, the Promega PowerPlex® Fusion kit is able to perform what would previously been termed both low copy and high copy DNA testing, down to the specified minimum sample size. *See also* Decision of the Hon. Margaret M. Foti, *People v. Rochat*, at 43 (both New York State courts and federal courts have declined to invalidate LCN testing… merely because OCME has improved methods of LCN testing).

Moreover, any claim that OCME abandoned the LCN methodology because it determined that the lowest "reliable" threshold for DNA testing is 37.5 picograms, is simply incorrect. As Dr. O'Connor's report reveals, the 37.5 picogram threshold was validated for the ProMega Fusion kit; however, going any lower than that would require OCME to use increased amplification cycles and modified interpretation protocols, similar to those

previously validated for use with the Applied Biosystems AmpFISTR Identifiler® PCR Amplification Kit. In order to employ that technique with ProMegaFusion, OCME would be required to perform another extensive validation study for use with ProMegaFusion. That would necessarily require OCME to expend an unduly burdensome amount of time and money in performing such a series of studies. To determine whether such expenditure was beneficial for the lab, a cost/benefit analysis was done and it was ultimately decided that given the historically small number of cases that are presented to OCME and found to contain less than 37.5 picograms (that yielded results), as compared to the high cost of performing a validation for ProMegaFusion/LCN, the OCME Department of Forensic Biology decided not to proceed with the validation. This cost/benefit analysis is the very same reason most forensic laboratories in the United States have never moved forward with their own LCN validation studies/testing at their facilities, and simply referred their cases to the OCME for LCN testing.

In sum, the unfounded assertions made by the defendant that LCN testing was abandoned by OCME based on reliability concerns is completely false. Accordingly, it should not be considered by the court in any way.

### IV. Conclusion

The Government recognizes that just like any scientific process, LCN DNA testing will garner critics. Respectful disagreement among acclaimed experts is the hallmark of a robust scientific community. But there can be no intellectually honest claim that the OCME's LCN DNA testing is "junk science." And at the end of the day, that is the <u>only</u>

issue before the Court on this motion.   To be sure, the defendant raises disagreements with the application of LCN techniques, namely the interpretations and conclusions of the OCME. However, those arguments go to the weight, not the admissibility, of the expert testimony. *Daubert* created a flexible standard, under which the rejection of expert testimony is to be the exception rather than the rule.   Traditional methods such as effective cross-examination, presentation of contrary expert evidence and careful instruction on the burden of proof are the appropriate means of attacking valid scientific evidence.

The defendant is not entitled to a *Daubert* hearing by the mere asking.   The Court has before it extensive briefing from both sides, a bounty of court decisions, supporting documentation and reports, publications, administrative letters of approval from the NYS Commission on Forensic Science and its DNA Subcommittee, as well as transcripts from prior *Frye* and *Daubert* hearings.   There is simply no basis upon which to preclude the LCN testimony at trial.   Because the matters are well within the capabilities of a jury and the adversary system generally, the Court should exercise its sound discretion and summarily deny defendant's request to conduct yet another evidentiary hearing on these same issues, a hearing which would amount to little more than a rehashing of old news.

## ADDITIONAL RULE 16 AND *BRADY* REQUESTS – OCME REPORTS

### ECF Docket Entry 80; 17-CR-6017CJS

Defendants have moved pursuant to Rule 16 of the Federal Rules of Criminal Procedure and *Brady v. Maryland*, 373 U.S. 83 (1963) for an Order compelling the government

to produce documents relating to "all nonconforming events at the Office of the Chief Medical Examiner of New York City ["OCME"] responsible for the DNA testing here, from 2011 to 2017 relating to the chain of custody and DNA testing and analysis." ECF Docket Entry 80, p. 3. Because these documents are not within the custody and control of the government, the request should be denied.

By way of background, "non-conforming reports" are utilized by OCME to document any human error or machine malfunction which may have occurred at any stage of the DNA testing procedure, or to memorialize the existence of typographical and/or other errors in the writing of a report. In this case, two separate files were prepared by the OCME. The first file, denoted as FB11-06738, refers to the reports generated in 2011 regarding the DNA profile obtained from the umbrella. The second file, denoted as FBS16-02532, refers to the 2016 reports involving Richard Wilbern's DNA profile and its comparison with the DNA profiles obtained from the umbrella. Naturally, these files included any "non-conforming reports" that were specific to this case and were turned over in the discovery process.

At the defense request, the government inquired whether the OCME would voluntarily produce additional, non-case specific "non-conforming" reports. In particular, the defense requested all non-conforming reports which may have been produced on any case that involved the work of Dr. Craig O'Connor and Michelle Egerman, the criminalists who performed testing on the two Wilbern files. The OCME agreed to provide those documents, however, because this request was non-case specific, OCME required the defense to enter into a non-disclosure agreement, routinely used in courts located downstate, which would allow the defense to utilize the documents for litigation purposes only. *See, e.g.,* ECF Docket Entry

80, Exh. A.   For whatever reason, this proposal was apparently not acceptable to the defense so the documents were not produced by OCME.

The defense has now expanded their request by asking for <u>all</u> non-conforming reports, on <u>any</u> case, involving <u>any</u> criminalist employed by OCME from 2011 - 2017, whether they worked on the Wilbern case files or not.   The government has been advised by counsel for the OCME that they will not voluntarily provide these documents, with or without a non-disclosure agreement, and will move to quash any subpoena or Court Order that may be issued.

The government should not be compelled to comply with the defendant's latest requests.   Simply stated, the government cannot produce documents that are in the exclusive control of the OCME.   Rule 16 and Brady only require the government to provide those documents and tangible objects which are "within the possession, custody or control of the government." Fed.R.Crim.P. 16(a)(1)(E);   *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *United States v. Walker*, 559 F.2d 365, 373 (5th Cir.1977);   *Pina v. Henderson*, 752 F.2d 47, 49 (2d Cir.1985).   Here, the documents the defense believes they are entitled to are maintained by a New York state agency who, by law, are independent of and not subject to the control of the office of any prosecutor.   *People v. Washington*, 86 NY2d 189 (1995).

In the Second Circuit, whether the government's disclosure duty extends to evidence maintained by another agency depends on whether the agency is "an arm of the prosecutor" or "part of the 'prosecution team.' " *United States v. Meregildo*, 920 F. Supp. 2d 434, 440–41 (S.D.N.Y.2013) (*quoting United States v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002).   Whether someone is part of the prosecution team depends on the level of interaction between the prosecutor and the agency or individual.   *See United States v. Locascio*, 6 F.3d 924, 949 (2d

Cir. 1993) (holding that the reports made by FBI agents in the course of investigations apparently unrelated to the defendants' prosecutions should not be imputed). Imposition of a duty on a prosecutor to obtain and disclose information possessed by officials from other agencies who are not assigned to the criminal prosecution team would inappropriately adopt "a monolithic view of government" that would "condemn the prosecution of criminal cases to a state of paralysis." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (*quoting United States v. Gambino*, 835 F. Supp. 74, 95 (E.D.N.Y. 1993), aff'd, 59 F.3d 353 (2d Cir. 1995)).

The most basic role of the prosecution "team" is to "perform investigative duties and make strategic decisions about the prosecution of the case." *Meregildo*, 920 F. Supp. 2d at 441. Members of a prosecution team perform investigative duties and make strategic decisions about the prosecution of the case. *See, e.g., Kyles*, 514 U.S. at 438 (police investigator). *See also United States v. Morell*, 524 F.2d 550, 555 (2d Cir.1975) (holding that imputation is only proper when an agency can be considered "an arm of the prosecutor" and listing cases). Given these parameters, it is clear to anyone the OCME is not an arm of the prosecution team. OCME has played no part in any investigative action, they were not consulted relative to any charging decisions or strategies, nor did they act "under the direction" of the United States Attorney's office. The criminalists from OCME have provide nothing more than their expertise in the area of LCN DNA testing, including the actual testing along with the explanations of their results and conclusions. Their involvement is limited to the area of their expertise. OCME has taken only those actions which are consistent with the ordinary role of an expert. *United States v. Stewart*, 323 F. Supp. 2d 606, 616–18 (S.D.N.Y.2004) (declining to impute knowledge of perjury from a forensic expert from the Secret Service lab who provided trial support for the prosecution and testified as an expert). As neither the OCME, nor the documents they possess, are under the control of the United

States Attorneys office, the government cannot be compelled to obtain the requested documents.

As a final point, the defendants are well aware that OCME maintains the records they seek. If they desire to obtain such material, they should apply for a Rule 17(c) subpoena, or for an order of the Court. At that point, it will be the OCME and their legal counsel, and not the federal government, who will respond as they deem appropriate.

## THE GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE

### ECF Docket Entry 80; 17-CR-6017CJS

The defendant moves to suppress tangible evidence derived as a result of search warrants executed on his cellular telephone, three computer hard drives, his personal vehicle and the garage at 23 Tubman Way, where he stored his personal belongings. The sole basis for the motion to suppress is a claim that "the search warrants were issued without probable cause as FBI Task Force Officer (TFO) Andrew Jasie's affidavits contained misleading statements and material omissions." In connection with the motion, the defendant seeks a *Franks* hearing.

### I.     Relevant Facts

On September 27, 2016, a search warrant (16-MJ-613) for 23 Tubman Way (garage only), Rochester, New York, was signed by Hon. Jonathan W. Feldman. On October 6, 2016, a search warrant (16-MJ-619) for defendant's 2005 GMC Van was signed by Hon. Jonathan W. Feldman. On November 28, 2016, a search warrant (16-MJ-655) for defendant's

Toshiba Laptop, Acer Laptop and iOmega portable hard drive was signed by Hon. Jonathan W. Feldman. TFO Andrew Jasie was the affiant on each of these search warrant applications.

## II.    Applicable Law

The Fourth Amendment to the United States Constitution states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. am. IV. "The Supreme Court has explained that 'probable cause is a fluid concept - turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules.' " *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008) (*quoting Illinois v. Gates*, 462 U.S. 213, 232 (1983)). When evaluating whether probable cause exists in a case, a judge must " 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015) (*quoting Gates*, 462 U.S. at 238). Given the initial subjective standard, "a reviewing court generally accords 'substantial deference to the finding of an issuing judicial office that probable cause exists,' limiting [the] inquiry to whether the office 'had a substantial basis for his [or her] determination.' " *United States v. Wey*, 256 F. Supp. 3d 355, 382 (S.D.N.Y. 2017) (quoting *Falso*, 544 F.3d at 133 and *United States v Leon,* 468 U.S. 897, 915 (1984)).

Generally, "a presumption of validity attaches to a law enforcement affidavit," *Falso*, 544 F.3d at 125, and a search carried out "pursuant to a warrant is presumed valid." *United States v. Mandell*, 752 F.3d 544 (2d Cir. 2014) (quoting *United States v Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003)). Nonetheless, a court may suppress evidence obtained pursuant to an affidavit containing erroneous information if the defendant makes a "substantial preliminary showing that [i] a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit, and [ii] the statement was necessary to the judge's finding of probable cause." *Franks v. Delaware,* 438 U.S. 154, 155-56, 170-71 (1978); *United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000). However, the *Franks* standard is "a high one," *see Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991) and "credible and probative evidence" must be adduced that the deficiencies in the warrant application were "designed to mislead" or were "made in reckless disregard of whether [they] would mislead." *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (quoting *Awadallah,* 349 F.3d at 68)).

## II.   Discussion

In support of his motion for suppression and a *Franks* hearing, the defendant essentially cut-and-pastes the very same arguments he advances to preclude LCN DNA evidence generally: that LCN DNA testing as performed by the OCME is "junk science." [13]   In a clever attempt to concoct an argument to make it fit within the *Franks* context, the defendant claims that since TFO Jasie "vouched" for the reliability of the OCME's LCN DNA testing procedure and final conclusions, conclusions to which the defendant objects, TFO Jasie

---

[13]    *See* Defendant's Motion to Exclude LCN DNA Evidence, ECF Docket Entry 81, 17-CR-6017.

necessarily "submitted false and/or misleading statements and omitted material facts knowingly and intentionally, or with reckless disregard for the truth." *See* ECF Docket Entry 80, p. 10-16.

The Defendant either misconstrues, or affirmatively misuses, the holding in *Franks*. *Franks* concerns itself solely with the affiant's intent – *ie.*, did the affiant intentionally mislead the court by action or omission. A common-sense review of the information provided by TFO Jasie in his affidavit easily answers the question. TFO Jasie didn't intentionally mislead the court, nor did he "vouch" for anything - he merely repeated the scientific information which was provided by the OCME laboratory through the production of their case reports.[14] His averments regarding LCN were not his personal opinions, but were based upon the reports issued by the OCME, as highlighted in bold below:

> On November 15, 2011, Webster Police investigators transferred the second set of swabs from the Monroe County Public Safety Building to the Office of Chief Medical Examiner (OCME) in New York City. OCME had developed the expertise and facilities necessary to perform a DNA testing technique that enables testing to be performed on trace amounts of evidence. This testing technique is referred to as High Sensitivity DNA testing (also referred to as Low Template testing). **On December 28, 2011, the Office of Chief Medical Examiner, New York City issued a report advising** that they were able to recover Human DNA from each of the submitted swabs from the umbrella, and that two of the submitted swabs contained sufficient levels of Human DNA to conduct High Sensitivity PCR DNA testing and comparison. PCR testing, more formally called polymerase chain reaction (PCR) is a technique used in molecular biology to amplify a single copy or a few copies of a piece of DNA across several orders of magnitude, generating large amounts of DNA by repeated cycles of copying the DNA loci. As to Swab 8.2, which was taken from the "umbrella closure wrap around", the Medical Examiner concluded that DNA from at least two people was located, but included one major male contributor, referred to as "Male Donor A." The DNA profile of Male Donor A was a full profile, based on testing at 15 different loci positions. That DNA profile would be expected to be found in only 1 in 6.80 trillion people. The second sample, Swab 8.4, which was taken from the

---

[14]    The OCME Laboratory reports are included as Exhibits 22 and 23.

"umbrella latch mechanism (lower)" of the umbrella was also a significant profile, based on testing at 10 different loci positions. The DNA profile would be expected to be found in only 1 in 138 million people. The DNA profiles were suitable for entry into the Combined DNA Index system (CODIS), but have not resulted in any positive matches. Notably, despite having a prior felony conviction, Richard Wilbern has never been compelled to provide a DNA sample for submission to the database.

Shortly after obtaining the DNA sample from Richard Wilbern, the evidence was delivered to the Office of the Medical Examiner in New York City to be compared against the "Male Donor A" DNA profiles obtained from the umbrella in 2011. **On September 1, 2016, law enforcement received the official report from the Office of the Medical Examiner. The Office of the Medical Examiner's report indicated** that they were able to obtain a full DNA profile from the saliva contained on the envelope. As to Swab 8.2, which was taken from the "umbrella closure wrap around", the Medical Examiner's Office concluded that the DNA profile obtained from "Male Donor A" positively matched the DNA profile of the sample obtained from Richard Wilbern. In other words, the DNA located on the "umbrella closure wrap around" is that of Richard Leon Wilbern. As stated above, the DNA profile of Male Donor A is expected to be found in only 1 in 6.80 trillion people. As for Swab 8.4, which was taken from the "umbrella latch mechanism (lower)", the Medical Examiner's Office concluded that DNA profile obtained from "Male Donor A" matches the DNA profile of the sample obtained from Richard Wilbern. As stated above, for Swab 8.4, the DNA profile of Male Donor A is expected to be found in 1 in 138 million people.

The defendant provides absolutely no authority for the proposition that an affiant intentionally misleads the court by simply informing the Court of scientific results and conclusions provided to them in the course of an investigation. While it's very evident the defendant disagrees with the scientific conclusions set forth in the affidavit, a mere restatement of them is hardly a *Franks* violation. In other words, had TFO Jasie intentionally misled the court by stating that the OCME linked the DNA evidence to the defendant when they in fact had not done so, or if he substituted his personal opinions or materially misstated (or overstated) the frequency calculations contained in the reports, the defendant would have a valid claim. But that is not what happened here. All TFO Jasie did was accurately relay the scientific information that was provided to him by a reputable laboratory, results he

believed, in good faith, to be accurate. TFO Jasie could not be expected, much less required, to do his own research to determine the veracity and reliability of the OCME's conclusions. This is no different than a situation where an affiant repeats the findings of an SEC investigation, or relays the cause of death determination in an autopsy report, or relies on the conclusions provided to him by a K-9 handler. Certainly all of those determinations and findings could be challenged at trial. But for *Franks* purposes, if the affiant accurately reflects the information being provided, he satisfies his obligations.

An analogous issue was presented to this Court in the case of *United States v Lonardo*, 2012 WL 3685958 (W.D.N.Y. June 27, 2012), Report and Recommendation adopted at 2012 WL 3686084 (W.D.N.Y., Aug. 24, 2012) involving the use of a FLIR thermal imaging device. In support of his application for a search warrant for Lonardo's home, NYS State Police Investigator Shepard incorporated the affidavit of Agent Diss, the operator of the FLIR device. Lonardo argued that Shepard's affidavit contained false and misleading statements about the reliability of the FLIR results. In rejecting the claim, this court stated:

> "The problem with Lonardo's argument is that he bears the burden of showing that the claimed misstatements in the search warrant application were the result of the affiant's deliberate falsehood or reckless disregard for the truth. There has been no factual showing upon which the Court could make such a finding here. And Lonardo has not cited any legal authority for the proposition that Investigator Shepard was required to question or conduct an independent evaluation of Agent Diss's factual findings and expert opinion before relying upon the FLIR results when applying to Judge Geraci for a search warrant. *See United States v. Harding*, 273 F.Supp.2d 411, 428 (S.D.N.Y.2003) (*Franks* threshold not met because affiant was not required to conduct a detailed analysis of an expert's opinion before relying on the evidence in a search warrant application).

> In other words, absent some reason for Investigator Sheperd to question the veracity of Diss's affidavit, Shepard committed no wrong in accepting Agent Diss's findings as truthful. Nor was Shepard required to independently determine whether thermal imaging was "junk science" before submitting the search warrant application to Judge Geraci. As the Court in Franks made clear, the requirement that an affiant be truthful

in an application for a search warrant does not mean that every fact stated in the application is correct." This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true. *Franks v. Delaware*, 438 U.S. at 165. There is no basis in this record for the Court to find that the information contained in the search warrant application at issue here was not "believed or appropriately accepted" by Investigator Shepard as true. "[T]he subject of [a *Franks*] hearing is the veracity of the affiant, not of persons on whom he justifiably relied." *United States v. Barone*, 787 F.2d 811, 814 (2d Cir.1986)."

Courts have clarified the extent of the burden placed on an affiant in other contexts as well. For example, it is well settled that a search warrant may not be challenged under *Franks* on the ground that an informant knowingly or recklessly made a false statement to the affiant - so long as the affiant in good faith accurately represents what the informant said. *United States v. Wapnick*, 60 F.3d 948, 956 (2d Cir.1995); *United States v. Merchant Diamond Group, Inc.*, 565 F.2d 252, 253 (2d Cir.1977). In other scenarios, courts have generally found no cause for preclusion where the affiant fails to set forth the entire scope of the investigation, including a listing of its failures. An otherwise sufficient application for a search warrant need not relate unproductive or unsuccessful efforts in the course of the investigation. *See United States v. Smith*, 9 F.3d 1007, 1014 (2d Cir. 1993).

Warrants are entitled to a presumption of validity. *Franks*, at 171. This court issued the respective search warrants having reviewed the applications and making the appropriate determination that probable cause existed. Fed R. Crim. P. 41(d)(1). The defendant has not articulated any "credible and probative evidence" that the alleged deficiencies in the warrant application, even if they were present, were "designed to mislead" or were "made in

reckless disregard of whether [they] would mislead." Nor is there any basis for the Court to find that the information contained in the search warrant application at issue here was not "believed or appropriately accepted" by TFO Jasie as true. Accordingly, defendant's motion to suppress the evidence, or for a *Franks* hearing, should be summarily denied on the submissions.

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS MADE TO THE FBI AND THE COLLECTION OF A DNA SAMPLE VOLUNTARILY PROVIDED

### ECF Docket Entry 80; 17-CR-6017CJS

The defendant moves to suppress (1) all statements made by the defendant during the course of three non-custodial conversations with FBI agents; and, (2) the collection of a DNA sample he provided to the FBI. The defendant moves solely under the Fourth Amendment, asking the Court to make a "determination of involuntariness" under a "totality of the circumstances" standard. *See* ECF Docket Entry 80, p 14. The singular basis advanced in support of his suppression motion is that the FBI agents allegedly employed "constant and pervasive deception" and, by virtue of "trickery", unlawfully obtained both the verbal statements and his DNA sample. *Id*. at 15. For the reasons discussed below, this argument is unavailing.

### I. Relevant Facts

In March 2016, after conducting a press conference for the purpose of developing additional information and/or new leads in the Xerox robbery/murder investigation, a concerned citizen contacted the Federal Bureau of Investigation with material and relevant

information.    Upon personally interviewing the individual, law enforcement learned that the perpetrator of the crime was identified as a former Xerox employee named Richard Wilbern.    As such, law enforcement agents began a thorough investigation into the history and background of Wilbern, as they had similarly done with other persons of interest during the course of the investigation.

In conducting the background, agents learned that Wilbern made five phone calls to the FBI Public Access Line between July 14, 2015 and April 14, 2016.    These complaints were apparently in relation to a suspected real estate scam involving the property located at 82 Southern Parkway, Brighton, New York.    Wilbern claimed to be the victim of an attempted fraud and sought the assistance of the FBI.    On June 29, 2016, FBI agents contacted Richard Wilbern via the cell phone number he provided on the Public Access Line. Wilbern was invited to come to the FBI Office in Rochester for the first of what would amount to three meetings.[15]  Wilbern was essentially told that the FBI wanted to learn more about the facts and circumstances of the alleged fraud about which he complained.

On July 7, 2016, Wilbern drove in his personal vehicle (GMC Savana Cargo Van) to the FBI offices located on Scottsville Road.    He arrived at the location with his infant son and was escorted to an interview room.    During that initial meeting, Wilbern outlined the

---

[15]    Each of the three meetings between law enforcement and the defendant were captured by audio and video, which will be provided to the Court under separate cover.    Given the clarity of the video, neither the conversational tone of the encounter, nor the conduct of the participants, nor the actual words spoken can be in dispute.    The government does not intend to offer any portion of the interviews conducted on the first two dates, that is, July 6, 2016 and July 19, 2016.    The government does intend to offer relevant portions of the third interview, dated September 28, 2016. Notably, Wilbern never confessed to the Xerox robbery/murder although portions of the third interview are, in the government's view, quite relevant and probative of issues to be proven at trial.

facts and circumstances relating to the attempted fraud he believed had been perpetrated. After speaking with agents, Wilbern and his infant son left the premises. His freedom of movement was not restricted in any way, and he certainly was not in custody. The government does not dispute that agents invited Wilbern to the FBI offices in large part to fully identify him, his personal vehicle and to potentially obtain a DNA sample for comparison against the known sample developed in 2011.

On July 19, 2016, Wilbern was again invited to the FBI office. He was not ordered or compelled in any way to come to the FBI offices. On this occasion he came alone and was escorted to the same interview room. During that meeting, Wilbern was asked to sign paperwork acknowledging his consent to audio record any future telephone calls he might have with the target of the alleged fraud of which he complained. He was asked to sign the acknowledgment paperwork and seal it in an envelope, which he did by licking the envelope, and to sign and date the envelope across the seal. Wilbern then left the envelope on the conference table. Upon completing this task, Wilbern left the FBI offices. After Wilbern left the FBI office, law enforcement collected the envelope and immediately placed it in an evidence bag.[16]

On September 27, 2016, Wilbern was again invited to the FBI offices. He arrived in the same vehicle and entered the FBI offices where he was escorted to the same interview room. During this third interview, law enforcement discussed a number of topics, including

---

[16]      Shortly after obtaining the DNA sample from the defendant, the evidence was delivered to the Office of the Chief Medical Examiner in New York City.

Wilbern's prior involvement with civil lawsuits, his employment and termination at Xerox, his lawsuit against Xerox, as well as his criminal background, including his conviction for armed robbery in 1980.[17]   As the video shows, the conversation was fluid and civil.   After taking a bathroom break, TFO Andrew Jasie began to ask the defendant pointed questions relative to the last time Wilbern could recall being inside the Xerox Federal Credit Union. TFO Jasie asked Wilbern whether he could show him some pictures and the defendant's body language and attitude changed abruptly.   Wilbern stated:   "I don't want to see no pictures. I want to leave.   If I'm not under arrest, I'd like to leave."   Wilbern told the agents, in sum and substance, that he didn't know what the agents were talking about, and flatly denied any involvement in the crime.   Wilbern then invoked his right to counsel and was placed under arrest shortly thereafter.

## II.   Discussion

### a.   The Defendant's Conversations with the FBI Agents were Non-Custodial and Voluntary

The defendant contends that the various conversation he had with the FBI agents during the course of the July 7, July 19 and September 27, 2016 meetings were "involuntary" on the basis that he was essentially "misled" as to the purpose of the meetings.   Specifically, he claims that "law enforcement misled him into believing they would assist [in his fraud claim]; in reality they had no intent to do so."   ECF Docket Entry 80, p. 15.   To the extent

---

[17]     Prior to conversations relating to his criminal past, in an abundance of caution, the defendant was administered his *Miranda* rights, although he was not then in custody.

this could even be considered "deceit and trickery", as opposed to the FBI's mere desire not to reveal the information they had regarding the defendant's potential involvement in the Xerox crime, the affirmative use of trickery by law enforcement officers will rarely render a statement involuntary, and even less so when the statements are provided in a non-custodial situation.

Given the limited basis upon which the defendant moves, and the fact that the conversations took place on video, no hearing is required to resolve this issue. The Fifth Amendment "forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). In the context of statements made to law enforcement, "ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak" will not render a defendant's statement involuntary. *Id.*, *See also, e.g., Lewis v. United States*, 385 U.S. 206, 209 (1966) ("in the detection of many types of crimes, the Government is entitled to use decoys and to conceal the identity of its agents"); *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991); *Tankleff v. Senkowski*, 135 F.3d 235, 245 (2d Cir. 1988) (lie told to 17 year-old suspect that his father awoke from a coma and implicated him did not "irredeemably taint" a confession given after subsequent *Miranda* warnings); *Frazier v. Cupp*, 394 U.S. 731, 737 (1969) (false statement by police that co-defendant had confessed did not render confession involuntary); *Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir. 1998) (misrepresentation pertaining to fingerprint evidence found in the victim's home); *Ledbetter v. Edwards*, 35 F.3d 1062, 1066 (6th Cir. 1994) (falsified fingerprint comparison chart, claim that three witnesses had identified defendant, and staged victim identification); *but see Lynumn v. Illinois*, 372 U.S. 528, 533–34, (1963) (concluding that the defendant's confession was

coerced when the police implied that she would lose custody of her children and her state financial benefits if she did not cooperate); *Spano v. New York*, 360 U.S. 315 (1959) (misrepresentation by the suspect's friend that the friend would lose his job as a police officer if the suspect failed to cooperate rendered his statement involuntary).

In reviewing the totality of the circumstances surrounding Wilbern's conversations with the FBI, one thing cannot be disputed: there is absolutely no evidence of coercion, force, deprivation or compulsion. In fact, it was the defendant who first initiated contacted with the FBI. He voluntarily accepted an invitation to come to the offices of the FBI to be interviewed. Thus, unlike the facts found in *Lynum* and *Spano*, there is no valid argument that the defendant had "no choice" but to submit to the officers questions about his background. Nor could it be said that the FBI agents engaged in "outrageous governmental conduct" by simply failing to warn him that he was a "person of interest" in the Xerox case. And while the defendant's subjective intent was apparently to discuss an alleged real estate fraud, the fact that the FBI may have had little interest in pursuing his fraud claims has no bearing on a determination as to whether the statements made by the defendant were voluntarily given. Stated another way, the defendant's motion completely fails to articulate how his misperception about the agents' objectives rises to the level of "compulsion or coercion to speak," or otherwise impaired his "capacity for self-determination," particularly given the otherwise voluntary and collegial nature of each of the encounters. *See United States v. Maney*, 2006 WL 3780813 (W.D.N.Y. 2006) *citing Colorado v. Spring*, 479 U.S. 564 (1987) ("a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege.").

The defendant cites the Ninth Circuit case of *United States v. Bosse*, 898 F.2d 113, 115 (9th Cir. 1990) for the general proposition that a government agent may not conduct a "search" by misrepresenting the nature or scope of his governmental authority through fraud, deceit, or trickery. *Id*. at 115. However, the facts of the *Bosse* case hardly align with the instant case and can easily be distinguished. In *Bosse*, the defendant (Bosse) was a firearms dealer who had an application pending for a state license to buy and sell machine guns. As part of the license application process, Dunkin, an agent from the California Department of Justice, inspected Bosse's home and surrounding premises with Bosse's consent. Bosse presumably gave consent because he wished to keep his firearms license. Accompanying Dunkin, however, was Rusin, a federal agent with the Bureau of Alcohol, Tobacco and Firearms (ATF), who was present to investigate criminal conduct. Rusin purposely did identify himself to Bosse as an ATF agent. The Ninth Circuit held that Dunkin made "a deliberate misrepresentation" of Rusin's purpose and status to Bosse. *Id*.[18] The Court opined that "a government agent [may not] gain access to records which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust." *Id*., quoting *SEC v. ESM Government Securities, Inc.*, 645 F.2d 310, 316 (5th Cir. 1981).

In the instant case, the agents who interviewed the defendant did not conceal their identities in any way. The defendant was fully aware that he was speaking with federal law

---

[18] The district court concluded that observations made by Agent Rusin may have been the basis for the subsequent search warrant for Bosse's home, and accordingly granted Bosse's motion for new trial. However, the Ninth Circuit vacated the district court's order and remanded. It held that the district court's findings were "inconclusive ... with respect to the effect of Rusin's illegal entry and search on" the "decision to seek the warrant." *Id*. at 116. While they stated that Bosse's Fourth Amendment rights may have been violated if information gathered by Rusin during the inspection was used to obtain the search warrant, it nevertheless remanded to determine if there was an independent basis.

enforcement and voluntarily chose to come to the FBI offices and discuss his apparent fraud claims. The agents did not gain any access to statements or information that would otherwise be unavailable to them; instead, the defendant freely provided it. And unlike Bosse, who believed he had no choice other than to allow an inspection of his home in order to keep his license, Wilbern's decision to meet with law enforcement and participate in a discussion was his choice and his alone.

As a final point, there can be no factual dispute that during the encounter on September 27, 2017, the defendant was specifically advised of his *Miranda* rights, which included his right to remain silent. The video captured the administration of those rights. There is also no factual dispute that he acknowledged his right to remain silent, and waived the same by continuing the conversation. Accordingly, everything he stated thereafter, to the extent it is probative, relevant and otherwise satisfies the rules of evidence, remains admissible at trial.

### b. The Collection of the Defendant's DNA Sample was Not a Search under the Fourth Amendment

In a similar manner, the defendant argues the collection and analysis of his biological sample (saliva) constituted an illegal "search" under the Fourth Amendment. Specifically, he contends that his saliva was obtained by virtue of the "deceit and trickery" of law enforcement officials. *See* ECF Docket Entry 80, p. 15. Because the undisputed facts reveal that the defendant voluntarily relinquished his DNA without any force or compulsion, thus abandoning any reasonable expectation of privacy, the collection was constitutionally reasonable.

It is well recognized that the "forcible" collection of bodily fluids from an "unconsenting" individual will almost always constitute an unreasonable search in the absence of a warrant or court order. *Maryland v. King*, 133 S. Ct. 1958 (2013). In fact, it has been written that virtually any governmental "intrusio[n] into the human body," *Schmerber v. California*, 384 U.S. 757, 770 (1966), will work an invasion of "'cherished personal security' that is subject to constitutional scrutiny.'" *See Missouri v. McNeely*, 133 S. Ct. 1552 (2013). But those aren't the facts here. In this case, the entire interaction between the defendant and FBI Special Agent Seth Fleitman was captured on video, so there can be no factual dispute whether the defendant was subjected to any forced collection of his DNA; indeed, the defendant alleges none. Nor do any facts exist suggesting that the government used physical force or otherwise compelled the defendant to hand over the envelope upon which he had just placed his saliva. As the video suggests, the defendant voluntarily relinquished the enveloped, placed it on the conference table in front of him and left the interview room.

Of course, the defendant now argues that if he realized the government intended to use the DNA sample to compare against the Xerox crime scene, he would have never released it. However, the inquiry here centers not upon the subjective motives of law enforcement, but whether by the defendant knowingly and voluntarily exposed his saliva, as compared to being unlawfully "compelled" to do so. Where a defendant exposes his saliva or skin cells to the public and the government has access to it without having to use any invasive or compulsory technique, there is no longer any objectively reasonable expectation of privacy in that DNA material. The distinction is derived from the general principle that "physical characteristics that are constantly exposed to the public" are not protected by the Fourth

59

Amendment. *United States v. Mara*, 410 U.S. 19, 21 (1973); *Raynor v. State*, 440 Md. 71 (Md. Aug. 27, 2014) (similar to the analysis of a latent fingerprint, which involves no physical intrusion into the body, there was no constitutionally protected search when police swabbed DNA from the armrest of a chair where the defendant was interviewed); *People v. Ayler*, 799 N.Y.S.2d 162 (N.Y. 2004) (DNA obtained from cigarette butts left in a police interview room).[19]

So, while the defendant may have enjoyed a subjective expectation of privacy in the saliva while it remained in his mouth, once he chose to expose his saliva by licking the envelope and willingly handing it over to the FBI, he relinquished any reasonable expectation of privacy he might have had. In other words, he voluntarily abandoned it, regardless of the subjective motives of law enforcement. *See California v. Greenwood*, 486 U.S. 35, 39–41 (1988) (defendants do not have a reasonable expectation of privacy "in the inculpatory items that they discard"). Had the defendant wished to keep his DNA sample private, he could have stated that he no longer desired the assistance of the FBI, or he could have simply refused to lick the envelope or used another method to seal the envelope. There was absolutely no demonstration of force, physical or verbal, compelling the defendant to relinquish custody of

---

[19]    There are a whole host of cases which have determined that an individual releases any expectation of privacy upon discarding or relinquishing possession of the object from which DNA was extracted, including: *People v. Sterling*, 57 A.D.3d 1110 (N.Y. App. Div. 2008) (DNA from a milk carton); *People v. Barker*, 195 Misc. 2d 92 (Monroe County Ct. N.Y. 2003) (DNA from a discarded plastic spoon); *Piro v. State*, 146 Idaho 86 (Idaho Ct. App. 2008) (DNA from a water bottle left in a police interrogation room); *Marino v. Commonwealth*, 488 S.W.3d 621 (Ky. Ct. App. Apr. 29, 2016) (DNA from a cup that a suspect drank from while being interrogated); *Commonwealth v. Perkins*, 450 Mass. 834 (Mass. 2008) (DNA from cigarette butts and a soda can left in a police interrogation room); *Williamson v. State*, 413 Md. 521 (Md. 2010) (DNA from a discarded McDonald's drink cup). *State v. Williford*, 239 N.C. App. 123 (N.C. Ct. App. Jan. 6, 2015) (defendant relinquished expectation of privacy in his DNA when he discarded a cigarette butt dropped on the ground outside his apartment).

that envelope. In fact, as evidenced by the video, the defendant never expressed any reluctance in leaving the envelope in the custody of the FBI. After the conversation with the agent concluded, the defendant exited the building as freely as when he entered.

Nor does the fact that the FBI utilized a ruse to obtain the defendant's DNA alter the Fourth Amendment determination. The defendant's case is very similar to the actions of law enforcement in *State v. Athan*, 160 Wn.2d 354, 363 (Wash. 2007). In that case, the police posed as a fictitious law firm and solicited information from the defendant. After the defendant willingly mailed them the desired information in an envelope sealed with his saliva, the police used this saliva to acquire his DNA profile. When the defendant challenged his conviction, citing the admissibility of the DNA evidence, the Court determined that law enforcement's use of a ruse was not unconstitutional and reverted to the same analysis used by other courts, concluding that DNA obtained "without forcible compulsion and analyzed by the government for comparison to evidence found at a crime scene is not a search under the Fourth Amendment". *Id.* at 374.

In *Jones v. Meehan*, 2018 WL 459662 (S.D.N.Y. Jan. 16, 2018), the Court in addressing plaintiff's civil rights claims under 42 U.S.C. § 1983, held on a summary judgment motion that law enforcement did not violate the plaintiff's rights when they obtained plaintiff's saliva, albeit through trickery. The plaintiff, who was being investigated for numerous burglaries, was placed in an interview room. Plaintiff argued that the police deliberately deprived him of water, medication, or toileting opportunities at the precinct house, in order to trick him into providing a DNA sample when he drank from the cup that was eventually provided to him. That DNA was later compared to DNA recovered from the crime scene. The Court

relied on a theory of abandonment in determining there was no Fourth Amendment violation: "The Fourth Amendment does not protect abandoned or voluntarily discarded property because any expectation of privacy that may have existed becomes irrelevant the moment it is abandoned." *citing* Anip Patel, *The Constitutionality of DNA Sampling of Arrestees,* 13 U. Pitt. J. Tech. L. Pol'y 1, 25 (2012). Both the Supreme Court and the Second Circuit are clear on this point. *See, e.g., United States v. Lee*, 916 F.2d 814, 818 (2d Cir. 1990) ("When a person voluntarily abandons property, ... he forfeits any reasonable expectation of privacy that he might have had in the property.") *Id.* The *Jones* Court further opined that even under a Fourteenth Amendment theory, the fact that law enforcement engaged in "such trickery, even if true, does not a due process violation make." *Id.*

Similarly, in *Commonwealth v. Bly*, 448 Mass. 473, 489–491 (2007), in affirming the denial of a motion to suppress DNA evidence, the Supreme Judicial Court determined that the defendant lacked an expectation of privacy in the cigarette butts and a water bottle that he had abandoned, and that the police did not act improperly in collecting DNA evidence from those items after questioning the defendant on unrelated offenses. The items had been collected by the police pursuant to a ruse where the police intentionally placed cigarettes and the water bottle in the interview room, in the hope, unbeknownst to the defendant, of collecting DNA evidence. *See also United States v. Green*, 2010 WL 5502347 (W.D.Mo. 2010) (no Fourth Amendment concerns even if officers used deception to obtain the defendant's DNA profile by handing him a styrofoam cup of water without telling him what they planned to do with the cup).

In sum, the video of the entire interaction between the defendant and FBI Special Agent Seth Fleitman is available to the Court. The defendant cannot allege that his DNA was taken from him by "force or compulsion" or by any other "bodily intrusion." Nor is there any indication that the envelope itself was obtained from the defendant by anything other than the voluntary transfer from the defendant's hands to the Agent. Because the collection was not a "search", and in any event, because the defendant relinquished any reasonable expectation of privacy in the envelope containing his DNA, no Fourth Amendment violation could have occurred. Accordingly, defendant's motion to suppress on this ground should be denied without the need for any further factual hearings.

## GOVERNMENT'S OPPOSITION TO THE SUPPRESSION OF IDENTIFICATION EVIDENCE BY PERSONS FAMILIAR TO THE DEFENDANT WHO IDENTIFIED HIM THROUGH SECURITY CAMERA PHOTOGRAPHS

### ECF Docket Entry 82; 17-CR-6017CJS

The defendant moves to suppress evidence of "pre-trial identification procedures" as well as an in-court identification on ground that the identification procedures were unduly suggestive, and, as a result, any in-court identification not independently reliable. However, no traditional pre-trial identification procedures, such as a line-up, show-up or photo array involving an eyewitness, occurred in this case. Instead, trial testimony is expected to be offered by non-eyewitness civilians, who by virtue of their personal familiarity with the defendant, will testify that the person depicted in bank surveillance photographs is Richard Wilbern. That testimony is admissible as lay opinion testimony under Federal Rules of Evidence 701 requiring no pre-trial *"Wade"* hearing. Any questions relating to the

identification of the defendant, including so-called "confirmation bias", go to the weight of the evidence, and not to its admissibility. Accordingly, it is respectfully requested that all matters relating to the admissibility of this particular evidence be deferred to the trial court.

## I.        Relevant Facts

In the aftermath of the bank robbery and murder at the Xerox, law enforcement personnel immediately obtained surveillance videos maintained by the Xerox Federal Credit Union. The surveillance videos were recorded on a VCR tape. The security system at the XFCU was a multi-plex recording unit which captured 5 different camera angles inside the credit union. The surveillance video did not capture "running" video, but instead toggled through each of the five cameras in sequence, capturing still images for each camera.[20] Shortly after obtaining the original video from the XFCU, the video was reviewed and individual still frames photographs were produced. Several images showing the culprit were obtained from the videotape and were displayed in the local news media as well as on "wanted" posters distributed throughout the law enforcement community.

On or about May 14, 2014, FBI SA Bastian Freund obtained the original VCR tape from the Webster Police Department. The video was sent to Quantico, VA in an effort to obtain the best quality glossy photos through digitization of the VCR tape. Although the effort did result in production of higher quality photos, the photos remained somewhat indistinct as the original video was highly pixelated. On August 27, 2014, a CD compilation

---

[20]    In addition to the video tape for that particular day, four additional VCR tapes were submitted into evidence at the Webster Police Department. These videos capture prior dates, including dates on which the defendant appears inside the XFCU conducting banking transactions.

of the videos was entered into evidence. From that CD, a set of black and white and color photos were created for law enforcement use.

The Government intends to present evidence at trial from five (5) individuals who will testify that they recognized the person in the surveillance photographs as the person they know as Richard Wilbern. None of these witnesses was an eyewitness to the crime, nor were they present at the XFCU on August 12, 2003. However, each of the witnesses was personally familiar with Richard Wilbern in August 2003 (and prior to that date). Each witness will testify that they have been in Wilbern's presence on numerous occasions. They are each familiar, in varying degrees, with his appearance, demeanor, gait and clothing at or near the time of the Xerox robbery. In terms of identifying the witnesses who will offer the testimony, the government has informed the defense that the following individuals have viewed still photographs that were produced by the FBI at Quantico in 2014 and identified the person in those photos as the defendant, Richard Wilbern:

Witness A -   On or about September 27, 2016, viewed a photograph identified herein as A1, positively identifying Richard Wilbern.

On or about November 15, 2016, before a United States Grand Jury, viewed photographs identified herein as A2, A3 and A4, positively identifying Richard Wilbern.

Witness B -   On or about December 20, 2016, before a United States Grand Jury, viewed a photograph identified herein as B1, positively identifying Richard Wilbern.

Witness C -   On or about September 27, 2016, viewed photographs identified herein as C1-C5, positively identifying Richard Wilbern.

On or about October 13, 2016, viewed photographs identified herein as C6-C7, positively identifying Richard Wilbern.

On or about November 1, 2016, before a United States Grand Jury, viewed a photograph identified herein as C8, positively identifying Richard Wilbern.

Witness D -   On or about October 18, 2017, viewed photographs identified herein as D1-D5, positively identifying Richard Wilbern.

Witness E -   On or about May 14, 2018, viewed photographs E1-E7, positively identifying Richard Wilbern.

While the defense has requested more specific information regarding the identification of these witnesses, Rule 16 simply does not require the government to expose their identities prior to the release of the witness list.    Nor should the government be required to release any *Jencks* or 3500 materials relating to the statements or grand jury testimony provided by these witnesses, which includes testimony relative to their overall relationship and consequent familiarity with the defendant, as well as the timing and circumstances which led to their recognition of the defendant.    The government has complied with its *Brady* obligations by disclosing the names of those individuals who failed to identify the defendant after viewing the FBI photographs.

## II.      Applicable Law

Rule 701 of the Federal Rules of Evidence allows a lay witness to offer opinions or inferences if they are: (a) rationally based on the perception of the witness; (b) helpful to clearly understanding the witness' testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

## III.  Discussion

### a.  Defendant's Reliance on *Brathwaite* and *Biggers* is Misplaced

The defendant has followed conventional motion practice by moving to suppress evidence of "pre-trial identification procedures" as well as an in-court identification on ground that the identification procedures were unduly suggestive, and, as a result, any in-court identification not independently reliable.   The defendant places considerable reliance on established court decisions, including *Manson v. Brathwaite*, 432 U.S. 98 (1977), *United States v. Maldonado-Rivera*, 922 F.2d 934 (2d. Cir.1990) and *Neil v. Biggers*, 409 U.S. 188 (1972), for the general principles used to determine whether the Due Process clause requires suppression of an <u>eyewitness</u> identification tainted by alleged law enforcement suggestiveness.   That reliance, however, is entirely misplaced in this case.   Here, the government does not intend to offer eyewitness testimony.   Instead, the government will offer identification testimony by non-eyewitness civilians who, by virtue of their long-standing personal familiarity with the defendant, will testify that the person depicted in the bank surveillance photographs is Richard Wilbern.   Because the non-eyewitnesses' identifications of the defendant do not implicate the concerns that animate *Brathwaite* and its progeny, there are no due process rights that cannot be adequately protected at trial through vigorous cross-examination, the presentation of expert witnesses, protective rules of evidence, and the requirement that guilt be proved beyond a reasonable doubt.

In *Biggers* and *Brathwaite*, the Supreme Court set forth a list of five factors for lower federal courts to balance against suggestiveness when deciding whether a pre-trial identification by an eyewitness to a crime, in addition to being "unnecessarily suggestive," creates a "very substantial likelihood of irreparable misidentification." Specifically, Justice Blackmun wrote in *Brathwaite*:

> The factors to be considered are set out in *Biggers*. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Brathwaite*, 432 U.S. at 114.

The holdings in *Biggers* and *Braithwaite*, much like that found in *United States v. Wade,* 388 U.S. 218 (1967), addressed the Supreme Court's "concern with the problems of eyewitness identification." *Braithwaite*, 432 U.S. at 111-12. As Justice Blackmun stated, "[u]sually the witness must testify about an encounter with a total stranger under circumstances of emergency or emotional stress. The witness' recollection of the stranger can be distorted easily by the circumstances or by later actions of the police. Thus, *Wade* and its companion cases reflect the concern that the jury not hear eyewitness testimony unless that evidence has aspects of reliability." *Id.*; *Wade,* 388 U.S. at 230 (quoting then-Professor Frankfurter: "The identification of strangers is proverbially untrustworthy" (citation omitted)); *see also, e.g., Vasquez v. Poole*, 331 F. Supp.2d 145, 151 (E.D.N.Y. 2004) (noting that the leading Supreme Court cases in this area "developed out of concerns that eyewitness identifications (by strangers) are not reliable." (citation omitted)).

68

The "eyewitness" concerns addressed in *Biggers, Brathwaite, Wade and Maldonado-Rivera* are simply not present here. Those cases are designed to place limits on identifications of defendants who are "total strangers" to the identifying witness, not on identifications of defendants who are as well known to the witness. The government has plainly represented the fact that none of the identification witnesses were present at the XFCU on August 12, 2003. Thus, the government is not offering victim/eyewitness identification testimony of a "stranger" who was responsible for the robbery. Instead, the witnesses' recognition of Wilbern's photograph is rooted in their personal familiarity with him. This is not to say that the facts surrounding the identification will go unchallenged at trial. However, the proper forum for the challenge is not through a pre-trial hearing, but rather through the rigors of trial before a jury.

b.      **The Identification Testimony is Admissible under FRE 701**

The government intends to offer the lay opinion testimony from each of five witnesses who identified the defendant from still photographs created from the surveillance video at the XFCU. Fed.R.Evid. 701 governs the admission of lay opinion testimony. The rule allows   non-expert testimony in the form of opinions or inferences if they are: (a) rationally based on the perception of the witness; (b) helpful to clearly understanding the witness' testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Fed. R. Evid. 701. Rule 701 retains the traditional concern for invasion of the role of the jury by requiring that lay opinion testimony be helpful to the jury. The government submits that lay opinion

identification testimony by each of the five witnesses, all of whom had a personal familiarity with the defendant during the relevant time frame, is admissible evidence at trial.

There is ample support in both state and federal courts for the admissibility of lay opinion "identification" testimony, provided the requisite familiarity is present and the remaining provisions of FRE 701 are satisfied.[21]   For example, in *United States v. Arroyo*, 2013 WL 227733, (S.D.N.Y. Jan.22, 2013), aff'd, 2015 WL 264640 (2d Cir. Jan.22, 2015), the Court of Appeals considered the propriety of admitting lay opinion testimony as to the identity of an individual (Arroyo) who purportedly discharged a firearm in front of an apartment building.    The shooting was captured on the building's surveillance system and the perpetrator was observed by the building manager (Gjelaj).   The Second Circuit held that "the District Court acted well within its discretion in determining that Gjelaj's identification of Arroyo as the man in the video was based on factors that the jury did not possess, namely Gjelaj's familiarity with Arroyo's manner of dress, gait, and demeanor observed in Gjelaj's several prior encounters with Arroyo. This court has previously found such insights sufficient to render an opinion helpful to the jury." *citing United States v. Garcia*, 413 F.3d 201, 211 (2d Cir.2005).

More recently, in *United States v. Riglioni*, 694 Fed Appx.14 (2017), the Second Circuit held that the District Court did not commit error, plain or otherwise, under Federal Rules of Evidence 701 by admitting an agent's lay opinion identifying defendant's voice on recordings.   The Court noted that the agent did not rely on scientific, technical, or other

---

[21]      For an extensive collection of cases dealing with this issue, the Government directs the Court's attention to a secondary source, 74 A.L.R.5th 643, "Admissibility of Lay Witness Interpretation of Surveillance Photograph or Videotape."   (originally published in 1999).

specialized knowledge in forming his opinion as to whether defendant's voice was the same as voice in recording from clothing stores where controlled purchased occurred, and simply used process of reasoning familiar in everyday life, by comparing defendant's voice, which he heard firsthand during the thirty-minute post-arrest conversation, to the voice which he heard on the recordings, and opinion was helpful to jury in determining principal fact in issue.    Again, the salient basis for the admissibility of the evidence under FRE 701 was familiarity with the culprit, in this case, with his voice.    *Id.*, at 16-17.

In *Sanders v. United States*, 809 A.2d 584 (2002), the District of Columbia Court of Appeals upheld the admissibility of lay opinion identification evidence.    Prior to trial, the government proffered that lay witnesses who had "known one or more of the defendants for an extended period of time" and who were "well acquainted with the appearance and the voice of a given defendant," would testify.    The government presented a number of witnesses who identified [the defendants] from the jewelry store surveillance videotape that had recorded the incident on September 27, 1993, or by examining photographs from still frames of the videotape. The lay witnesses each testified at trial that they knew the defendants personally and provided the nature and length of their relationship.    Each witness was subject to cross examination.    *Sanders*, 809 A.2d at 594.

In affirming the convictions, the Court stated:

> …we conclude that the trial court did not abuse its discretion by admitting into evidence the opinions of lay witnesses who identified Mr. Brooks and Mr. Robinson as the two men appearing in the Georgia Avenue jewelry store's surveillance videotape and the photographs derived from the videotape. The government properly laid the foundation showing that each of the lay witnesses' opinion was rationally related to the witness' own perceptions, and that the testimony would be helpful to the jury.    Like the trial court, we have no reason

to question the reliability of the identifications. The lay witnesses demonstrated particular familiarity with both men and had had substantial contact with them.

*Id.*, at 596.

The vast majority of Courts considering this issue have likewise admitted lay opinion identification testimony where the requirements of FRE 701 and familiarity with the accused are satisfied.   For example, in *United States v. Jackman*, 48 F.3d 1 (1st Cir.1995), the Court held that lay witness opinions regarding the identity of a bank robber captured in surveillance photographs were admissible because those witnesses were intimately familiar with the suspect's appearance. In that case, the surveillance photographs were somewhat blurred and only showed half of the robber's face. Under those circumstances, the First Circuit held that the district court properly admitted the testimony of three witnesses who knew the defendant well and "had seen him on multiple occasions under a variety of circumstances." *Jackman*, 48 F.3d at 5.   The witnesses' identification testimony was helpful because they knew the defendant's appearance well and the surveillance photographs were unclear. *Id.*, at 5-6.   As the First Circuit explained, the lay identification testimony was admissible because "the witness[es] possesse[d] sufficiently relevant familiarity with the defendant that the jury [could not] also possess." *Id.*   "[W]hen the photographs are not either so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification," lay witness testimony is admissible.   *Id.*, at 6.

In *United States v. White*, 639 F.3d 331 (7th Cir. 2011), the defendant appealed his bank robbery conviction challenging the district court's admission of testimony from his sister and ex-girlfriend that he was the individual in a still photograph taken from the surveillance

video of the bank robbery.    The Court held that the requirements of Rule 701 were met as both witnesses were very familiar with White, and thus their opinion was "rationally based" on their perceptions. Additionally, their testimony satisfies the second prong of Rule 701 because it helped determine a fact in issue, i.e., the identity of the bank robber.    *White,* 639 F.3d at 335.    The Court also relied on prior rulings in the 7th Circuit, including *United States v. Jackson*, 688 F.2d 1121 (7th Cir.1982)(jury free to accept or reject testimony regarding the identification of the defendant in surveillance photos), *United States v. Towns*, 913 F.2d 434 (7th Cir.1990) (holding the district court did not err in admitting lay opinion testimony from the defendant's ex-girlfriend that the defendant was one of the robbers in a bank surveillance photograph) and *United States v. Stormer*, 938 F.2d 759, 762 (7th Cir.1991) (holding the district court did not err in admitting lay opinion testimony that defendant was the individual depicted in a bank surveillance photograph).

In *United States v. Farnsworth*, 729 F.2d 1158 (8th Cir.1984), the Court upheld the admission of lay opinion identification testimony where parole officers identified the defendant as one of the robbers depicted in bank surveillance photograph.    The "district court noted that the defendant had grown a full beard since the time of the robbery. In addition, the day of the robbery, he wore a scarf over his face. These factors made it difficult for the jury to make a positive identification from the photographs. Because the parole officers' frequent contacts with Farnsworth familiarized them with his appearance prior to the robbery, the district court considered their identification testimony helpful to the jury and admissible under Fed.R.Evid. 701 and 403."    *Farnsworth*, 729 F.2d at 1160-61.

In *United States v. Beck*, 418 F.3d 1008 (9th Cir. 2005) the Ninth Circuit held that the defendant's probation officer had sufficient contact with the defendant to render admissible

his identification of the defendant in a bank robbery surveillance photograph where the officer met with the defendant four times in a two-month period for a total of more than seventy minutes. *Beck*, 418 F.3d at 1015. Although the Ninth Circuit has "not provided clear guidance as to the extent of contact sufficient to render lay opinion testimony rationally based and helpful to the jury," the court did, in *Beck*, discuss several examples where the Ninth Circuit had previously upheld identification testimony by a lay witness, *see Id.* n.4. For example, in *United States v. Henderson*, 241 F.3d 638, 650–51 (9th Cir. 2000) the Ninth Circuit "held that there was no abuse of discretion when a lay witness testified to the defendant's identity in surveillance photographs and had known the defendant for more than four years, and had seen him more than 100 times." *Beck*, 418 F.3d at 1014 n.4. Likewise, in *United States v. Holmes*, 229 F.3d 782, 788–89 (9th Cir. 2000), the court "held that there was no abuse of discretion where a lay witness had met the defendant six times for at least thirty minutes each time." *Beck*, 418 F.3d at 1014 n.4. Finally, in *United States v. Butcher*, 557 F.2d 666, 670 (9th Cir. 1977), the Ninth Circuit held "admissible the lay opinion identification testimony of two police officers and a probation officer who identified the defendant as the culprit depicted in bank surveillance photographs." *Beck*, 418 F.3d at 1014 n.4.

In *United States v. Contreras*, 536 F.3d 1167 (10th Cir. 2008), the Court held that a probation officers prior familiarity with the defendant made her identification of the defendant from a bank surveillance still photograph helpful to the jury, notwithstanding the defendant's contention that the jurors could have reviewed the surveillance video and drawn their own conclusions. Because the probation officer had regular meetings with the defendant, it allowed her to develop a more sophisticated mental picture of the defendant

outside the sterile, one dimensional atmosphere of the courtroom, and gave her a greater appreciation of the defendant's normal appearance. *Contreras*, 536 F.3d at 1170-71 (citations omitted). The witness's prior familiarity with the defendant's appearance is the most critical factor to determine if such a basis exists. *Id.*, *citing United States v. Allen*, 787 F.2d 933 (4th Cir.1986)(testimony by those who knew defendants over a period of time and in a variety of circumstances offers to the jury a perspective it could not acquire in its limited exposure to defendants. Human features develop in the mind's eye over time. These witnesses had interacted with defendants in a way the jury could not, and in natural settings that gave them a greater appreciation of defendants' normal appearance. Thus, their testimony provided the jury with the opinion of those whose exposure was not limited to three days in a sterile courtroom setting).[22]

## IV. Conclusion

No traditional pre-trial identification procedures, such as a line-up, show-up or photo array involving an eyewitness have occurred in this case. Instead, trial testimony will be offered by non-eyewitness civilians, who by virtue of their personal familiarity with the

---

[22] In fact, cases which have rejected lay opinion identification evidence tether their opposition to the fact that a sufficient basis of familiarity has not been demonstrated. See, eg., *United States v. Fulton*, 837 F.3d 281, 101 (3d Cir. 2016) (finding inadmissible the lay opinion of FBI agent and police officer, as to whether appearance of defendant or a second suspect better matched bank robber in video as it was not helpful to jury because neither witness had any familiarity with the appearance of either suspect); *People v. Brown*, 82 N.E.3d 148 (Ill.App.Ct.lst Dist. 2017) (finding opinion inadmissible where record failed to show detective had any familiarity with defendant absent computer records and witness identification); *Carter v. State*, 756 S.E.2d 232 (Ga. Ct. App. 2014) (concluding that detective's opinion that one of the individuals in video which showed robbers with covered faces was inadmissible absent evidence that detective was familiar with him prior to viewing the video or that defendant's appearance had changed before trial); *United States v. LaPierre*, 998 F.2d 1460 (9th Cir. 1993) (finding error to allow officer who had never met the defendant to testify that the defendant was the individual in photos of bank robberies).

defendant, will testify that the person depicted in bank surveillance photographs is Richard Wilbern. That testimony is admissible as lay opinion testimony under Federal Rules of Evidence 701 and requires no pre-trial *"Wade"* hearing. Any questions relating to the identification of the defendant, including "suggestiveness" or so-called "confirmation bias", go to the weight of the evidence, and not to its admissibility. All matters relating to the extent of the witnesses familiarity with the defendant and the admissibility of this particular evidence pursuant to FRE 701 should be deferred to the trial court.

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S REQUEST FOR AN ORDER REGARDING POTENTIAL CONFLICTS

### ECF Docket Entry 76; 17-CR-6017CJS

### I.     Background

In April of 2018, defense counsel filed an application *in camera* which advised the District Court that a potential conflict of interest may exist involving Richard Wilbern and Thomas T. Lofton, both of whom were then represented by the Office of the Federal Public Defender. While the government was not privy to the precise nature of the potential conflict raised by the defense, as all of the filings were placed under seal, it became clear that the defense believed they might utilize some variation of a defense strategy which involved implicating client Thomas Lofton in order to exculpate client Richard Wilbern. *See* Rules of Professional Conduct, Rules 1.7 (2009) (concurrent representation). In his decision relieving the Public Defender's office from their representation of Lofton, Judge Siragusa delved deeply into the rules regarding concurrent representation. In his remarks, he confirmed the nature of the potential conflict:

"You have to understand the role of the prosecution and the role of the defense are different.   The defense is representing their clients – and I know this is difficult to accept – but it's our system.   It's what our forefathers set up.   The defense's obligation is not to prove their client innocent.   Their obligation is to hold the prosecution to their burden of proof beyond a reasonable doubt.   And how do you – how can you do that within the rules of advocacy and ethics? **By suggesting, listen, there could be someone else who's done this**.   That's perfectly acceptable for the defense to do."

ECF Docket Entry 72-1, Transcript of the Proceedings before the Hon. Charles J. Siragusa, *United States v. Richard Leon Wilbern*, dated June 22, 2018, at 12.   Attached as Exhibit 24.


## II.     The Requested Order


The defense has now requested this Court issue an Order, with a date certain, by which the government must advise counsel and the Court of the existence of any *additional* potential conflicts of interest of which it is aware involving the Federal Public Defender's Office.   *See* ECF Docket Entry 76, at 3.   There is no need for such an Order.   The government understands its ongoing obligation to ensure that the proceedings are fair and impartial, and indeed has a responsibility to make the Court aware where it perceives an actual or potential conflict of interest.   *United States v. Locascio*, 6 F.3d 924, 931 (2d Cir. 1993) (the question of representation "therefore implicates not only the Sixth Amendment right of the accused, but also the interests of the courts in preserving the integrity of the process and the government's interests in ensuring a just verdict and a fair trial."); *United States v. Jones*, 381 F.3d 114, 119 (2d Cir.2004) (same).   With that understanding in mind, the Government is presently unaware of any potential conflicts that the Public Defender's office would have with any witnesses the Government intends to offer in its direct case.   The Government's case is largely dependent on civilian witnesses from Xerox Federal Credit Union, law enforcement

personnel, scientific experts and known associates of Mr. Wilbern. To the government's knowledge, none of these individuals been previously represented by the Public Defender's office.

The conflict issue with Thomas Lofton likely arose as follows. In April 2017, more than 17 months ago, the government provided the defense with the entirety of the "Xerox Lead Logs" and FBI 302's as part of the Government's Discovery and *Brady* obligations. In particular, the Xerox Lead Logs were utilized to document, among other things, the names of *every* individual who was identified as a "potential suspect" or "person of interest" in the Xerox crime. This list is exhaustive and included, among many others, the name Thomas T. Lofton.[23] The Xerox Lead Logs were initiated on the date of the crime, August 12, 2003. The Xerox Lead Logs were maintained and updated throughout the investigation, up to and including the September 2016 arrest of the defendant. The various names and identities originated from investigative interviews, calls from the public to "911" or Crime Stoppers, anonymous reporting, as well as other investigative means. The Xerox Lead Logs provided not only the names of persons of interest, but in many instances, their addresses, phone numbers, interview notes and reasons for disqualification as viable suspects.[24]

---

[23] The defense sets forth several reasons why they believe Thomas Lofton was considered a solid suspect. *See* ECF Docket Entry 76, at p. 4, ¶ 9. This information could only be gleaned from a review of the Rule 16 discovery and *Brady* materials provided to the defense. This information was undoubtedly conveyed to Judge Siragusa.

[24] Some Leads and FBI 302s have not been disclosed as they contain Rule 3500/ *Jencks* materials relating to Mr. Wilbern. However, in satisfying our *Brady* obligations, every single Lead that contains information relative to a potential suspect or person of interest has been disclosed.

To be clear, the Xerox Lead Logs and FBI 302s contain the complete listing of all "potential suspects" and "persons of interest." Stated another way, there no separate lists of "potential suspects" or "persons of interest." Given that full disclosure, it is rather disingenuous now to argue that "the government is *uniquely* able to identify potential conflicts of interest which could trigger additional delays." Instead, at least at this stage of the proceedings, any future conflicts will be entirely "defense driven." From the Government's perspective, none of the other "potential suspects" or "persons of interest" listed in the Xerox Lead Logs or FBI 302s will ever create a "conflict" unless the person falls into the following two categories:

(1) The Office of the Public Defender represents (or previously represented) an individual named in the Lead Log or 302; and,

(2) The defendant intends to implicate, impugn or blame that named individual for the commission of the Xerox murder/robbery, or otherwise utilize that named individual as a witness in the *Wilbern* trial *(ie.* "there could be someone else who's done this" scenario)

The government has many resources at its disposal but a crystal ball is not one of them. In other words, the government has absolutely no way of identifying the individual (or individuals) the defense intends to slot into category two. Therefore, it is actually the defense who is now in the *unique* position to identify potential conflicts because any conflict would be now created *solely* as a result of the defense Mr. Wilbern chooses to employ. To compel the government to "highlight" or "flag" a list of potential conflicts presumes the government can divine which individual may be scapegoated next.

Neither party wishes unreasonable delay in these proceedings. Accordingly, should the defense wish to provide the government with a list of those individuals upon whom it intends to implicate or otherwise utilize as a defense witness at trial, we would be more than happy to review our docket database in order to determine if there is any type of potential conflict. In the meantime, since the defense presumably has access to the internal records of the entire Public Defender's office, and the names of the persons the office currently and/or previously represented, it may be more expeditious for them to run the prospective names through their own database. In either event, the Court does not need to take any affirmative action on the defendant's motion, other than to deny it as moot.

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNT 2 CHARGING FIREARMS POSSESSION

### ECF Docket Entry 77; 17-CR-6017CJS

Defendant moves to dismiss Count 2 of the Indictment which charges firearms possession in violation of 18 U.S.C. § 924(c) because the charge is linked to bank robbery in violation of 18 U.S.C. § 2113(a) charged in Count 1. Defendant principally argues that bank robbery does not qualify as a crime of violence under the "elements" or "force" clause under § 924(c)(3)(A) because bank robbery "lacks the scienter and violent force elements that § 924(c)(3)(A) requires." (Defendant's Motion [7-31-18], at 4, Docket Entry 77, *United States v. Wilbern*, 17-CR-6017 (CJS)). According to the defendant, because bank robbery is not a crime of violence, then Count 2 fails to state an offense. Defendant's argument lacks merit.

A crime of violence under § 924(c) is defined in 18 U.S.C. § 924(c)(3) as an offense that is a felony and—

(A)      has an element of the use, attempted use, of threatened use of physical force against the person or property of another, or

(B)      that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Thus, a felony is a crime of violence for purposes of § 924(c) if it satisfies either the so-called "elements clause" (or "force" clause) under § 924(c)(3)(A), or the "risk of force" clause under § 924(c)(3)(B).

In *Johnson v. United States*, __U.S.__, 135 S.Ct. 2551, 192 L.Ed. 569 (2015)(hereinafter "*Johnson II*"), the Supreme Court struck down as unconstitutionally vague that portion of the Armed Career Criminal Act (ACCA), 18 U.S.C. §924(e)(2)(B)(ii) (known as the "residual clause"), defining the term "violent felony" as any felony that "involves conduct that presents a serious potential risk of physical injury to another." The wording of the "residual clause" is similar to § 924(c)(3)(B)'s "risk of force" clause. In *Sessions v. Dimaya*, __ U.S. __, 138 S.Ct. 1204, 200 L.Ed. 549 (2018), the Supreme Court struck down the similarly worded definition of "crime of violence" found in 18 U.S.C. § 16(b).

Neither *Dimaya* nor *Johnson* dealt directly with "risk of force" clause pursuant to § 924(c)(3)(B). Thus, this statutory definition for "crime of violence" for purposes of establishing a predicate offense underlying a § 924(c) conviction remains intact. In any event, bank robbery in violation of 18 U.S.C. § 2113(a), which underlies the defendant's charge on Count 2 for violating 18 U.S.C. Section 924(c)(1)(A)(iii), is, notwithstanding defendant's arguments to the contrary, categorically a crime of violence under § 924(c)(3)(A)'s "force" or "elements" clause.

Bank robbery under 18 U.S.C. § 2113(a) prohibits individuals who:

"**by force and violence, or by intimidation**, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loans association…"

§ 2113 (e) proscribes individuals:

"in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, **kills** any person or forces any person to accompany him without the consent of such person…" [25]

Because bank robbery has "an element of the use, attempted use, of threatened use of physical force against the person or property of another," many courts have already held that § 2113(a), is categorically a crime of violence under the "elements" (or "force") clause of § 924(c)(3)(A). *See*, *United States v. McNeal*, 818 F.3d 141, 153 (4th Cir. 2016), *cert. denied*, __U.S.__, 137 S.Ct. 164, 196 L.Ed. 138 (2016); *United States v. Williams*, 864 F.3d 826, 828-829 (7th Cir. 2017); *Diaz v. United States*, 863 F.3d 781, 783 (8th Cir. 2017); *United States v. Gutierrez*, 876 F.3d 1254, 1257 (9th Cir. 2017) (*per curiam*), *In re Sams*, 830 F.3d 1234, 1239 (11th Cir. 2016); *see also*, *Thomas v. United States*, 2018 WL 3094936, at *3 (EDNY June 22, 2018) (collecting cases holding that bank robbery under § 2113(a) and § 2113(d) are crimes of

---

[25] Defendant here claims that "while § 2113( e) requires proof of a death or a hostage taking, it does not add to the charged crime an essential element of the use, attempted use or threatened use of violent physical force." (Defendant's Motion [7-31-18], at 4, Docket Entry 77, *United States v. Wilbern*, 17-CR-6017 (CJS)). This statement fails to take into account that § 2113(e) first provides "in committing any offense defined in this section" and, as charged here, the minimum, lesser included conduct, is what has been charged under § 2113(a). Moreover, § 2113 requires more than proof of a death – it requires proof of a killing – an act which unquestionably involves violent physical force. *See* 18 U.S.C. § 2113(e)("kills any person").

violence under 924(c)'s force clause or under the Career Offender Guideline's "almost identically worded force clause."). While the Second Circuit has not yet had the opportunity to address the issue in a § 924(c) context, in *Killion v. United States*, 728 F.App'x 19 (2d Cir. 2018), the Second Circuit held that §§ 2113(a) and 2113(d) qualified as "violent felonies" under the ACCA's similarly worded force or elements clause.

In many of the cases that have addressed whether § 2113(a) is categorically a crime of violence under the elements or force clause, the defendants similarly argued, as defendant does here, that the minimal criminal activity proscribed by statute is the taking of property by intimidation or extortion, and that neither "intimidation" nor "extortion"[26] requires force or violence as discussed in *Johnson v United States*, 559 U.S. 133 (2010)(hereinafter "*Johnson I*"). (Defendant's Motion [7-31-18], at 11, Docket Entry 77, *United States v. Wilbern*, 17-CR-6017 (CJS)). In *Johnson I*, the Supreme Court held that defendant's prior battery conviction under Florida law was not a "violent felony" under the ACCA. The Supreme Court determined that "in the context of a statutory definition of 'violent felony,' the phrase 'physical force' means violent force – that is, force capable of causing physical pain or injury to another person." *Johnson I*, 559 U.S. at 140.

The courts that have addressed the issue have recognized that other federal crimes involving takings "by force and violence, or by intimidation" "have as an element, the use, attempted use, or threatened use of physical force." *McNeal*, 818 F.3d at 152-153. "The logic of those decisions is straightforward. A taking 'by force or violence' entails the use of

---

[26] Defendant acknowledges that extortion "is accomplished with 'wrongful use of actual or threatened force, violence or fear.'"(Defendant's Motion [7-31-18], at 11, ECF Docket Entry 77, *United States v. Wilbern*, 17-CR-6017 (CJS)).

physical force.   Likewise, a taking by intimidation' involves the threat to use such force."
*Id*.   "'There is no "space" between "bank robbery" and "crime of violence" because 'violence in the broad sense that includes a merely threatened use of force is an element of every bank robbery.'" *McNeal*, 818 F.3d at 153 (quoting *United States v. Jones*, 932 F.2d 624, 625(7th Cir. 1991)); *see also*, *United States v. McBride*, 826 F.3d 293, 295-96 (6th Cir. 2016) ("Bank robbery by 'force and violence' plainly involves 'the use, attempted use of physical force [and][w]e reject [the] contention that daylight can be found between 'intimidation' and 'threatened use of physical force.'").

While the Second Circuit has not yet squarely addressed the issue whether §2113(a) bank robbery is categorically a crime of violence under § 924(c)(3)(A), in *United States v. Hill*, 890 F.3d 51 (2d Cir. 2018), it did join all of the circuits to have addressed the issue as it pertains to the similar Hobbs Act robbery[27] statute.   *See Hill*, 890 F.3d 51, 56, n.7 (collecting cases).   By holding that Hobbs Act robbery is categorically a crime of violence under the elements or force clause, the Second Circuit affirmatively rejected the defendant's argument that placing another in fear of injury (*ie.*, intimidation) does not constitute a threat or use of force.   *Id*. at 58.

The defendant in *Hill*, like Wilbern here, similarly relied on a series of hypotheticals to attempt to make the point that threat of injury does not amount to a threat or use of force.

---

[27]   The term "robbery" pursuant to the Hobbs Act statute means "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining."

*Id.* As the Second Circuit noted in *Hill*, in order to establish that a predicate act is not a crime of violence "'requires more than the application of legal imagination to [the] statute's language' …there must be 'a realistic probability, not a theoretical possibility,' that the statute at issue could be applied to conduct that does not constitute a crime of violence." *Id.* at 56 (quoting *Gonzales v. Duenas –Alvarez*, 549 U.S. 183, 193 (2007).   The defendant here, as with the defendant in *Hill*, and as with the defendant in the Second Circuit's most recent decision in *United States v. Barrett*, __F.3d__ , 2018 WL 4288566 (2d Cir. September 10, 2018) fails to make this showing of the "realistic probability" that, in his own case or other cases, bank robbery is not a crime of violence.

In essence, Wilbern rehashes the exact arguments recently made by the defendant in *Killion*.   In *Killion,* the Second Circuit rejected the defendant's argument that in light of *Johnson II*, "federal armed bank robbery is no longer a violent felony" under the ACCA because "the offense does not require the use of any force, and the offense does not proscribe intentional acts." *Killion*, 728 F.App'x at 21.   As for the defendant's first argument, that the offense does not require the use of any force because placing another in fear of injury does not constitute a threat or use of force, the Second Circuit concluded that, "the threat of injury is still a threat to use physical force, and is punishable under the ACCA's force clause." *Id.* at 22.   As for defendant's second argument, that the offense does not proscribe intentional acts,[28] the Second Circuit noted that federal armed bank robbery "is a general intent crime."

---

[28]     On this point, defendant tries to rely on the Fourth Circuit's decision in *United States v. Ketchum*, 550 F.3d 363, 365 (4th Cir. 2008).   In that case, the defendant handed a bank teller a note indicating that other people were forcing the defendant to get money from the bank and that these other people had a gun. On a sufficiency challenge, the Fourth Circuit concluded that the proof of intimidation is sufficient "if an ordinary person in the teller's position could infer a threat of bodily harm from the defendant's acts, whether or not the defendant actually intended the intimidation."

*Id.* "Violation of the federal armed bank robbery statute entails intentional conduct; one cannot unintentionally rob a bank." *Id.*

Based on the foregoing, bank robbery where a killing occurs under 18 U.S.C. §§ 2113(a) and (e) categorically satisfy § 924(c)'s force or elements clause as a crime of violence. Accordingly, defendant's motion to dismiss Count 2 of the Indictment should be denied.[29]

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR AN INTRADISTRICT TRANSFER OF THE CASE FOR TRIAL

## ECF Docket Entry 78; 17-CR-6017CJS

The defense has filed a motion for an "intradistrict" transfer of the defendant's case for trial. Specifically, the defense requests, under Fed.R.Crim.P. 18 and the Fifth and Sixth Amendments, that the defendant's case be transferred to the "Buffalo division of the Western District of New York for trial." In support of this request, the defense claims that given the "significant" media coverage since 2003, and the "ties" that the Rochester venire jury

---

*Id.* at 367. Defendant claims that the Fourth Circuit's holding that evidence regarding the defendant's intent on the intimidation was irrelevant, somehow results in the proposition that § 2113(a) encompasses the conduct of people who do not intentionally "threaten or use violent force," thus taking it out of § 924(c)(3)(A). That is not the proper analysis. In any event, contrary to defendant's claim, *Ketchum* does support the defendant's contention that bank robbery is not a crime of violence.

[29]   Moreover, based on the Second Circuit's recent decision in *United States v. Barrett*, § 924(c)(3)(B) is still applicable. *United States v. Barrett*, __F.3d__ , 2018 WL 4288566 (2d Cir. September 10, 2018). As the Second Circuit determined in *Barrett*, § 924(c)(3)(B) is not necessarily foreclosed from application notwithstanding the Supreme Court's decisions in *Dimaya* and *Johnson*. 2018 WL 4288566, at * 7. "Section 924(c)(3)(B) can be applied to a defendant's case-specific conduct, with a jury making the requisite findings about the nature of the predicate offense and the attending risk of physical force being used in the its commission. Such a conduct-specific approach avoids both the Sixth Amendment right-to-trial and due process vagueness concerns identified in *Dimaya* and *Johnson*." *Id.* at *9. Simply put, a jury can make the determination whether Count 2 survives by making a finding whether Count 1 is a crime of violence under § 924(c)(3)(B).

members will likely have to Xerox, such an "intradistrict" transfer is warranted. In further support of this request, the defense attaches a self-serving, un-tested survey from a Dr. Margaret Bull Kovera. *See* ECF Docket Entry 79.

This motion is well premature, and should be deferred to the discretion of the District Court, the Hon. Charles J. Siragusa, in front of whom this case will be tried. However, to the extent this Court is prepared to resolve the issue, the defendant's request should denied in all respects.

## I.     Applicable Rules and Law

Federal Rule of Criminal Procedure 18 provides for the place of prosecution and trial, as follows:

> Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice.

Fed. R. Crim. P. 18; *see also United States v. Reed,* 773 F.2d 477, 479-80 (2d Cir. 1985) ("Fed. R. Crim. P. 18 provides that venue in federal criminal prosecutions lies in the district in which the alleged crime was committed. This rule was derived from the constitutional venue provisions."). The Second Circuit has observed that "Rule 18 was amended in 1966 to eliminate an earlier requirement that the trial take place in the district and division where the crime occurred." *United States v. Fernandez,* 480 F.2d 726, 730 (2d Cir. 1973). "Both the Sixth Amendment and the first sentence of Rule 18 speak of a right to trial in the *district* where the crime occurred...." *Id.* "[W]hen a district is not separated into divisions, ... trial at any place

within the district is allowable under the Sixth Amendment and the first sentence of F.R.Cr.P. 18." *Id.*

In our district, under Local Rule of Criminal Procedure 7, "each criminal case is assigned to a Judge in either Buffalo…or Rochester," and "[t]he assignment within these areas shall ordinarily be by random selection." Further, Local Rule 7 provides that the Court may transfer a case within a district "sua sponte" and a party may file a motion requesting such a transfer.

Federal Rule of Criminal Procedure 21(a) provides that, "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 2l(a). In keeping with the amendments to Rule 18, the 1966 Amendments to Rule 21 eliminated references to "divisions":

> All references to divisions are eliminated in accordance with the amendment to Rule 18 eliminating division venue. The defendant is given the right to a transfer only when he can show that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in the district. Transfers within the district to avoid prejudice will be within the power of the judge to fix the place of trial as provided in the amendments to Rule 18.

Fed. R. Crim. P. 21 advisory committee's note to 1966 amendment.

"Substantial publicity alone is not enough to require a change of venue." *United States v. Stevens,* 83 F.3d 60, 66 (2d Cir. 1996). Instead, "[i]n order to prevail on a motion under Rule 21(a), the defendant must show 'a reasonable likelihood that prejudicial news prior to

trial will prevent a fair trial.'" *United States v. Maldonado-Rivera,* 922 F.2d 934, 966-67 (2d Cir. 1990) (quoting *Sheppard v. Maxwell*, 384 U.S. 353, 363 (1966)).

> In assessing the motion, the district court may take into account, *inter alia,* the extent to which the government is responsible for generating the publicity, the extent to which the publicity focuses on the crime rather than on the individual defendants   charged with it, and other factors reflecting on the likely effect of the publicity on the ability of potential jurors in the district to hear the evidence impartially.

*Maldonado-Rivera*, 922 F.2d at 967. "The ultimate determination of whether unfavorable publicity renders a fair trial unlikely is committed to the district court's discretion ...." *Id.*

Courts have also held that a motion for change of venue based on pretrial publicity is usually premature prior to *voir dire. See United States v. Nicolo*, 523 F.Supp.2d at 319 (*citing, United States v. Ayala–Martinez,* 24 F.Supp.2d 165, 168 (D.P.R.1998) ("since the jury selection process has not yet commenced . . . plaintiff cannot establish [that jurors had formed fixed opinions about the case].   Thus . . . any claim by defendant as to actual prejudice is premature and illusory"); *United States v. Eskridge*, 818 F.Supp. 259, 263 (E.D.Wis. 1993) ("Since *voir dire* examination is the preferable time for determination of whether pretrial publicity necessitates a change of venue, defendant['s] motion is premature and will be denied without prejudice")).

## II.      Discussion

The defendant's primary argument centers upon a subjective belief that his case has received "adverse publicity" which precludes him from obtaining a fair and impartial trial. However, the Second Circuit has held that "substantial publicity alone is not enough to

require a change of venue." *United States v. Stevens*, 83 F.3d 60, 66 (2d Cir. 1996) (*citing Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977)). Pretrial publicity is not a particularly unique circumstance in federal criminal matters. *Nicolo*, 523 F.Supp.2d at 318. In the "era of modern communications, it is nearly impossible to find a juror who has not been exposed to some measure of information regarding a highly publicized case." *Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir.) *cert. denied*, 515 U.S. 1136 (1995).

Whether a change of venue is warranted due to prejudicial pretrial publicity depends to a great extent on the actual jury pool and the <u>actual</u> difficulty at trial of selecting an impartial jury. Under Rule 21(a), the size of the population and geographic area from which the jury pool is drawn is a relevant factor. *Nicolo,* 523 F.Supp.2d at 319 *(citing United States v. Lentz,* 352 F.Supp.2d 718, 724 (E.D.Va. 2005). Significantly, the Rochester division of the Western District of New York comprises of approximately 9 counties, including Monroe, Wayne, Ontario, Livingston, Yates, Seneca, Schuyler, Steuben, and Chemung Counties. *See, United States District Court Western District of New York, available at* http://www.nywd.uscourts.gov/jury-duty-information. Many of these counties lie contiguous to the counties included in the Buffalo Division.[30] The population of Monroe County alone consists of approximately 747,642 people spread out over approximately 657 square miles. *See, United States Census Bureau State & County QuickFacts, available at* http://www.census.gov/quickfacts/table/PST045217.

---

[30] Although the W.D.N.Y is divided geographically by counties, media coverage is not. Therefore, there is no way to assure that citizens of these contiguous counties, and who are part of the Buffalo Division jury pool, did not view the same "intense" media coverage referred to about by the defense.

A similar motion was recently brought by Buffalo defense counsel, in the case of *United States v. Willson* et. al, 15-CR-142-W, *see,* ECF Docket Entry 840. In Willson, defense counsel brought a motion for an intradistrict transfer from Buffalo to Rochester, claiming prejudice from intense media coverage. The defense most prominent argument was that the media coverage from a 2016 state court murder trial, involving two of the charged defendants, prejudiced the jury pool in Buffalo for the 2018 trial. Similar to our case, the defense, in *Willson,* claimed that the intense media coverage leading up to the federal trial, prejudiced the jury pool.[31] As a result, the defense sought for an intradistrict transfer of the trial to Rochester, New York. Considering all of the factors, including the recognition of extensive media coverage, United States District Court Judge Elizabeth A. Wolford denied the defense motion. The trial remained in Buffalo. *See,* Decision and Order, ECF Docket Entry 998.

In *United States v. Livoti*, 8 F.Supp.2d 246, 249 (S.D.N.Y 1998) (*aff'd, United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999), the defendant moved for an intradistrict transfer of his case from the federal courthouse in Manhattan to a courthouse in White Plains, New York, claiming that "massive pre-trial publicity and unprecedented news coverage" concerning the case prejudiced the defendant. *Id.* at 248. Despite references to instances of current media coverage, the district court, in *Livoti*, found that the defendant had failed to show that an impartial jury cannot be selected following careful *voir dire* questioning. *Id.* at 249.

---

[31] The defense motion was based upon other claims of prejudice, but much emphasis was placed upon the 2016 state murder trial, as well as an October 4, 2017 news article three months before the January 2018 federal trial.

Similarly, in this case, the defense has failed to show the defendant is unfairly prejudiced by any news coverage relating to this case. As noted above, the charged crime occurred in 2003. Many years passed before the defendant was arrested for this crime. Although the media did cover some of the events surrounding this Indictment, the defense has failed to show that the coverage was out of the ordinary, or exorbitant. Instead, the media coverage of this case is similar to many other cases previously prosecuted in Rochester. During those trials, the courts took great efforts to question the potential jurors with respect to media coverage, and any influence it does, or would have, on their ability to sit as a juror. Thereafter, during the course of those trials, the courts continually admonished the jurors about paying attention to any media coverage. These safeguards are put in place to protect the defendant from any undue influence or prejudice.

Nor is transfer warranted simply because jurors may have some preexisting knowledge of the facts of a case, or even because they may have formed an opinion about the case. *Nicolo*, 523 F.Supp.2d at 318. "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Knapp*, 46 F.3d at 176 (citing, *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)). "In other words, the Constitution does not require ignorant jurors, only impartial ones." *Id.* (*citing Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975)).

In sum, the defendant's motion is premature and should, in any event, be decided by the District Court. On that score, the government is certain that the District Court will employ appropriate safeguards in this case, and conduct a careful *voir dire* questioning of the jury pool to ensure a fair trial for the defendant. Any undue influence past media coverage would have had on any potential juror would be adequately addressed, and vetted, by the District Court during *voir dire*. As a result, the defense motion for intra-district transfer should be denied.

## Governments Demand Under Rule 16(b)(1)((B) & (C)

The defendant's request for disclosure under Rule 16(a)(1)(F) triggers the Government demand for disclosure pursuant to Rule 16(b)(1)((B) & (C). Specifically, the government demands that the defense identify to the government the name of any expert witnesses it intends to call, a written summary of their expected testimony, a written summary of their opinions, copies of any and all tests performed which underlie their expected testimony, the bases and reasons for those opinions and the witnesses qualifications.

## Reservation of Rights

The government has no objection to the defendant bringing further motions in this case, provided that such motions could not have been made with the Omnibus motion presently before the Court and that such motions have not been previously made and decided by the Court.

**Government's Request for Reciprocal Discovery**

The government hereby requests that the defendant be directed to produce any and all discovery to which the government is entitled under Rules 16(b)(1)(A), 16(b)(1)(B) and 16(b)(1)(C).

**Conclusion**

For the reasons specified herein, the defendant's motions for various forms of relief should be denied except insofar as the materials and information requested have been provided, or the relief sought in the motions is not at issue. Further, the government's motion for expert disclosure and reciprocal discovery should be granted.

Dated:   October 1, 2018
      Rochester, New York

                                    JAMES P. KENNEDY, JR.
                                    United States Attorney
                                    Western District of New York

                       BY:   s/DOUGLAS E. GREGORY
                                   Assistant United States Attorney
                                   United States Attorney's Office
                                   100 State Street, Room 500
                                   Rochester, New York 14614

cc:   Anne Burger, AFPD
      Sonya Zoghlin, AFPD
      Joel Violanti, AUSA