# Federal Public Defender's Office
## Western District of New York

MARIANNE MARIANO
**FEDERAL PUBLIC DEFENDER**
marianne_mariano@fd.org

ANNE M. BURGER
**SUPERVISORY ASSISTANT FEDERAL PUBLIC DEFENDER**
anne_burger@fd.org

28 EAST MAIN STREET
FIRST FEDERAL PLAZA, SUITE 400
ROCHESTER, NEW YORK 14614

585-263-6201
FAX: 585-263-5871

BUFFALO OFFICE
300 PEARL STREET, SUITE 200
BUFFALO, NEW YORK 14202
716-551-3341
716-551-3346-FAX

REPLY TO: ROCHESTER

January 3, 2019

**VIA CM-ECF**

Honorable Jonathan W. Feldman
United States Magistrate Judge
U.S. Courthouse
100 State Street
Rochester, NY 14614

> Re: *United States v. Richard Leon Wilbern*, 17-cr-6017-CJS-JWF
> *United States v. Richard Leon Wilbern*, 17-cr-6016-CJS-JWF

Dear Magistrate Judge Feldman:

The defense previously sought the production of non-conforming event reports from the OCME from 2011 through 2017 relating to chain of custody and DNA testing and analysis. *See* Documents 60 (17-cr-6016) and 80 (17-cr-6017). The Court granted the defense's request in part and ordered the government to disclose non-conforming event reports of OCME employees "who performed any work on or testing of DNA that the government claims connects the defendant to the crimes charged." *See* Documents 63 (17-cr-6016) and 87 (17-cr-6017). The OCME balked at the prospect of the disclosure of the reports absent a protective order prohibiting the defense from disclosing the materials to others. *See* Documents 67, enclosure (17-cr-6016) and 95, enclosure (17-cr-6017). At oral argument on December 13, 2018, the Court directed counsel to inquire and report as to whether those upon whom the defense would seek to share the non-conforming event reports for the purpose of advancing the defense of Mr. Wilbern would themselves agree to such a protective order. The defense continues to oppose the protective order sought by the OCME.

Not surprisingly, the defense did not find a consistent willingness to collaborate with Mr. Wilbern's defense under the condition of the protective order proposed by the OCME. Such restrictions on disclosure can create issues, both ethical and practical, for defense counsel, for example. The Code of Professional Responsibility requires that a lawyer practice competent (Rule 1.1) diligence (Rule 1.3) free of conflicts of interest (Rule 1.7). The order sought by OCME would also confine the other lawyers' abilities to themselves practice under Rule 5.6. An

order that requires the other lawyers to agree to keep confidential, for Mr. Wilbern's benefit, information that the lawyer ordinarily has no duty to protect, creates a potential conflict between the lawyers' present clients' interests and those of the lawyer's potential future clients. The opposed order would also undermine counsel's ability to fulfill their obligations to represent current clients.

The effect of such a protective order in this case would be to deprive Mr. Wilbern's defense team of meaningful tools with which to defend him. Counsel and others who are well-familiar with the workings of the OCME's LCN DNA testing and the lab's general functioning will be unavailable to assist and consult with Mr. Wilbern's defense team regarding the nearly 500 pages of non-conformity reports. The more widespread effect is to isolate information in such a way as to allow the OCME to effectively hide *Brady* material if the government does not thoroughly investigate the OCME experts it calls at trial.

The OCME claims it needs this extreme secrecy to avoid

a chilling effect on the free exchange of information within the laboratory. Such disclosure would thus impede OCME's ability to maintain as rigorously high a level of quality assurance – and quality work – as it currently does and must maintain to keep its professional accreditation and its sterling reputation.

*See* Documents 67, Attachment (17-cr-6016) and 95, Attachment (17-cr-6017).

Secrecy is also necessary, according to the OCME, "to maintain the level of candor and freedom from fear of retribution necessary for effective self-reporting" and to "permit[] OCME employees to share their observations and opinions freely, both requiring and promoting frank communication." *Id.* The OCME also maintained that the reports should remain secret to keep private action taken against its scientists: "non-conformity reports contain a candid assessment of employee performance including corrective action if warranted." *Id*.

What the OCME ignores is the fact that transparency for the first time was forced on the lab after a series of scandals – the wrong DNA profiles being uploaded to the state CODIS database, news that a criminalist who had failed proficiency exams went on to cross-contaminate sexual assault kits, the mishandling of evidence in over 800 rape cases, and revelations that a deputy director violated protocol when changing a test result from exclusionary to inclusionary – that led to a major shake-up at the lab in 2013. After a management changeover and an investigative report by the Inspector General, the City Council took action by passing N.Y.C. Admin Code §17-207. The new law required the OCME to report significant events through a procedure called a "root cause analysis." The OCME has assured this Court that the regulation guarantees a thorough and in-depth response to significant issues within the lab coupled with the requirement that the lab report "significant events" to external agencies. *See* Documents 67, Attachment (17-cr-6016) and 95, Attachment (17-cr-6017).

Recently, the OCME unsuccessfully sought a protective order in connection with its required disclosure of a non-conformity report. *See* Exhibit A. The OCME made the same arguments in support of secrecy and a protective order which would have prevented counsel for Mr. Wilbern from ever receiving it. The New York State Supreme Court rejected the OCME's application for a protective order and found that the OCME had failed to establish good cause for such an order. *People v. Sissoko*, 2018 WL 6614309, attached as Exhibit B.

This non-conformity report documents an OCME scientist (identified as "KCM") contaminating a DNA sample from a swab of a firearm with his/her own DNA. *See* Exhibit A. Yet, strangely, KCM performed no work on the firearm swab, nor did KCM even witness the DNA testing of the swab. The report finds that "KCM was working in the area during the week when the swab was tested, no lab cleanup was performed during this week and "[i]t cannot be determined at what point DNA from the analyst came in contact with the sample." *Id*. The lab speculates that the most likely cause was contamination occurring during the handling of supplies. *Id*. Despite the seriousness of this problem, the only measures taken were to remind the analyst to be better with "lab hygiene" and properly wear protective gear and clean their gloves and work area. *Id*. No other investigation to determine if KCM contaminated other samples was undertaken and the lab's Quality Assurance manager felt it was unnecessary to forward the form to the OCME Root Cause Analysis Officer. *Id*.

The OCME has consistently made the same arguments it makes here, that secrecy will somehow lead to better forensic science. This claim is unsupported and is belied by its unsuccessful efforts to keep secret the evidence of significant contamination in the *Sissoko* case. Here, the defense is seeking to obtain and make use of records of errors that were caught in a forensic DNA laboratory in furtherance of its defense of Mr. Wilbern. DNA evidence is treated by lay persons as infallible and the gold standard of forensics. If the Court issues the OCME's protective order Mr. Wilbern's rights will be violated. He is constitutionally entitled to confrontation rights under the Sixth Amendment, due process rights under the Fifth Amendment, and the right to present a defense also under the Fifth and Sixth Amendments.

As noted by the attorneys in the *Sissoko* case, what the lab is saying is, 'when the DNA profile of one of our scientist/expert witnesses contaminates a crime scene sample after it is run through our computer database, we're afraid that the criminalist – who we hold out to the public as a scientist/expert witness – might deceive us about how the sample was contaminated. We're afraid that the scientist/expert witness might refuse to remember that he or she wiped the sweat off of his or her forehead and then touched the sample (or observed a colleague who did the same). We're afraid that the expert witness might exaggerate his or her following lab protocols.'

The lab cannot have it both ways - publicly touting the accuracy and reliability of its lab work [*see* Thomas Tracy, NYC Medical Examiner's DNA lab gets perfect score on accreditation review for the first time ever, New York Daily News, December 4, 2015, available at http://www.nydailynews.com/new-york/nyc-dna-lab-perfect-score-review-article-1.2455634?barcprox=true (last accessed 1/3/2019)] while demanding that its lab errors remain secret in order to ensure that OCME employees are following their own protocols.

In light of the above, the defense requests that the Court expand the *Brady* order to include disclosure of non-conformity reports involving not only those responsible for the DNA testing and analysis but also those involved in the chain of custody within the OCME. In addition, the defense requests that the Court decline to issue the OCME's protective order.

                                                Respectfully submitted,

                                                s/Anne M. Burger
                                                Anne M. Burger
                                                Assistant Federal Public Defender

Encl.
cc: Douglas Gregory, AUSA (via CM-ECF)