**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

UNITED STATES OF AMERICA**,**

-vs-

RICHARD LEON WILBERN,

                        Defendant.
_____

DECISION and ORDER

17-CR-6016
17-CR-6017

On January 24, 2017, a federal grand jury returned two indictments against Defendant, each assigned a separate docket number. The first indictment charges Defendant with felon in possession of a weapon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), 17-CR-6016, ECF No. 6. The second indictment charges Defendant with credit union robbery in violation of 18 U.S.C. § 2113(a) and murder with a firearm in furtherance of a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 924(j)(1), 17-CR-6017, ECF No. 15. These cases were both referred by text orders of the undersigned, entered on January 24, 2017, to the Hon. Jonathan W. Feldman, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(A)–(B), 17-CR-6016, ECF No. 7 and 17-CR-6017, ECF No. 16. With respect to the indictments, Defendant filed several pretrial motions as reflected in the following chart:[1]

_____

[1] The Court has modified slightly the two charts created by Judge Feldman in his Report and Recommendation, 17-CR-6016, ECF No.96; 17-CR-6017, ECF No. 124, that is the subject of this Decision and Order.

**CHART A**

| | DOCUMENT NAME | 17-CR-6016 | 17-CR-6017 |
|---|---|---|---|
| 1 | Indictment | ECF #6 | ECF #15 |
| 2 | Motion for Disclosure of Pretrial Material | ECF #25 | ECF #39 |
| 3 | Motion for Timely Disclosure of Conflicts | | ECF #76 |
| 4 | Motion to Dismiss Count 2 | | ECF #77 |
| 5 | Motion to Change Venue | | ECF #78 |
| 6 | Motion to Suppress Evidence (DNA) | ECF #60 (*Franks*) | ECF #80 (*Franks*); statements and DNA sample |
| 7 | Motion to Exclude Evidence and for *Daubert* Hearing | | ECF #81 |
| 8 | Motion for *Brady* Disclosure and Suppression of ID Evidence | | ECF #82 |
| 9 | Motion to Suppress Evidence (jail calls) | ECF #74 | ECF #103 |

Judge Feldman heard oral argument on Defendant's applications on October 23, 2018, and on January 22, 2019.

On April 19, 2019, Judge Feldman filed his Report and Recommendation ("R&R"), 17-CR-6016, ECF No. 96; 17-CR-6017, ECF No. 124, recommending the following:

**CHART B**

| | DOCUMENT NAME | 17-CR-6016 | 17-CR-6017 | DISPOSITION |
|---|---|---|---|---|
| 1 | Motion for Disclosure of Pretrial Material | ECF #25 | ECF #39 | **Granted in part and denied in part** |
| 2 | Motion for Timely Disclosure of Conflicts | | ECF #76 | **Granted** |
| 3 | Motion to Dismiss Count 2 | | ECF #77 | **Recommend deny** |
| 4 | Motion to Change Venue | | ECF #78 | **Denied without prejudice to renew** |
| 5 | Motion to Suppress Evidence (DNA) | ECF #60 (*Franks*) | ECF #80 (*Franks*); statements and DNA sample | **Recommend deny** |
| 6 | Motion to Exclude Evidence and for *Daubert* Hearing | | ECF #81 | **Denied without prejudice to renew** |
| 7 | Motion for *Brady* Disclosure and Suppression of ID Evidence | | ECF #82 | **Denied in part and denied without prejudice to renew in part** |
| 8 | Motion to Suppress Evidence (jail calls) | ECF #74 | ECF #103 | **Recommend deny** |

On June 3, 2019, Defendant timely made two filings objecting to the R&R, 17-CR-6016, ECF No. 100; 17-CR-6017, ECF No. 128 & 129. In that regard, with respect to the first filing, 17-CR-6016, ECF No. 100; 17-CR-6017, ECF No.128, Defendant objects as follows:

1)  the Court should reject the R&R and issue an order dismissing count two of indictment 17-CR-6017;

2)  the Court should reject the R&R and either recommit the matter to the magistrate judge or itself conduct a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and following a hearing, order the evidence derived from the search warrants at issue suppressed;[2]

3)  the Court should reject the R&R and either recommit the matter to the magistrate judge for the making of factual findings or, in the alternative, the Court should make factual findings and order suppression of statements and evidence;

4)  the Court should reject the R&R and order suppression of the jail telephone calls.

As to the second filing, 17-CR-6017, ECF No. 129, Defendant objects to Judge Feldman's recommendation that his application for a pretrial hearing addressing identification procedures be denied.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of Magistrate Judge Feldman's R&R to which objections have been made. The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.

At the outset, the Court notes that Defendant has not objected to Judge Feldman's recommendations as referenced in Chart B with respect to numbers 1, 2, 4, and 6,[3] *supra*.

---

[2] Absent a *Franks* argument, Defendant would face the "good faith" hurdle in trying to prevail on his application for suppression "of the evidence derived from the search warrants at issue." *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984)

[3] While Defendant has not objected to Judge Feldman's recommendation that his motion to exclude evidence and for a *Daubert* hearing be denied without prejudice with leave to renew, he did request, agreed to, and was granted a prospective interest-of-justice speedy trial exclusion, pursuant to 18 U.S.C. § 3161(h)(7)(A) & (B), until July 30, 2019, to present additional information to this Court with respect to his application, 17-CR-6017, ECF No.131. Defendant's Response Relating to *Daubert* Hearing Request, 17-CR-6017, ECF. No. 139, was timely filed on July 30, 2019.

Accordingly, the Court need not address those recommendations in this Decision and Order. The Court now turns its attention to those recommendations to which objections were made.

**Chart B, Number 5. Motion to Suppress Evidence and for *Franks* Hearing on the Basis that Affidavit in Support of Search Warrant for 23 Tubman Way was Based on Misleading Statements and Material Omissions (17-CR-6016, ECF No. 60; 17-CR-6017, ECF No. 80)**.

Upon a *de novo* review of the R&R, and after consideration of Defendant's objections, the Court accepts Judge Feldman's proposed findings and recommendations. Accordingly, the application to suppress evidence and for a *Franks* Hearing is denied.

**Chart B, Number 5. Motion to Suppress Statements and DNA Sample, 17-CR-6016, ECF No. 60**

On page 13 of "Objections to the Report and Recommendation of April 19, 2019," 17-CR-6016, ECF No. 100, in connection with the heading, Section IV, Defendant argues that the "Court Should Reject the R & R and Either Recommit the Matter to the Magistrate Judge for the Making of Factual Findings or, in the Alternative, the Court Should Make Factual Findings and Order Suppression of Statements and Evidence." In that regard, Defendant was interviewed by law enforcement on three separate occasions, and for each interview a video/audio recording was made. At the second interview, Defendant was asked to seal an envelope from which a sample of his DNA was obtained. These recordings were provided to Judge Feldman, along with copies of relevant email and text messages. Defendant maintains that, although it is presumed that Judge Feldman reviewed the recordings and documents submitted to him, he erred by failing to make specific findings in support of the legal conclusion that he reached in recommending that suppression of the statements and DNA sample be denied.

The Government maintains in footnote 15, p. 52 of its Response, 17-CR-6017, ECF 84, to Defendant's pretrial motions that "[g]iven the clarity of the video, neither the conversational tone of the encounter, nor the conduct of the participants, nor the actual words spoken can be in dispute." The Court, nonetheless requested and was provided with the recordings[4] and pertinent documents in question, which it has reviewed and will, as suggested by Defendant, make its own findings of fact. At the outset, and to place the Court's findings of fact in context, it appears undisputed that in March of 2016, law enforcement developed information which led it to believe that Defendant was the perpetrator of the crimes for which he now stands accused in Indictment No. 17-CR-6017. Subsequently, law enforcement learned that Defendant had contacted the Federal Bureau of Investigation's ("FBI") public access line on more than one occasion to bring to the FBI's attention a fraud pertaining to real estate. The FBI contacted Defendant at the cell phone number he left on the public access line and invited him to its Rochester Office for the first of what turned out to be three interviews. The Court now makes the following findings of fact.

The first interview of Defendant by two members of the FBI occurred on July 7, 2016. Pursuant to his request to speak to the FBI, Defendant transported himself to the Rochester FBI office accompanied by his toddler son, who, on the recording, the Court approximates to be about one to one and a half years old. The interview began about 12:15 p.m. and lasted until about 1:26 p.m. At all times, Defendant's son was with him and

_____

[4]The recordings consisted of five DVD's relating to three dates, July 7, 2016 (two discs labeled 1 of 2 and 2 of 2), July 19, 2016 (one disk labeled 1 of 1), and September 28, 2016 (labeled 1 of 2 and 2 of 2). The Court notes that, as to the July 7, 2016, interview, the DVD labeled 2 of 2 only shows an empty interview room.

at various times during the interview, Defendant provided his son a bottle, presumably filled with water, from which the child drank and from which Defendant also drank. Additionally, at various times on July 7, 2016, both Defendant and his son ate from a bag of what appears to be potato chips or the like. At no time during the interview was Defendant restrained in any fashion and he and his son were free to move about as they pleased. During the interview, Defendant can be seen with his cell phone in his hand while conversing with the FBI agents, who wore plain clothes and whose weapons, if they had them, were in no way visible. Defendant indicated he had not been around for two months because he had been participating in a pharmaceutical study in Texas. When asked about what brought him to the FBI office, Defendant said that he had been trying to get in touch with the FBI for about two months. He started speaking about being illegally evicted from his residence. When one of the agents responded that an eviction does not sound like something the FBI does, Defendant suggested that the eviction was fraudulent. He said that he had a lawyer, but that the opposing law firm had made big contributions to the judge who decided the eviction. As to the eviction, he complained about his personal items being put in a dumpster. Defendant then provided information about what he believed to be a real estate scam. He explained that in April of 2016, he and his fiancée were looking for a place to rent. He said that his fiancée had located a residence to rent, possibly on Craigslist, although he wasn't sure. He called the number provided, spoke to a man, who said he was a pastor and that he was very busy. The man to whom Defendant spoke said the house, which was at 82 Southern Parkway in Brighton, was renting for $1,500 to $1,700 a month. Defendant said to the agents that it sounded fishy to him. The residence had an in-ground pool and five to six garages, and he believed it should be renting for a

lot more, somewhere in the neighborhood of $4,000. According to Defendant, this man sent him an application by email, which Defendant said he completed, and which application Defendant was informed was accepted. Defendant said the man to whom he spoke wanted him to send money to Virginia. Defendant went and looked around 82 Southern Parkway, but didn't go inside. He then called the realtor whose name was listed on the sign on the property. Defendant spoke to the realtor who was a woman and concluded that she was involved in the scam. Defendant showed the agents communications from the pastor that he received. At times throughout the interview, Defendant complained about his eviction. The interview concluded with one agent indicating that he would be in touch and that maybe they could do something proactive. Defendant and his son then left the interview room.

With respect to the July 7, 2016, interview, Defendant did not appear to be sick or injured in any way, nor did he complain about being sick or injured. He responded to the questions asked by the agents and his responses were coherent. His speech was not slurred, and he did not, on the recording, appear to be intoxicated. He never asked for a lawyer, nor did he ever indicate that he did not want to talk to the agents. Neither agent made him any promises, nor did either agent threaten him or physically abuse him in any way to get him to converse.

The second interview with Defendant occurred on July 19, 2016, and was brief in duration, beginning at about 8:32 a.m. and ending at about 8:38 a.m. Defendant arrived at what appears to be the same interview room as shown in the July 7, 2016, recording at about 8:30 a.m. He can be seen wearing a baseball cap and glasses. The agents, who were in plain clothes, entered the interview room at about 8:32 a.m. If the agents were

armed, their weapons were not visible. After entering the interview room, the agents had a discussion with Defendant about using him as a confidential source and said that they would give him a confidential number. Of note, during his conversations with the agents, Defendant again brought up his eviction. With regard to being a confidential source, it was explained to Defendant that, with his permission, as a confidential source, any conversations he had would be recorded. Defendant was asked, as a confidential source, to complete a document, sign it, place it in an envelope, seal the envelope, and initial over the seal, all of which Defendant did voluntarily, not as the result of any type of coercion. When this was completed, one of the agents said "that's all we need." Defendant then left the room. On July 19, 2019, Defendant was not restrained in any way or physically abused in any fashion. He was not threatened in any way, nor was he promised anything to cooperate. Defendant responded to questions asked and his responses were coherent. He did not appear to be sick or injured, nor did he complain that he was sick or injured. His speech was not slurred, and he did not appear in any way to be intoxicated. He never indicated that he did not want to talk to the agents, nor did he ever indicate that he wanted an attorney.

The third interview with Defendant occurred on September 28, 2016, in what appears to be the same interview room where the first two interviews took place. It began at about 9:20 a.m. and ended at about 11:51 a.m. at which time Defendant requested an attorney and was arrested.

The agents were again in plain clothes, and, if they were armed their weapons were not visible. At the outset, Defendant and the agents talked about people getting sick, drug studies and how they are conducted apart from the pharmaceutical companies, and about

how drug companies operate with specific mention of Pfizer. They conversed about Defendant's eighty-five-year-old mother and his two brothers, one of whom Defendant indicated that he did not like. One of the agents told Defendant that they get background information from "everybody we work with and talk to." Defendant mentioned that he was homeless, living out of his car. There was discussion of how Defendant could be paid for his cooperation, with one agent advising him that it was easier to pay bills than obtain cash. Defendant went on to describe how he and his fiancée broke up. He related how she went through his phone, and how she did not understand his relationships before her. Defendant told the agents that a prominent woman in Rochester had sent him nude photos of herself. Defendant said it was a problem because his fiancée went through his stuff, but that he stops to see her and his son. He indicated that she made him get physical with her, that she attacked him, and that she put him in uncomfortable situations. He also brought up his eviction again, and spoke about his lawsuit against American Tax Funding, and the fact that he had to pay attorney's fees of $3,000.

At about 9:46 a.m., the agents returned to why they asked Defendant to come in. They went over Defendant's travel out of the country. In that regard, in trying to help Defendant to remember dates of travel, one agent related that 9/11 helps him to remember time frames for events in his life. Defendant then discussed his travel to Japan, and he spoke about someone teaching his son how to shoot a basketball. An agent asked Defendant about driving and flying when traveling. At about 10:05 a.m., one of the agents indicated to Defendant that they were aware of his prior criminal record about which they needed to speak with him. The agent explained to Defendant that whenever they talk about someone's criminal activity they are required to advise that person of his constitutional

rights. Defendant was then given his *Miranda* warnings and asked two questions. The first was "Do you understand?" to which Defendant replied "Yes." Then when asked "Are you willing to talk to us?," Defendant nodded his head up and down. The agents then engaged Defendant in a discussion about his prior criminal activity and contact with police. Defendant spoke to the agents about a number of subjects, including his thoughts on racism, his work history, the first time Defendant saw "Black Power," his plan to do stand-up comedy in L.A. and London, and how he missed the stage. Defendant was asked about his termination from Xerox, the areas in which he worked at Xerox, and the lawsuit he had against Xerox. Defendant stated he loved the friends he made and people he met at Xerox. He also mentioned that he previously worked at Kodak. At about 11:18 a.m., Defendant was asked if, when he was fired from Xerox, he closed down his accounts at the credit union. When asked specifically if he had an account with Xerox, he responded, of course. He was asked if everyone who worked at Xerox used the credit union and responded he was sure they did. Defendant was asked if there was a credit union in Xerox (presumably, if there was still one), and he responded that he did not know if there was still one there now because he had not been there. He went on to say that if you work for a place, why not do business with them. Defendant also mentioned that he had previous accounts first with Bank of America and then Wells Fargo. Defendant was asked if, when fired by Xerox, he closed down his accounts at the credit union. He responded that he did not remember, but that he probably did and that he was pretty sure that if he had money in the credit union, he would have withdrawn it. He mentioned getting something from Xerox a couple weeks before requesting confirmation of his address, but that he did not send it back. The conversation turned again to Defendant's brother, and then shifted to Defendant getting

kicked out of his house in Fairport. Defendant related how, after leaving Fairport, he managed to keep his son enrolled in the Fairport School District, although he should not have been. Defendant was asked if he kept in touch with anyone with whom he had worked at Xerox, and he said no. Defendant then spoke about the diverse work force at Xerox. There was about a three minute break in the conversation from about 11:40 a.m. to 11:43 a.m. When the interview resumed, Defendant asked how the agents were going to use him and was told that they were still trying to figure that out, but, since Defendant was homeless, there had to be a way that they could help him out. At approximately 11:44 a.m., Defendant was specifically asked if he remembered the last time that he was at the credit union at Xerox, and he responded no. He was then asked to think back to the time when he was there. He said he could not and questioned the relevance. Defendant was asked if he watched television, and he responded, of course, sports. One of the agents then entered into a discussion about crime shows and forensics, making a point that something is always taken and something is always left behind. Defendant said he did not watch crime shows.

Starting at about 11:46 a.m. the following exchanges occurred:

FBI:                    . . . And I'm going to continue to be straight forward with you. I'm not trying to beat around the bush. I'm not trying to play tricks on you, no. You're being honest with us and I believe you're being honest with us and I'd like to continue with that relationship that we have going and I know you're not a dumb guy. I know you're a smart guy and I know that you probably have an idea where I'm going.

DEFENDANT:        Not really. That's what I'm asking.

FBI:                    Can I show you a picture?

DEFENDANT:        I don't want to see no pictures.

FBI:                    (unintelligible)

DEFENDANT:              Am I free to leave? I don't know where we going. I was talking to you guys and you guys were helping me.


FBI:                     We're trying to get some information.

DEFENDANT:              But not related to what I came in for. I came in to help you guys, I believe, to put an end to someone out there doing whatever it is they was doing, correct?
                        (both investigators say that's correct)


DEFENDANT:              So are we still on that track or are we off that track is that what we working on or are we working on something else? That's all I want to know. If we working on something else and I'm not under arrest, I'd like to leave because I don't feel that you guys are open and honest with me. I don't know where we're going. I just don't want to continue the conversation.


FBI:                    Well, and that's your right. That's your prerogative. I want you to understand that. I would like to continue the conversation because I think that there's, we talked about before, there's always a reason, there's a reason.


DEFENDANT:              For what?

FBI:                    For the way things go down, the way things happen. You're always getting backed into corners. You're always getting shit on, quite frankly, a lot of cases, a lot of lawsuits, you know, getting into car accidents, you know, your fiancée going through your shit.


DEFENDANT:              What does that have to me helping you guys?

FBI:                    I'm trying to understand you and about you. You know, there's—like I started, you know, we try to get all the skeletons out of the closet, you know, try to find out if there's something out there that we need to know about, something more.

DEFENDANT:      Mm-mm.

FBI:            This is all part of the process.

DEFENDANT:       Conversation is over.

FBI:            You can listen to us. You don't have to say anything. Just sit there and listen to us.

DEFENDANT:      I'd like to leave. Whatever you read to me, I'd like to invoke it and I'd like to leave. If I'm not leaving, then arrest me. We done.

FBI:            You don't want to hear any more? You don't want to hear anything else we have to say?

DEFENDANT:      No, you guys are not being up front with me. I thought I was helping you guys.

FBI:             When was the last time you were at the bank?

DEFENDANT:      You haven't done anything that I've asked you to do.

FBI:            That's not entirely true.

DEFENDANT:      I told you my case, you didn't do anything to assist me with that.

FBI:            I think that there's an explainable reason why things went bad that day.

DEFENDANT:      What day are you talking about?

FBI:             August 12, 2003.

DEFENDANT:      I don't know what you talking about.

FBI:            Everybody knows about the incident.

DEFENDANT:     So, from this point on, I'd like to see an attorney. I don't want to talk to you guys.

With respect to the September 28, 2016, interview, Defendant was not physically abused in any fashion or threatened in any way to get him to speak with the agents. He wasn't promised anything to get him to speak with the agents. He was only told that he could be paid for his cooperation and, in that regard, it would be easier to pay his bills than get him cash. Defendant responded to questions asked and his responses were coherent. He did not appear to be sick or injured, nor did he complain that he was sick or injured. His speech was not slurred, and he did not appear in any way to be intoxicated. Up to the point he indicated that he did not want to continue the conversation, Defendant did not say that he did not want to talk to the agents, nor did he say he wanted an attorney.

Based upon the Court's own findings of fact, and upon a *de novo* review of the legal conclusions and law as set forth in the R&R, and after consideration of Defendant's objections, the Court accepts Judge Feldman's recommendations as follows. Defendant's application to suppress his DNA sample is denied. Defendant's application to suppress statements is denied as to the July 7, 2016, and July 19, 2016, interviews, and denied as to the September 28, 2016, interview up to the point Defendant stated, "I just don't want to continue the conversation."[5]

---

[5]The Government, in correspondence dated November 5, 2018, 17-CR-6017, ECF No. 92, and in correspondence dated June 25, 2019, stated that as to the September 28, 2016, interview it intended to offer pre-*Miranda* statements: 09:36:21 through 09:36:51 & 09:46:54 through 09:56:16 and post-*Miranda* statements: 10:05:10 through conclusion of video. The Court's ruling limits the post-*Miranda* statements that the Government may offer and these statements may be further limited based upon relevancy and prejudice.

**Chart B No. 3 Motion to Dismiss Count 2, 17-CR-6017, ECF No. 77**

Defendant moves to dismiss Count 2 of Indictment 17-CR-6017 on the basis that the violation of 18 U.S.C. § 2113(a), as charged in the count is not categorically a crime of violence. Count 2 reads as follows:

### *Murder with Firearm in Furtherance of a Crime of Violence*

On or about August 12, 2003, in the Town of Webster, in the Western District of New York, the defendant, RICHARD LEON WILBERN, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, a violation of Title 18, United States Code, Sections 2113(a) and 2113(e), committed in the manner set forth in Count 1 of this Indictment, the allegations of which are incorporated herein by reference, did knowingly and unlawfully use, carry and discharge, and in furtherance of such crime, did knowingly and unlawfully possess and discharge a firearm, in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii), and in the course of those violations, the defendant caused the death of Raymond Batzel through the use of such firearm, which killing was murder as defined in Title 18, United States Code, Section 1111, in that the defendant, with malice aforethought, and in the perpetration of, and attempt to perpetrate robbery, did unlawfully kill Raymond Batzel willfully, maliciously, and with premeditation by shooting him with a firearm. All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 924(j)(1).

In the wake of the United State Supreme Court decisions in *Johnson v. United States*,__U.S.__, 138 S. Ct. 2551(2015), *Sessions v. Dimaya*, __U.S.__, 135 S. Ct. 1204 (2018), *Stokeling v. United States*,__U.S.__, 139 S. Ct. 544 (2019), and, most recently, *United States v. Davis*, __ U. S. __,139 S. Ct. 2319 (2019), the government and Defendant agree that the Court must apply the categorical approach and that the fact specific approach for resolution by the jury, and approved by the Second Circuit in *United States v. Barrett,* 903 F. 3d 166 (2d Cir. 2018*)* has been abrogated by *Davis*.

That resolved, what exactly is the categorical approach? With respect to whether an offense is a crime of violence, the Second Circuit explained:

To determine whether a crime is a "crime of violence" under § 924(c)(3)(A), we apply the so-called "categorical approach." Under this "approach," we evaluate whether "the minimum criminal conduct necessary for conviction under a particular statute" necessarily involves violence. In doing so, we focus only on the elements of the offense and do not consider the particular facts of the underlying crime.

*United States v. Hendricks*, 921 F.3d 320, 327 (2d Cir. 2019). The *Hendricks* court further

explained:

We have recently held that § 2113(a) is a "divisible" statute because it contains two separate paragraphs that "delineate[ ] two methods of committing" credit union robbery. In this case, there is no dispute that Robert was charged with, and convicted of, the first method of committing credit union robbery—namely, "by force and violence, or by intimidation." We therefore must determine whether credit union robbery "by force and violence, or by intimidation" categorically constitutes a "crime of violence." Perhaps unsurprisingly, we conclude that it does.

*Id.* The "recently held" case to which *Hendricks* refers is *United States v. Moore*, 916 F.3d

231 (2d Cir. 2019) where the Second Circuit held:

In the event a statute criminalizes multiple acts in the alternative, thereby defining multiple crimes, it is considered "divisible," and we apply the modified categorical approach. *Id.* A statute is not considered divisible if, instead of defining multiple crimes, it lists various factual means of committing a single crime. *Id.* For example, a statute that prohibits "the lawful entry or the unlawful entry of a premises with intent to steal" is divisible because it criminalizes two alternative offenses—the less serious offense of burglary with lawful entry and the more serious offense of burglary with unlawful entry. *See Mathis v. United States*, —— U.S. ——, 136 S. Ct. 2243, 2249, 195 L. Ed. 2d 604 (2016) (internal quotations omitted). In a case like that, a court would apply the modified categorical approach and look to "a limited class of documents," such as "the indictment, jury instructions, or plea agreement and colloquy" to determine which of those two alternative offenses was the offense of conviction. *Id.* (internal quotations omitted). The court would then return to the categorical analysis and compare the elements of the offense of conviction with the elements of the relevant generic offense. *Id*.

The parties do not contest that § 2113(a) of the federal bank robbery statute is divisible, and we agree. That subsection delineates two methods of committing the crime of bank robbery: (1) "by force and violence, or by

intimidation" or (2) "by enter[ing] or attempt[ing] to enter" a federal financial institution "with intent to commit ... any felony affecting" such financial institution "and in violation of any statute of the United States, or any larceny." 18 U.S.C. § 2113(a). Therefore, § 2113(a) is divisible, and we may look to Moore's plea agreements to determine under which method he was convicted. *See United States v. Wilson*, 880 F.3d 80, 84 n.3 (3d Cir. 2018) (accepting the district court's determination that § 2113(a) is divisible because it contains two separate paragraphs, each containing a separate version of the crime of federal bank robbery); *United States v. Rinker*, 746 F. App'x 769, 772 n.21 (10th Cir. 2018) (unpublished) (collecting cases); *see also Jones II*, 878 F.3d at 16.

*United States v. Moore*, 916 F.3d 231, 238 (2d Cir. 2019).

18 U.S.C. § 2113 in pertinent part reads as follows:

(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or

Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank, credit union, or such savings and loan association and in violation of any statute of the United States, or any larceny–

*Moore* and *Hendricks* indicate that 18 U.S.C. § 2113(a) is divisible into **two** parts, each part beginning with the word "Whoever," with each part delineating a separate method of committing credit union robbery. Since robbery is generically defined as forcible stealing, the Court fails to see how part 2 of 2113(a), entering a bank, credit union, or any savings and loan association with intent to commit a felony affecting such bank, credit union, or any savings and loan association can be referred to as a second method of committing bank robbery. It sounds more like bank burglary. However, more to the point, what about the third way of violating the first part of 2113(a), (which *Hendricks* and *Moore* hold to be a two

-18-

part statute): obtaining bank, credit union, or savings and loan property by extortion. As *Moore* explained, having identified which part of this two-part statute is at issue, we must return to the categorical approach detailed in *Hendricks*, *supra*. If we do as directed, must we not logically conclude that, since the first part of 2113(a) can be violated by extortion, which does not necessarily involve violence, it is not categorically a crime of violence any more than the "bank burglary" set forth in the second part of 2113(a), which *Hendricks* and *Moore* refer to as a second way of committing bank robbery?

If this all sounds confusing, it is. As the Second Circuit has remarked:

> The aspirations behind the categorical approach first articulated in *Taylor* were worthy ones. The Supreme Court hoped to remain faithful to "ACCA's text and history[,] ... avoid[ ] the Sixth Amendment concerns that would arise from sentencing courts' making findings of fact that properly belong to juries[, a]nd ... avert[ ] 'the practical difficulties and potential unfairness of a factual approach.'" *Descamps*, 570 U.S. at 267, 133 S. Ct. 2276 (*quoting Taylor*, 495 U.S. at 600–01, 110 S. Ct. 2143). But the laudable goals motivating this approach have not been realized. *See Mathis*, 136 S. Ct. at 2258 (Kennedy J., concurring) (labeling the categorical approach "a system that each year proves more unworkable"); Transcript of Oral Argument at 26, *Stitt*, 139 S. Ct. (No. 17-765) (Alito J.) (characterizing the Court's categorical approach jurisprudence as "one royal mess").

> In hindsight, judicial difficulties with the categorical approach might have been expected. The approach demands that federal courts employ an analysis for which they are not constitutionally (or practically) suited. While cases such as *Evans's* undoubtedly pose an actual case or controversy as the Constitution demands, *see* U.S. Const. art. III § 2, cl. I, the categorical approach paradoxically instructs courts resolving such cases to embark on an intellectual enterprise grounded in the facts of other cases not before them, or even imagined scenarios. Courts are required to discern the outer reaches of countless federal and state statutory provisions in an exercise most reminiscent of the law school classroom, and quite alien to courts' well-established role of adjudicating "concrete legal issues, presented in actual cases, not abstractions." *United Public Workers v. Mitchell*, 330 U.S. 75, 89, 67 S. Ct. 556, 91 L.Ed. 754 (1947) (quotation marks omitted).

> A solution lies with two sources: Congress, which can "amend[ ] the ACCA," and the Supreme Court, which may "revisit its precedents in an appropriate

case." *Mathis*, 136 S. Ct. at 2258 (Kennedy J., concurring) (calling for a reconsideration of the categorical approach should "continued congressional inaction" persist). Mindful of the competing textual, constitutional, and practical concerns underpinning the categorical approach, we offer no opinion as to which of the many proposed solutions—from a conduct-specific approach to eliminating mandatory minimums—may be appropriate. We ask only that Congress or the Supreme Court take action. Until such time, the litany of ACCA challenges will continue, as will our efforts faithfully to apply the categorical approach, however awkward its demand that judges deciding cases act, instead, the part of law school professors spinning out hypotheticals.

*United States v. Evans*, 924 F.3d 21, 31–32 (2d Cir. 2019). For an illustration of this confusion, we need look no further than the court appearance held in this case on Tuesday, July 16, 2019, 17-CR-6017, ECF No. 134. Initially at that appearance, specifically to address the effect of the Supreme Court's decision in *Davis*, the government maintained that the modified categorical approach was dead and that 2113(a), in its entirety was, categorically a crime of violence. However, by the end of the court appearance the government retreated from this position in favor of arguing that 2113(a) is divisible into **three** parts (not **two** as held in *Hendricks* and *Moore*) and, relying on the modified categorical approach to determine that the part of 2113(a) charged in Count 2 was taking property by force and violence or intimidation, argued that this was categorically a crime of violence. In support of its position, the government relied on *Evans*, where the Second Circuit cited to the Ninth Circuit case of *United States v. Watson*, 881 F. 3d 782, 786 (9th Cir. 2018). In *Watson*, the Ninth Circuit stated that "2113(a) contains at least two separate offenses, bank robbery and bank extortion." (In making this statement, the *Watson* court obviously was referring only to the first "Whoever" clause in § 2113(a).) However, this language in *Evans* was *dicta*, since *Evans* was decided under the pre-1986 version of 2113(a) which did not include the extortion language. Moreover the *Evans* court specifically

stated "we need not decide whether bank extortion qualifies as a crime of violence." *United States v. Evans*, 924 F 3d at 28.

Despite the fact that the Court is skeptical that Count 2 categorically charges a crime of violence, in the end, this Court is bound by the Second Circuit's holding in *Hendricks* that bank robbery committed by force and violence or by intimidation is categorically a crime of violence for the purposes of § 924(c)(1)(A). Accordingly, based on that holding the Court, upon *de novo* review, must necessarily deny the motion to dismiss Count 2.[6]

**Chart B No. 7 Motion for Suppression of ID Evidence; ECF No. 82 (17-CR-6017)**

Defendant objects to Judge Feldman's recommendation that his motion "for disclosure of pretrial identification procedures and witness identities be denied," and his recommendation that denial be "without prejudice to renew with respect to suppression of that evidence as best made in a motion in limine before [this Court]." Objections to Report and Recommendation filed April 19, 2019, 17-CR-6017, ECF No. 129, p1. The identification testimony that the Government seeks to elicit at trial is testimony from five

---

[6]Apparently in light of the Supreme Court decisions cited above and the arguable inconsistencies in the application of the categorical approach discussed above, the government indicated at a August 14, 2019, court appearance that it is considering whether to pursue Count 2. As discussed in our court appearance on July 16, 2019, 17-CR-6016, ECF No. 104; 17-CR-6017, ECF No. 134, if convicted of a violation of 18 U.S.C. §§ 2113(a) and 2113(e) as charged in Count 1, Defendant faces mandatory life imprisonment. He obviously can not be convicted of Count 2 unless first convicted of Count 1, and if convicted faces a consecutive sentence of "imprisonment for any term of years or for life." 18 U.S.C. § 924(j). Also, for mandatory life, pursuant to 18 U.S.C. § 2113(e), the government need only prove beyond a reasonable doubt that, if Defendant did commit the credit union robbery as charged in Count 1, in the course of doing so, he killed any person. However, with respect to Count 2, the government, to invoke the penalty of 18 U.S.C. § 924(j)(1), would have to prove beyond a reasonable doubt the crime of Murder in violation of 18 U.S.C. 1111.

individuals who will testify that the person in surveillance photographs, which they were shown, is Defendant with whom they were familiar. In this regard, the government contends that none of these individuals "actually witnessed the crime, but rather they all are 'personally familiar' with the defendant. The government intends to use these witnesses at trial to make an in-court identification of the defendant pursuant to Federal Rule of Evidence 701. . . ." R&R, p. 24, quoting Government's Response to Defendant's Pretrial Motions, 17-CR-6017, ECF No.84, p.63, 65.

While none of the five prospective government witnesses was an eyewitness to the crime, the Court assumes *arguendo* that what occurred with respect to each was some type of pretrial identification procedure. After all, presumably each prospective witness will take the stand and identify Defendant as someone whom he or she has known, be shown surveillance photographs, and testify that, in his or her opinion, it is the Defendant in the photographs.

With respect to determining the admissibility of in-court identification testimony subsequent to arguably suggestive pretrial identification procedures, the Supreme Court has established a two-part test. First, courts must determine whether the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384 (1968); *see also Manson v. Brathwaite*, 432 U.S. 98, 105–14 (1977); *Neil v. Biggers*, 409 U.S. 188, 196–97 (1972); *United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir.1992). If the procedure is determined to be impermissibly suggestive, then courts must determine, under the totality of the circumstances, whether the identification was nevertheless reliable. *See Manson*, 432 U.S. at 114 ("reliability is the linchpin in determining the admissibility of

identification testimony"); *see also Biggers*, 409 U.S. at 199. If a court determines the identification to be reliable, testimony about the identification is admissible. *Manson*, 432 U.S. at 114.

With respect to the admissibility of identification testimony pursuant to Rule 701 in the circumstance presented here, the Court is guided by the Western District of Kentucky, which in a well-reasoned decision observed:

> Rule 701 of the Federal Rules of Evidence authorizes the admission of opinion evidence by a lay witness. "Such lay opinion testimony is permitted under Rule 701 because it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event." *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013) (quoting *United States v. Jayyousi*, 657 F.3d 1085, 1120 (11th Cir. 2011) (Barkett, J., concurring in part and dissenting in part)). To ensure that lay testimony serves the "objective of putting the trier of fact in possession of an accurate reproduction of the event," Rule 701 provides that the witness's testimony must be: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *Id*. (quoting Fed. R. Evid. 701 & advisory committee's note). "The burden is on the proponent to provide adequate foundation for the testimony." *Id*. at 595–96 (citing *United States v. Grinage*, 390 F.3d 746, 749 (2d Cir. 2004)). Further, "[i]f a witness's testimony fails to meet any one of the three foundational requirements, it is not admissible." *Id*. (citing Fed. R. Evid. 701). However, the decision of whether or not to admit certain testimony under Rule 701 is committed to the sound discretion of the district court. *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013); *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007); *United States v. Jackson*, 688 F.2d 1121, 1123 (7th Cir. 1982) (citing *United States v. Skeet*, 665 F.2d 983 (9th Cir. 1982); *Bohannon v. Pegelow*, 652 F.2d 729, 732 (7th Cir. 1981); *United States v. Borrelli*, 621 F.2d 1092 (10th Cir.), *cert. denied*, 442 U.S. 956 (1980); *United States v. Butcher,* 557 F.2d 666 (9th Cir. 1977)).

> Here, Defendant requests that the Court exclude two lay opinions from evidence. The first is that of Officer Andre Shaw, who made an identification from a wanted poster prepared by LMPD. This wanted poster used still surveillance photos from the first Cricket Wireless robbery. The second is that of Detective Ricky Guffey, who made an identification of Defendant from

Duke's proffered photo and Defendant's mugshot.

With respect to Shaw's identification from the wanted poster, a number of circuits have ruled in a variety of circumstances that opinion testimony identifying a defendant from surveillance photographs may indeed be helpful to the jury and is therefore admissible in the trial court's discretion. See *United States v. Maddox*, 944 F.2d 1223, 1230–31 (6th Cir. 1991); *United States v. Stormer*, 938 F.2d 759, 762 (7th Cir. 1991); *United States v. Wright*, 904 F.2d 403, 404–05 (8th Cir. 1990). Such testimony is admissible, **at least when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess, and when the photographs are not either so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification**. *United States v. Jackman*, 48 F.3d 1, 4–5 (1st Cir. 1995); see *United States v. Farnsworth*, 729 F.2d 1158, 1160 (8th Cir. 1984) ("A witness's opinion concerning the identity of a person depicted in a surveillance photograph is admissible if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury."); *but see United States v. LaPierre*, 998 F.2d 1460, 1465 (9th Cir. 1993) (excluding opinion testimony by investigating police officer identifying defendant in surveillance photograph because defendant's appearance had not changed between time of robbery and trial and officer had never seen defendant before in person).

*United States v. Whittle*, 2016 WL 4408992, at *6 (W.D. Ky. Aug. 16, 2016), aff'd 713 F. App'x 457 (6th Cir. 2017) (emphasis added).

There is an analogous approach employed in New York law where it is well settled that if a defendant and identifying witness are known to each other, any identification is merely confirmatory and a *Wade* hearing is not required. That is to say, New York law allows for in-court identifications despite what would otherwise be considered unduly suggestive pretrial procedures, provided the witness knew the defendant and was therefore immune from suggestion. *See People v. Rodriguez*, 79 N.Y.2d 445, 449–50 (1992). In that regard, New York courts hold pre-*Wade* or *Rodriguez* hearings to consider whether the witness had sufficient familiarity with the defendant to eliminate the issue of police suggestiveness in the identification process, so as to render the identification confirmatory.

See *Kelly v. Lee*, No. 11-CV-3903 (CBA), 2014 WL 4699952 (E.D.N.Y. Sept. 22, 2014).

It is clear that New York's "confirmatory identification" rule tracks the federal standard that

identification procedures raise due process concerns only to the extent that they yield

"unreliable" identifications. *Espinal v. Duncan,* No. 00 Civ. 4844(RWS), 2000 WL 1774960,

at *3 (S.D.N.Y. Dec 4, 2000) (citing *Manson v. Brathwaite*, 432 U.S. at 114 ; and *Neil v.*

*Biggers*, 409 U.S. 188, 199–201). It is also clear that New York's confirmatory identification

rule is also consistent with the emphasized language from the *Whittle* case, *supra*.

> Apparently adopting the New York approach, the Eastern District of New York held:
>
> Moreover, even if a pre-trial identification procedure is unduly suggestive, an in-court identification is still allowed as long as it is "independently reliable rather than the product of the earlier suggestive procedures." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990). An in-court identification is therefore admissible, despite an improper pre-trial identification procedure, if the witness is familiar with the defendant prior to the incident. *See, e.g.*, *Stanley,* 2009 WL 5066864, at *5 (witness "was a co-conspirator and had spent one to two days with the defendant"); *Johnson v. Walker*, No. CV-01-6862, 2003 WL 22002420, at *9 (E.D.N.Y. Aug. 25, 2003) ("[T]he fact that petitioner was known to the eyewitness and was not a stranger is itself compelling evidence of an independent source for the identification."); *Espinal v. Duncan,* No. 00 CIV. 4844, 2000 WL 1774960, at *3 (S.D.N.Y. Dec. 4, 2000) (finding "that the in-court identification was reliable notwithstanding the prior photographic display" because "Santiago already knew Espinal 'by first name as well as street name, ... knew where [Espinal] lived and the car he drove, and [ ] had seen him at least 20 times in the prior year.'" (alterations in original)).

*United States v. Crumble*, No. 18-CR-32 (ARR), 2018 WL 1737642, at *2 (E.D.N.Y. Apr.

11, 2018).

Upon *de novo* review, and after consideration of Defendant's objections to Judge

Feldman's recommendations with respect to his application to suppress identification

evidence, the Court must determine whether each of the five witnesses whom the

government intends to call has "sufficiently relevant familiarity with the defendant that the

jury cannot also possess, and [that] the photographs are not either so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification," *United States v Whittle, supra,* to permit lay opinion testimony. Therefore, the Court directs the government, by August 30, 2019, to provide to Court and Defendant the following: (1) an affidavit from each of the identifying witnesses it intends to call at trial, detailing each one's familiarity with Defendant, including the time frame of contacts, number of contacts within such time frame, and the manner and means by which each knew Defendant, mindful, of course, that the crime occurred on August 12, 2003; and (2) any police reports relating to the identification of Defendant buy such witnesses from surveillance photographs. Additionally, the government is directed to provide to the Court by August 30, 2019, copies of the surveillance photographs at issue.

**Chart B No. 8 Motion to Suppress Evidence (jail calls), ECF No. 74(17-CR-6016); ECF No. 103 (17-CR-6017)**

As to ECF No. 103 (17-CR-6017), the Court denies as moot Defendant's application to suppress jail calls based upon the representation by the government that it does not intend not to introduce any such evidence at the trial of the subject indictment. As to ECF No. 74 (17-CR-6016), the Court reserves on Defendant's application to suppress jail calls, ECF No. 74, and reserves on Defendant's application that the Court consider a further submission, ECF No. 106 in support of his motion to suppress.


**SUMMARY**

Accordingly, upon *de novo* of the R & R, 17-CR-6016, ECF No, 96 AND 17-CR-6017, ECF No. 124, the Court directs as follows:

**CHART C**

|  | DOCUMENT NAME | 17-CR-6016 | 17-CR-6017 | DISPOSITION |
|---|---|---|---|---|
| 3 | Motion to Dismiss Count 2 | | ECF #77 | **DENIED** |
| 5 | Motion to Suppress Evidence (DNA) | ECF #60 (*Franks*) | ECF #80 (*Franks*); statements and DNA sample | **DENIED** |
| 7 | Motion for *Brady* Disclosure and Suppression of ID Evidence | | ECF #82 | **Disclosure as directed. Reserved as to admission of "ID testimony>"** |
| 8 | Motion to Suppress Evidence ( jail calls) | ECF # 74 | ECF #103 | **Denied as moot (ECF # 103; Reserved ECF # 74** |

IT IS SO ORDERED.

Dated: August 16, 2019
Rochester, New York
ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge