UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

vs.                                                    DECISION AND ORDER
                                                        17-CR-6017
RICHARD LEON WILBERN,

                    Defendant.

_____

## INTRODUCTION

This matter is before the Court on the letter application of Anne M. Burger, Assistant Public Defender ("Ms. Burger"), ECF No. 273[1], on behalf of Defendant, Richard Leon Wilbern ("Wilbern" or "Defendant"), requesting a post-verdict "inquiry" "to determine whether juror misconduct may have affected his trial." For the reasons stated below, the application is denied.

## BACKGROUND

Defendant was convicted on November 8, 2020, after a jury trial, of robbery of a credit uniony during which he caused the death of Raymond Batzel, a customer of the credit union, in violation of 18 U.S.C.§ 2113 (a) and 18 U.S.C. § 2113(e). He faces a mandatory statutory sentence of life imprisonment. After adjournments of sentencing at the request of Defendant and as a result of the Covid-19 pandemic, the Court, upon communicating with counsel for Defendant and counsel for the government, entered a text order on June 8, 2020, setting July 13, 2020, as the new sentencing date. Thereafter, on June 24,

---

[1]Documents with respect to the subject application were filed in redacted form so as not to identify jurors by name.

2020, the Court received Ms. Burger's letter application referred to above. In her correspondence, Ms. Burger indicated that Karen Francati ("Ms. Francati"), an investigator with the Federal Public Defender's Office, spoke to the foreperson of the jury post-verdict. The foreperson indicated to her that since he was concerned about his role as foreperson, he "googled" it. He also informed Ms. Francati that he was told by another juror ("reporting juror") that an alternate juror made statements about skin color that the reporting juror described as racist. The foreperson added that he did not do anything in response to the information he received from the reporting juror, since the statements were made by an alternate juror.

Upon receiving the June 24, 2020, letter request from Ms. Burger, the Court, on June 25, 2020, sent an email to all counsel, directing the  defense to respond to certain questions:

> First, when specifically "[e]arlier this year, before the COVID-19-related state of emergency," did Ms. Francati interview [the foreperson] and obtain the information related in Ms. Burger's correspondence? Second, why was the Court and opposing counsel  not notified at that time of the substance of the interview and the defense concern about potential misconduct? Third, why, at the very least, when the defense made its adjournment of sentencing requests was the Court and opposing counsel not alerted? Finally,  was Ms. Francati's conduct in accordance with the state of the law in the Second Circuit? As to this last question, I direct counsel to the following:
>
> > The Court of Appeals for the Second Circuit has unambiguously prohibited parties from questioning jurors after the verdict without at least notice to the Court and opposing counsel. *United States v. Schwarz*, 283 F.3d 76, 98 (2d Cir. 2002) ( "[W]e have established the requirement that '[a]t a minimum, . . .  notice to opposing counsel and the court should be given in all cases' before engaging in any post-verdict inquiry of jurors.") (quoting *United States v. Moten*, 582 F.2d 654, 665–66 (2d Cir. 1978)). *See also United States v. Brasco*, 516 F.2d 816, 819 n. 4 (2d Cir.1975) (noting that in the context of a full-scale examination of jurors, "post-trial questioning of

> jurors must only be conducted under the strict supervision and control of the court . . . ." (internal quotation marks omitted)). Such a rule is necessary because, as recognized in *Moten*, a "serious danger exists that, in the absence of supervision by the court, some jurors, especially those who were unenthusiastic about the verdict or have grievances against fellow jurors, would be led into imagining sinister happenings which simply did not occur or into saying things which, although inadmissible, would be included in motion papers and would serve only to decrease public confidence in verdicts." *Moten*, 582 F.2d at 665.

*United States v. Sattar*, 395 F. Supp. 2d 66, 75 (S.D.N.Y. 2005), *aff'd sub nom. United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009).

In its June 25, 2020 email, the Court directed the government to reply to the defense submission.

On June 29, 2020, Timothy P. Murphy, Assistant Federal Public Defender, ("Mr. Murphy"), one of the three attorneys, along with Ms. Burger and Sonya A. Zoghlin, Assistant Federal Public Defender ("Ms. Zoghlin"), assigned to Mr. Wilbern's case, responded to the Court's June 25, 2020 email. In his submission, ECF No. 267, Mr. Murphy indicated that Ms. Francati had spoken to the foreperson on March 11, 2020, and he offered that there was no strategic reason for failing to raise the issue until June 24, 2020. Rather, he stated that the delay was due to the press of other issues which required defense counsels' attention. Mr. Murphy further responded that Ms. Francati did act in accordance with Second Circuit Law, since the Court stated to counsel, outside the presence of the jury after the verdict was rendered, that it would tell the jurors that "sometimes attorneys might want to talk to them about the case. They're free to talk. They're free not to talk. It's strictly up to them, in the event that anyone wants to reach out to them."

3

On July 1, 2020, Douglas E. Gregory, Assistant United States Attorney ("Mr. Gregory"), as directed by the Court, filed a reply to Mr. Murphy's submission, ECF No. 268. In his filing, Mr. Gregory, *inter alia,* called into question certain representations made by Mr. Murphy. Additionally, Mr. Gregory suggested that the post-verdict conduct on the part of defense counsel may well have violated New York Rule of Professional Responsibility 3.5(a)(5)[2] which prohibits a lawyer from "communicating with a juror . . . after discharge of the jury . . . if the communication is prohibited by law or court order." In that regard, he cautioned that such situation, if found to exist, might well create a potential conflict of interest between Mr. Wilbern and the Federal Public Defender's Office.[3]

On July 7, 2020, the Court after considering the submissions of counsel issued a letter order, ECF No. 271 indicating:

> I write in regard to the defense's request for a post-verdict juror inquiry by the Court, as set forth by Ms. Burger in her letter of June 24, 2020. Thereafter, pursuant to my text order of June 26, 2020, ECF No. 266, Mr. Murphy, on behalf of the defense, filed on June 29, 2020, a redacted response, ECF No. 267, to questions that were raised in the Court's email of June 25, 2020. Then on July 1, 2020, Mr. Gregory, on behalf of the government, filed a redacted reply, ECF No. 268. (Both sides provided the Court with unredacted copies of their submissions.)

---

[2]Local Rule of Civil Procedure 83.3 for the Western District of New York reads, "Attorneys practicing in this Court shall faithfully adhere to the New York Rules of Professional Conduct. In interpreting the New York Rules of Professional Conduct, absent binding authority from the United States Supreme Court or the United States Court of Appeals for the Second Circuit, or significant federal interests, this Courts, in the interests of comity and predictability, will give due regard to the decisions of the New York State Court of Appeals and other New York State courts."

[3]In this regard, Mr. Gregory cited to *United States v. Jones*, 900 F.2d 512, 519 (2d Cir. 1990) ("When allegations are supported by some credible evidence, disciplinary or criminal charges become more than mere threats, and the attorney has 'reason to fear that vigorous advocacy on behalf of his client would expose him to criminal liability or any other sanction.'" *Waterhouse v. Rodriguez*, 848 F.2d 375, 383 (2d Cir.1988)).

> The Court is, of course, aware that it has both the power and the duty to direct, supervise, and closely control any inquiry into credible, non-speculative reports of juror misconduct or bias. *United States v. Calbas*, 821 F.2d 887, 896 (2d Cir. 1987) (citing *United States v. Moten*, 582 F.2d 654, 665 (2d Cir.1978)); *see also United States v. Gagnon*, 282 F App'x 39, 40-41 (2d Cir. 2008).

In that letter order, the Court also addressed a pending application by Defendant to adjourn his sentencing, ECF No. 270:

> In any event, the Court will grant the defense's motion, ECF No. 270, to adjourn sentencing to a date to be determined by the Court once the pending request for juror inquiry is resolved. In that regard, the defense's request for a "blanket" six-month adjournment of sentencing is denied.  As to the adjournment, the Court believes it is important to the integrity of our system of equal justice for all that the defense application for juror inquiry be resolved prior to sentencing. Consequently, sentencing will not occur on July 13, 2020 as previously scheduled. Rather, on that date at 9:30 a.m. (instead of 10:00 a.m. - the time for which sentencing was scheduled), we will appear in court to address, discuss, and hopefully resolve Ms. Burger's June 24, 2020, request. Obviously, that determination will dictate what the Court does next.

> As an initial step, the Court will examine Ms. Karen Francati to hear directly from her what she was told by the jurors she contacted, as well as the timing and context. Therefore, Ms. Francati is directed to appear before this Court at 9:30 a.m. on July 13, 2020, and to bring with her all materials that may be relevant to her discussion with jurors in this matter, (including, but not limited to, her instructions from counsel, any script with which she was provided, her notes from her conversations with jurors, and any reports she generated). In that regard, the Court directs that both sides refrain from any further discussions with Ms. Francati with respect to the issue at hand pending her examination by the Court.

On the same date the Court's letter order was filed, Ms. Zoghlin filed a memorandum, ECF No. 272, challenging certain assertions made and conclusions reached by Mr. Gregory in his July 1, 2020 letter. Included with Ms. Zoghlin's memorandum was an affidavit by Ms. Francati, ECF No. 272-1, describing how the information at issue was obtained.

5

Subsequently, at the court appearance on July 13, 2020, the Court, at the outset, detailed the procedural history of the case. In doing so, the Court pointed out that the defense submitted requests for adjournments of sentencing – which were granted – and had made a motion for a new trial, but never mentioned the post-verdict juror contact at issue in those applications. The Court also expressed its reservation that defense counsel reasonably believed that, based upon the Court's statement that it would tell jurors that they could choose to speak or not to speak to counsel if contacted, the defense was acting in accordance with Second Circuit precedent concerning attorneys reaching out to members of the jury post-verdict. As the Court explained at the next court appearance on August 4, 2020, such justification would have been more readily acceptable  had Ms. Burger mentioned it in her June 24, 2020 initiating letter.  Nonetheless, the Court listened intently as Mr. Murphy explained and justified at the July 13, 2020 appearance, the post-verdict juror contact.

Based upon Mr. Murphy's representations and based upon the Court's prior experience with defense counsel, it accepted that they were acting in good faith and did believe  that they were contacting jurors with the Court's permission. Consequently, the Court concluded that defense counsel did not violate New York Rule of Professional Responsibility 3.5(a)(5) as raised by Mr. Gregory in his July 1, 2020, filing. However, the Court concluded that defense counsel did run afoul of New York Rule of Professional Responsibility 3.5(d) which requires that "a lawyer . . . reveal promptly to the court improper conduct by a member of the venire or a juror. . . ."

Here, defense counsel became aware of what they believed was an issue of potential juror misconduct in mid-March of 2020, but did not bring it to the Court's attention

6

until June 24, 2020. Such delay is clearly inconsistent with the mandate of Rule 3.5(d). However, as the Court indicated, to the extent that corrective measures are called for, the Court would leave it to the Federal Public Defender, Marianne Mariano, for whom the Court has the greatest respect, to take whatever action she deems appropriate. Ms. Mariano has provided consistently excellent leadership during her tenure as Federal Public Defender, and the Court has no doubt that she will appropriately address the matter.

In any event,  before Ms. Francati could testify, as ordered by the Court, the July 13, 2020 court proceeding segued into a consideration of whether, as Mr. Gregory suggested in his July 1, 2020, filing, a potential conflict of interest existed. In that regard, both defense counsel and government counsel agreed that a potential conflict with Mr. Wilbern's representation by the Federal Public Defender's Office might well exist, and that the proper course of action would be to appoint conflict-free counsel to discuss the issues with Defendant and to advise him.  The Court then commenced a *Curcio* hearing, advising Mr. Wilbern of the situation and of his right to conflict-free counsel. Then, at Mr. Wilbern's request, the Court appointed William T. Easton, Esq., as the conflict-free attorney. Subsequently, after being notified by Mr. Easton that he had a full opportunity to review all relevant materials, including the transcript of the July 13, 2020 court appearance, as well as meet with Mr. Wilbern, the Court reconvened on August 4, 2020, to continue the *Curcio* hearing. At that continuation, the Court placed Mr. Wilbern under oath, examined him, and found that, to the extent a potential conflict with the Federal Public Defender's Office existed, Defendant knowingly, intelligently, and voluntarily waived such conflict, choosing to continue with Ms. Burger, Ms. Zoghlin, and Mr. Murphy as his counsel. With the conflict

issue resolved, the Court, in connection with the pending June 24, 2020 letter application of Ms. Burger, rescheduled its examination of Ms. Francati to occur on August 18, 2020.

At the court appearance on August 18, 2020, Ms. Francati testified under oath regarding the circumstances and content of her post-verdict juror questioning. The Court primarily conducted the examination, but Ms. Zoghlin and Mr. Gregory also had the opportunity to put questions to Ms. Francati.  As to Ms. Francati, the Court finds that she testified in a very professional and forthright manner. It was obvious that she was doing her very best to discharge her responsibilities as delegated to her by defense counsel. Consequently, the Court finds Ms. Francati's testimony to be very credible and acceptable. This includes her account of an interaction with the Court that occurred on some unspecified date, but prior to the time she received the information at issue, when she appeared in the courtroom with respect to some unidentified case, unrelated to Mr. Wilbern's. According to Ms. Francati, the Court asked her to approach the bench for a purpose she did not specifically recall.[4] Ms. Francati testified that while at the bench, she volunteered that she had spoken (past tense as clarified during her examination) to jurors on the Wilbern case, and that they all had wonderful things to say about the Court. She further indicated that the Court Deputy, Kathy Allen, who was in a position to overhear what  Ms. Francati volunteered,  added that "they always do."

The Court surmises that  this testimony, which was elicited by Ms. Zoglin, was offered for the purpose of suggesting that the Court must have believed it gave the defense permission to contact jurors with its on-the-record comment referenced above, since it took

---

[4] The Court, however, can fill in that blank. It was to inquire about her new granddaughter and the health of her significant other, a friend of the Court's for over thirty years.

no action after hearing what Ms. Francati volunteered. Or, perhaps, it was elicited to suggest that the Court, by its inaction, was ratifying the post-verdict juror contact by the defense. Of course, at the time of Ms. Francati's unsolicited comments to the Court that she had spoken to jurors, nothing of consequence had occurred. Nonetheless, the Court now second guesses the "no harm, no foul" approach it adopted, and in retrospect, would have been better advised to schedule a court appearance to clarify what had taken place. However, judging, like lawyering,  is a constantly-evolving learning experience, no matter what one's age or experience. Here, the Court has learned two things. First, in the future, the Court, in addition to advising jurors they can speak or not speak about the case once discharged, will explicitly caution counsel about the Second Circuit's rules on post-verdict juror contact. Second, if the Court again receives casual, unsolicited  information such as that provided by Ms. Francati, it will not be dissuaded  by flattery or the inclination to avoid stirring the pot for no reason, but will promptly schedule a court appearance to address the matter.

In any event, this is all of no import. The Court is not, in any way, deciding Ms. Burger's June 24, 2020 application on procedural miscues, real or perceived. As the Court indicated on the record on July 13, 2020, it accepts Mr. Murphy's explanation that, in directing Ms. Francati to contact jurors post-verdict, defense counsel were proceeding with the good faith belief that they had the Court's permission to do so.  Further, to the extent that defense counsel ran afoul of an obligation imposed by the Second Circuit to notify the Court and opposing counsel before embarking on questioning jurors post-verdict, or failed to comply with New York Rule of Professional Responsibility 3.5 (d) and timely report to the Court the information at issue when received, the Court finds that  such

9

transgressions were inadvertent and not done intentionally. In short, the Court is deciding

the pending application solely on the applicable substantive law.

## SUBSTANTIVE LAW

With respect to questions of post-verdict juror misconduct, two standards of

substantive law come into play. The first is Rule 606(b) of the Federal Rules of Evidence,

which reads:

> (b) During an Inquiry Into the Validity of a Verdict or Indictment.
>
> (1) *Prohibited Testimony or Other Evidence*. During an inquiry into the
> validity of a verdict or indictment, a juror may not testify about any statement
> made or incident that occurred during the jury's deliberations; the effect of
> anything on that juror's or another juror's vote; or any juror's mental
> processes concerning the verdict or indictment. The court may not receive
> a juror's affidavit or evidence of a juror's statement on these matters.
>
> (2) *Exceptions*. A juror may testify about whether:
>
> (A) extraneous prejudicial information was improperly brought to the jury's
> attention;
>
> (B) an outside influence was improperly brought to bear on any juror; or
>
> (C) a mistake was made in entering the verdict on the verdict form.

The second applicable standard of law is derived from case law, specifically the United

States Supreme Court's holding in *Pena-Rodriguez v. Colorado*, ___U.S.___, 137 S. Ct.

855, 869 (2017). There, the Supreme Court held that where a juror makes a clear

statement that indicates he or she relied on racial stereotypes or animus to convict a

criminal defendant, the Sixth Amendment requires that the no-impeachment rule, codified

in Rule 606(b)(1) of the Federal Rules of Evidence, gives way in order to permit the trial

court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee.

With these rules of law in mind, the Southern District of New York offered this most helpful blueprint for when a post-verdict inquiry into potential juror misconduct is warranted:

> The standard for conducting a post-verdict inquiry into allegations of juror misconduct is high because of the real risk that jurors may be harassed following a verdict and because our system of criminal justice depends upon jurors deliberating in private, secure in the knowledge that their deliberations will not become public. *See Tanner v. United States*, 483 U.S. 107, 119–21, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987); *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983) ("[C]ourts are, and should be, hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences."). At the same time, certain allegations of juror misconduct, such as allegations of racial animus on the part of any juror or allegations that the jurors considered extraneous prejudicial information not admitted at trial, may implicate a defendant's Sixth Amendment rights. *See Peña-Rodriguez v. Colorado*, —— U.S. ——, 137 S. Ct. 855, 871, 197 L.Ed.2d 107 (2017) (racial animus); *Bibbins v. Dalsheim*, 21 F.3d 13, 16–17 (2d Cir. 1994) (extraneous information).
>
> To protect both interests, the defendant's Sixth Amendment rights and the public's interest in the confidentiality of jury deliberations, "a post-verdict inquiry into allegations of such misconduct is only required 'when there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant.' " *United States v. Baker*, 899 F.3d 123, 130 (2d Cir. 2018) (alterations omitted) (quoting *Moon*, 718 F.2d at 1234). "Allegations of impropriety must be 'concrete allegations of inappropriate conduct that constitute competent and relevant evidence,' though they need not be 'irrebuttable because if the allegations were conclusive, there would be no need for a hearing.'" *Baker*, 899 F.3d at 130–31 (alterations omitted) (quoting *United States v. Ianniello,* 866 F.2d 540, 543 (2d Cir. 1989)).

*United States v. Aiyer*, 433 F. Supp. 3d 468, 472–73 (S.D.N.Y. 2020). This language is on point with the earlier decided case of *United States v. Yeagley*, 706 F. Supp.2d 421 (S.D.N.Y. 2010):

"The standard for conducting a post-verdict jury inquiry . . . is . . . demanding." *United States v. Sattar*, 395 F.Supp.2d 66, 72 (S.D.N.Y. 2005), *aff'd sub nom*. *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009). As the Second Circuit has cautioned, "post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting jury room deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts." *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir.1989). Courts should therefore be reluctant to "haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir.1983). Accordingly, a post-verdict jury inquiry is required only where there is "clear, strong, substantial and incontrovertible evidence that a specific, non-speculative impropriety has occurred." *Ianniello*, 866 F.2d at 543 (internal quotation marks and ellipse omitted); *see also Stewart*, 590 F.3d at 133 (same).

*Id.* at 433.

## DISCUSSION

As set forth in Ms. Burger's June 24, 2020 letter, and as detailed by Ms. Francati in her testimony on August 18, 2020, and her affidavit of July 6, 2020, the information provided by the foreperson at issue is as follows: 1) his comment that, concerned about his role as foreperson, he "googled" it; and 2) that he was told by the reporting juror that an alternate juror made statements about skin color that the reporting juror described as racist, but that he did not do anything in response to the information he received from the reporting juror, since the statements were made by an alternate juror. It should be noted that Defendant is African-American, and the foreperson is African-American.

The Court first considers the "google" comment. Rule 606(b)(2)(A) of the Federal Rules of Evidence, states that, despite the no-impeachment rule, a juror may testify about whether "extraneous prejudicial information was improperly brought to the jury's attention." To begin with, it should be noted that the Court, in conducting the voir dire indicated to

prospective jurors that the foreperson of the jury would be whoever occupied seat No. 1 once the jury was selected.  So, in this case, the foreperson was informed at the outset of the trial of his role, and armed with that knowledge, he utilized the internet to ascertain what his responsibilities as foreperson were.  The  Court did, in fact, instruct members of the jury  not to conduct any investigation or do any research on their own. Here, therefore, the Court assumes that the foreperson technically violated that very broad instruction by his google search into the duties of a foreperson.  However, as this Circuit observed, "not every instance of a juror's exposure to extrinsic information results in the denial of a defendant's right to a fair trial. Many such instances do not." *United States v. Schwarz*, 283 F.3d 76, 99 (2d Cir. 2002). On this point,

> . . . one bedrock principle looms: juror consideration of information relevant to the matter on trial, procured by a juror independently, standing alone, is not enough to find a Sixth Amendment violation. A showing of prejudice is also required."

*Rosemond v. United States*, 378 F. Supp.3d 169, 186 (E.D.N.Y. 2019).

Ms. Burger, in her June 24, 2020 letter, does not even suggest, let alone make any showing of how Defendant was prejudiced by the foreperson "googling" his responsibilities. Consequently, the Court concludes that  a post-verdict inquiry into such conduct is not warranted, since the defense has not come forward with any "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." *United States v. Baker*, 899 F.3d 123, 130 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 577 (2018), quoting *United States v. Sun Myung Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983); *see also*, *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir.1989) ("A 'duty to investigate arises . . . when the party alleging

13

misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality.'" (quoting *United States v. Barshov*, 733 F.2d 842, 851 (11th Cir.1984)). Here, to allow further inquiry of the foreperson regarding the google search would be at odds with the Second Circuit's direction that, when it comes to post-verdict questioning of jurors, the district court should not condone a fishing expedition. *United States v. Moten*, 582 F.2d 654, 667 (2d Cir. 1978); *United States v. Ianniello*, *supra* at 543; *United States v. Schwarz*, *supra* at 97 (2d Cir. 2002); *United States v. Baker*, *supra* at 132.

The Court now turns to the largely double hearsay comment related by Ms. Francati: that the foreperson told her that he  was told by the reporting juror that an alternate juror made statements about skin color that the reporting juror described as racist, but that he did not do anything in response to the information he received from the reporting juror, since the statements were made by an alternate juror. First, it must be noted that skin color was an issue in the trial.  While bank cameras captured the robbery/homicide committed by an individual believed to be African-American, the trial testimony and exhibits explored how light, medium, or dark skinned the perpetrator actually was.

With that context, the Court considers whether what the alternate said to the reporting juror as recounted by the foreperson falls within the purview of Fed. R. Evid. 606(b)(1) and subject to the no-impeachment prohibition (unless trumped by *Peña-Rodriguez*) or does it amount to an exception to the no-impeachment rule as delineated in 606(b)(2). In answering this query, the Court finds the decision by the Eastern District of New York in *United States v. Gigante*, 53 F. Supp.2d 274 (E.D.N.Y. 1999) instructive:

14

Rule 606(b) also permits the court to determine if any "outside influence was improperly brought to bear upon any juror." *See id.* That authority is the basis for defendant's application. If an alternate who was to be discharged before deliberations applied intellectual pressure on the jurors through discussions about the case, that might be deemed an "outside" influence.

While deliberations are protected, a juror may testify on the question of "whether extraneous prejudicial information was improperly brought to the jury's attention." *See* Rule 606(b). There is no contention that improper "information" was brought to the attention of the jury except through discussions of the evidence with an alternate. It seems conceded that the jury had as "information"—that is to say evidence, arguments of the lawyers and instruction by the court—only what they heard in court.

Rule 606(b) embodies a strong policy to protect jurors against any attempt to interfere with their independence. The court has no more power than anyone else to interfere with the jurors' deliberations or to attempt to improperly influence them. Courts have recognized this principle since at least the time of "Bushel's case" in 1670. *See* Thomas A. Green, Verdict According to Conscience 236–48 (1985).

The most useful precedent is *United States v. Williams-Davis*, 90 F.3d 490 (D.C.Cir.1996). *Williams-Davis* involved predeliberation discussions by jurors. It rejected a motion for a hearing. The court held:

> Preserving the finality of jury verdicts militates strongly in favor of barring post-trial juror assertions of pre-deliberation discussion. The probability of some adverse effect on the verdict is far less than for extraneous influences. "[W]hen there are premature deliberations among jurors with no allegations of external influence on the jury, the proper process for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial."

*Williams-Davis*, 90 F.3d at 505 (quoting *United States v. Resko*, 3 F.3d 684, 690 (3d Cir.1993)); *see also United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir.1983) ("It hardly bears repeating that courts are, and should be, hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences.").

In cases where far more egregious conduct was alleged than that which the defendant charges here, courts have not allowed inquiry of jurors. *See*, *e.g.*, *Stockton v. Virginia*, 852 F.2d 740, 747 (4th Cir.1988); *United States v.*

*Abcasis*, 811 F.Supp. 828, 834 (E.D.N.Y.1992) (predeliberation discussions on guilt or innocence).

In *Stockton* jurors shared rides to the courthouse and discussed the case. The Fourth Circuit pragmatically declared that it is "unrealistic to think that jurors will never comment to each other on any matter related to a trial." *Stockton*, 852 F.2d at 747; *see also,* e.g., *United States v. Klee*, 494 F.2d 394 (9th Cir.1974); *United States v. Piccarreto*, 718 F.Supp. 1088, 1092 (W.D.N.Y.1989) ("[E]ven if [predeliberation] conversations on the merits occurred, it would be improper under Rule 606(b) to engage in extensive inquiry as to how these comments affected the jurors during deliberations."); *United States v. Oshatz*, 715 F.Supp. 74, 76 (S.D.N.Y.1989) ("[T]he defendants cite no federal case in which premature deliberations required a new trial.").

In *Klee* the Ninth Circuit realistically declared, "'[n]o normal honest Americans ever worked together in a common inquiry for any length of time with their mouths sealed up like automatons or oysters.'" *Klee*, 494 F.2d at 396 (quoting *Winebrenner v. United States,* 147 F.2d 322, 330 (8th Cir.1945) (Woodrough, J., dissenting)). In the Eastern District, normal honest Americans jurors often do keep their mouths shut as instructed. The impressive jury in the instant case gave every indication that it followed the court's instructions.

*Id.* 276–77. *See also United States v. Shalhout*, 507 F. App'x 201, 207 (3d Cir. 2012), (involving statement by non-deliberating alternate juror, decided pre *Pena-Rodriguez*, and finding "Evaluating jurors' pre-deliberation statements 'necessarily' requires inquiring into 'their thought process to determine whether or not the premature statements affected their verdict,' an inquiry that is 'prohibited under [Rule 606(b)])(citation omitted). Here, the Court finds that the comments attributed to an alternate juror fall within the purview of Fed. R. Evid. 606(b)(1).

Finally, the Court must determine whether the conclusory suggestion of racism as reported to Ms. Francati by the foreperson based upon his over-three-month old recollection of what another juror told him is sufficient under the *Peña-Rodriguez* decision,

to overcome the no-impeachment rule as codified in Fed. R. Evid. 606(b)(1). In

*Peña-Rodriguez*, the Supreme Court held:

> For the reasons explained above, the Court now holds that where a juror
> makes a clear statement that indicates he or she relied on racial stereotypes
> or animus to convict a criminal defendant, the Sixth Amendment requires that
> the no-impeachment rule give way in order to permit the trial court to
> consider the evidence of the juror's statement and any resulting denial of the
> jury trial guarantee.
>
> Not every offhand comment indicating racial bias or hostility will justify setting
> aside the no-impeachment bar to allow further judicial inquiry. For the inquiry
> to proceed, there must be a showing that one or more jurors made
> statements exhibiting overt racial bias that cast serious doubt on the fairness
> and impartiality of the jury's deliberations and resulting verdict. To qualify, the
> statement must tend to show that racial animus was a significant motivating
> factor in the juror's vote to convict. Whether that threshold showing has been
> satisfied is a matter committed to the substantial discretion of the trial court
> in light of all the circumstances, including the content and timing of the
> alleged statements and the reliability of the proffered evidence.

*Pena-Rodriguez v. Colorado*, *supra,* 869–70. In this case, the Court finds that further

inquiry is not warranted, since there has been no showing whatsoever that "that one or

more jurors made statements exhibiting overt racial bias that cast serious doubt on the

fairness and impartiality of the jury's deliberations and resulting verdict." *Id*. With regard to

this finding, the Court notes that Ms. Francati testified that, including the foreperson, she

interviewed a total of five jurors, and as to the other four, none even suggested that racism

entered into their deliberations. Moreover, based upon what Ms. Francati reported  the

foreperson, who again himself is African-American, told her,  there is no basis, other than

rank speculation, to suggest that the verdict in this case was infected in any way by racial

animus.

17

**CONCLUSION**

Accordingly, the  application on the part of the defense (ECF No. 273) for further

juror inquiry is denied in all respects.[5]

IT IS SO ORDERED.

DATED:      September 3, 2020
               Rochester, New York


                                  CHARLES J. SIRAGUSA
                                  United States District Judge

---

[5]Court Deputy, Kathy Allen, will contact counsel to schedule a new sentencing date.